Sigmund S. Wissner-Gross
May Orenstein
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
(212) 209-4800

Steven D. Pohl
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111
(617) 856-8200

*Counsel for Edward S. Weisfelner,*
*as Litigation Trustee of the LB Litigation Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No.  09-10023 (REG) |
| LYONDELL CHEMICAL COMPANY, et al., | |
| | Chapter 11 |
| Debtors. | |
| | |
| EDWARD S. WEISFELNER, AS LITIGATION TRUSTEE OF THE LB LITIGATION TRUST, | (Jointly Administered) |
| | |
| Plaintiff, | Adv. Pro. No. 10-_____  (REG) |
| | |
| v. | |
| | |
| A HOLMES & H HOLMES TTEE, THE HOLMES FAMILY TRUST U/A DTD 03/06/1992, ALFRED R HOFMANN CHARLES SCHWAB & CO INC CUST IRA CONTRIBUTORY, ALPINE ASSOCIATES, AMERICAN BOARD OF PSYCHIATRY, ARBOR PLACE LIMITED PARTNERSHIP A PARTNERSHIP, BACAP EQUITY FUND XXI, BEAR STEARNS & CO. F/A/O GABELLI ASSOCIATES, BEAR STEARNS SECURITIES CORP. – FIRST NY SECURITIES / BRITALLY CAPITAL, A/K/A J.P. MORGAN CLEARING CORP., BEAR STEARNS SECURITIES CORP. F/A/O FNY SEC/HLW GROUP, A/K/A J.P. MORGAN CLEARING CORP., BELLSOUTH | |

GROUPLIFE TRUST - S&, BELLSOUTH
HEALTHCARE S&P 400, BERNARD V FULTZ
TTEE, BGC INTERNATIONAL BROKER DEALER
CREDIT ACCOUNT, BLOWITZ-RIDGEWAY
FOUNDATION -  DANIEL L. KLINE, BURL
SWAFFORD AND RUTH SWAFFORD JT TEN,
CAPTAIN ASSOCIATES, CATO ENTERPRISES
LLC ARBITRAGE ACCOUNT, CLERICS-COB
GREAT LAKES ADVISORS - ROBERT E.
ERICKSON C.S.V PROVINCIAL TREASURER,
CPU SHARE PLANS PTY LTD., CRAWFORD
COMPANY LLC (KIASTONE HOLDINGS LTD.),
CROWELL WEEDON AND CO. OMNIBUS
ACCOUNT, D LIGHT & J LIGHT TTEE DOUGLAS
M & JUDITH A LIGHT REV U/A DTD 02/06/1995,
DAVENPORT PRIVATE CAPITAL LLC, DAVID
LESHNER, DAVID R. JOHNSEN AND AMALIA G.
JOHNSEN (JT TEN WROS), DAVID S
MACALLASTER CHARLES SCHWAB & CO INC
CUST IRA CONTRIBUTORY, DAVID S OWENS &
JULIE ANN OWENS JT TEN, DEAN
COUGHENOUR, DENIS P. KELLEHER , DIANE L
ABBEY, DIANE PELLEGRINO CHARLES
SCHWAB & CO INC CUST IRA ROLLOVER,
DOFT & CO., INC. FIRM ACCOUNT, DONALD G
GOODWIN TTEE THE DONALD G GOODWIN
LIVING TR U/A DTD 12/23/1996, DONALD M
BALCUNS LIVING TRUST DONALD M
BALCUNS AND JENNIE ANNE BALCUNS,
ELISABETH H. DOFT,  EPISCOPAL CORP IA
DIOCESAN FUND JOY, ERIC A SILVA,
FISHBEIN ADVISORY CO,  A SOLE
PROPRIETORSHIP, GEZA SZAYER / PAULETTE
SZAYER JT TEN TOD DTD 10/24/2008,
GULFSTREAM MARKETING INC. HILARY L
SHANE, HTB INVESTMENTS LLC, IRA FBO
VELLO A KUUSKRAA  DB SECURITIES INC
CUSTODIAN DTD 01/17/03, IRA FBO, JANET F.
ROSS VFTC AS CUSTODIAN, JACK H CAIN &
ESTHER CAIN TTEE CAIN TRUST U/A DTD
06/08/1988, JACK H CAIN CHARLES SCHWAB &
CO INC CUST IRA ROLLOVER, JAMES FLOYD
BISSET CHARLES SCHWAB & CO INC CUST
IRA CONTRIBUTORY, JAMES SIEGEL, JENNIE
ANNE BALCUNS AND DONALD M BALCUNS,
JESUS CHAGOYA & ROSE MARY CHAGOYA JT

TEN, JOHN E HAYNES, JOHN M FOX &
MARCELLA F FOX JT TEN, JOSEPH
DIBENEDETTO JR TTEE JOSEPH DIBENEDETTO
JR MD INC DEF CONT U/A DTD 10/01/84
ACCOUNT 1, JOSEPH IAVICOLI CHARLES
SCHWAB & CO INC CUST IRA ROLLOVER, KDC
MERGER ARBITRAGE MASTER, KERMIT R
MEADE, KEVIN D JOHNSON, KIRK E HEYNE &
KAREN A TWITCHELL TEN/COM, LAMPOST
BLUE CHIP FUND LP, LAURA N TUCKER, LI
CHEN & ANDRE SCHARKOWSKI JT TEN WROS,
LOUIS S ROUSE & MARY A ROUSE JT TEN, M
HAKAN & R SALKIN TTEE MICHAEL J.
HAKAN$CHARITABLE RE U/A DTD 12/20/1995,
M NISITA & L NISITA TTEE MAURIZIO NISITA
REV TRUST U/A DTD 02/14/2005, MARY B ORD
UTA CHARLES SCHWAB & CO INC IRA
CONTRIBUTORY DTD 10/06/91, MARYL I
EBRITE TTEE MARYL I W EBRITE REV TRUST
U/A DTD 01/25/96, MASONS ANNUITY
SIERRA/GLENMEDE, MASONS PEN
SIERRA/GLENMEDE, MATTHEW J ANDERSON,
MICHAEL EDWARD DOKUPIL, MICHAEL
JARRETT IRA, MIKE MEHMET MUSTAFOGLU
CHARLES SCHWAB & CO INC CUST IRA
CONTRIBUTORY, MUGC MTBJ PT33, A/K/A
MITSUBISHI UFJ TRUST & BANKING
CORPORATION (U.S.A.), MTBJ PT 13, A/K/A
MITSUBISHI UFJ TRUST & BANKING
CORPORATION (U.S.A.), MJR PARTNERS, NEIL
T EIGEN & PATRICIA S EIGEN JT TEN, NEIL T
EIGEN CHARLES SCHWAB & CO INC CUST IRA
ROLLOVER, OHIO CARPENTERS MIDCAP,
OP&F / INTECH, OTHO S.A. SPRAGUE
MEMORIAL INST ATTN:  JIM ALEXANDER
ALEXANDER & ASSOCIATES, PEDRO
ALBERTO GARZA CANTU & E VILLARREAL DE
GARZA JT TEN, PERSHING SECURITIES LTD.,
PETER RANDALL ZIERHUT GAYLE M ZIERHUT
JT TEN, PULSE TRADING INC., R EMERY & D
EMERY TTEE ROBERT L & DANA M EMERY
FAMILY U/A DTD 06/22/1998, R MOLEY & E
MOLEY TTEE THE RICHARD MICHAEL MOLEY
ELI U/A DTD 09/29/1989, RAY R IRANI TTEE
RAY R IRANI DECL OF TRUST U/A DTD
11/13/1990, RICKERT C. HENRIKSEN AND

ZHEYLA M. HENRIKSEN COMMUNITY
PROPERTY, RIVERTON EQUITY LP-HARRIS
LCV IMA C/O MR. CHRIS JEROME, ROBERT H
KRAMER & HALINA J KRAMER TEN ENT
WROS,  ROBERT S BRIDGES & LINDA A
BRIDGES JT TEN, ROBERT T WILLIAMSON
CHARLES SCHWAB & CO INC CUST IRA
ROLLOVER, RONALD E WYMAN TTEE
RONALD E WYMAN REVOCABLE TRUST U/A
DTD 01/17/2006, SACRAMENTO EMPLOYEES
RETIREMENT SYSTEM RUSSELL, SANDRA A
SMITH TEN/COM, SANDRA G MONTRONE,
SANFORD SAUL WADLER, SANO
INVESTMENTS LLC, SERS/SSGA PASS, SHAUN
BRIDGMOHAN,  SHIRLEY R SABIN TR UA 06-
25-1981 SHIRLEY R SABIN TRUST, SOUTHERN
CALIFORNIA EDISON NUC, STANLEY
FROMMER  ROSLIND FROMMER JT TEN,
STEVEN FRIEDMAN TTEE YOUNG FAMILY 89
TRUST U/A DTD 12/20/1989 C/O EOS PARTNERS,
STIFEL NICOLAUS CUSTODIAN FOR SCENERY
HILL ASSOCIATES INC FBO JOHN
SAUERACKER, THE LYON FOUNDATION
ATTN:  MR. JOHN F. KANE, THOMAS
GWINFORD BARTON CHARLES SCHWAB & CO
INC CUST IRA ROLLOVER, THOMAS MARTIN
O'MALLEY, TIMOTHY ORD & MARY B ORD JT
TEN, TIMOTHY ORD UTA CHARLES SCHWAB
& CO INC IRA CONTRIBUTORY DTD 10/04/91,
TIMOTHY ORD UTA CHARLES SCHWAB & CO
INC IRA ROLLOVER DTD 01/14/97, TOM C
EVANS CHARLES SCHWAB & CO INC CUST
ROTH CONVERSION IRA, TRACK DATA
CORPORATION, UNITED METH HOMES & SER
FNDTN, VA BIRTH RELATED INJ-GREAT
LAKES ADV, VICKI M WADLER LIVING TRUST
UAD 10/10/02 VICKI M WADLER TTEE,
VINCENT DE CICCO,  VINCENT MARK
RAFANELLI TTEE V MARK RAFANELLI LIV TR
U/A DTD 07/07/2004, VIRGINIA L. LYON,
WALTER E. HENDRICKS, WENGLN PARTNERS
LP A PARTNERSHIP, WILLIAM J HARKINSON &
SARAH A HARKINSON TEN/COM, WILLIAM J
HUGHES CHARLES SCHWAB & CO INC CUST
IRA CONTRIBUTORY, WILLIAM LUKE
BOSWELL & AGNES HAFNER BOSWELL JT

TEN, WORKING WOMANS HOME ASSOC,







STATE STREET BANK & TRUST, FIDUCIARY –
STATE STREET BANK, a/k/a STATE STREET
BANK & TRUST COMPANY, STATE STREET
BANK – TRUST CUSTODY, a/k/a STATE STREET
BANK & TRUST COMPANY, STATE STREET
BANK – IBT/BGI, a/k/a STATE STREET BANK &
TRUST COMPANY, STATE STREET BANK –
SPDR'S, a/k/a STATE STREET BANK & TRUST
COMPANY, STATE STREET BANK & TRUST
CO/IBT, a/k/a STATE STREET BANK & TRUST
COMPANY, NATIONAL FINANCIAL SERVICES,
BROWN BROTHERS HARRIMAN, a/k/a BROWN
BROTHERS HARRIMAN & CO., NORTHERN
TRUST COMPANY, INGALLS & SNYDER LLC,
U.S. BANK N.A., RBC DOMINION SECURITIES,
PNC BANK, N.A., a/k/a NATIONAL CITY BANK,
CDS CLEARING DEPOSIT, ABBEY NATIONAL
SECURITIES, FIRST CLEARING, LLC, CALYON
SECURITIES (USA), COMERICA BANK,
SCOTTRADE, INC., REGIONS BANK, EDWARD
D. JONES, a/k/a EDWARD D. JONES & CO., L.P.,
SUMITOMO TRUST & BANKING, SWISS
AMERICAN SECURITIES, a/k/a SWISS
AMERICAN SECURITIES, INC., ROBERT W.
BAIRD & CO., AMALGAMATED BANK,
AMALGAMATED BANK CRGO, TD
WATERHOUSE CANADA, H&R BLOCK
FINANCIAL ADVISORS, n/k/a AMERIPRISE
ADVISOR SERVICES, INC., AMERICAN
ENTERPRISE INVESTMENT SERVICES, SCOTIA
CAPITAL, a/k/a SCOTIA CAPTIAL INC., MIZUHO
TRUST & BANKING CO., a/k/a MIZUHO TRUST
AND BANKING CO., LTD., NATIONAL CITY
BANK, CANTOR CLEARING SERVICES, UNION
BANK OF CALIFORNIA NA, n/k/a UNION BANK,
N.A., TRUSTMARK NATIONAL BANK, NBCN
INC., SOUTHWEST SECURITIES, INC., MORGAN
KEEGAN & CO., THE FIFTH THIRD BANK, BMO
NESBITT BURNS, a/k/a BMO NESBITT BURNS
INC., BMO NESBITT BURNS SA, a/k/a BMO

NESBITT BURNS TRADING CORP. S.A., COMM.
BANK OF KANSAS, BANK OF NOVA SCOTIA
TAX, BANK OF NOVA SCOTIA WMF/CDS,
STERN AGEE & LEACH, WEDBUSH MORGAN
SECURITIES, BANK OF TOKYO-MITSUBISHI,
a/k/a BANK OF TOKYO – MITSUBISHI UFJ
TRUST COMPANY, D. A. DAVIDSON & CO.,
PRIMEVEST FINANCIAL SERVICES, TIMBER
HILL LLC,  OPTIONSXPRESS, INC.,
INTERNATIONAL BROKERAGE RETAIL
EQUITY, KEYBANK NATIONAL ASSOCIATION,
FOLIO (FN) INVESTMENTS, INC., STEPHENS
INC., FERRIS, BAKER WATTS, a/k/a FERRIS,
BAKER WATTS, INCORPORATED, MORGAN
STANLEY & CO., INCORPORATED (AS
DEFINED AND NAMED HEREIN), MORGAN
STANLEY/RETAIL (AS DEFINED AND NAMED
HEREIN), CREDIT SUISSE SECURITIES US, a/k/a
CREDIT SUISSE SECURITIES (USA) LLC (AS
DEFINED AND NAMED HEREIN), CREDIT
SUISSE SECURITIES/IA, a/k/a CREDIT SUISSE
SECURITIES (USA) LLC (AS DEFINED AND
NAMED HEREIN), DEUTSCHE BANK
SECURITIES, a/k/a DEUTSCHE BANK
SECURITIES, INC., (AS DEFINED AND NAMED
HEREIN), CUSTODIAL TRUST COMPANY (AS
DEFINED AND NAMED HEREIN), WELLS
FARGO BANK, NA (AS DEFINED AND NAMED
HEREIN), WELLS FARGO INVESTMENT LLC
(AS DEFINED AND NAMED HEREIN), AG
EDWARDS & SONS (AS DEFINED AND NAMED
HEREIN), AND WACHOVIA BANK N.A. (AS
DEFINED AND NAMED HEREIN), each on their
own behalf, and on behalf of a class of defendants
consisting of persons or entities who, directly or
indirectly, received payments in respect of shares of
the Lyondell Chemical Company upon the conversion
of such shares on December 20, 2007 into the right to
receive $48 in cash,

Defendants.

## TABLE OF CONTENTS

COMPLAINT.................................................................................................. 1

THE PARTIES............................................................................................... 7

I.          The Plaintiff................................................................................... 7

II.         The Transferees............................................................................. 7

III.        The Shareholder Defendants ..................................................... 26

NON-PARTIES ............................................................................................ 42

JURISDICTION AND VENUE.................................................................. 45

DEFENDANT CLASS ALLEGATIONS .................................................. 46

FACTUAL BACKGROUND...................................................................... 48

I.          Lyondell Shareholders Are Cashed Out in a Highly Leveraged Acquisition .... 48

            A.       Lyondell – History and Background.......................... 48

            B.       Blavatnik Seeks to Make a Major Petrochemicals Acquisition.............. 51

            C.       Access Targets Lyondell for Acquisition ................. 56

            D.       Blavatnik Acquires the Toe-Hold Position in Lyondell........................... 64

            E.       The Long Range Plan .................................................. 67

            F.       Smith Directs the Creation of "Refreshed" EBITDA Projections ......... 70

            G.       Blavatnik Turns His Attention to Huntsman ........... 78

            H.       Blavatnik's Renewed Pursuit of Lyondell ................ 79

II.         The Merger Occurs Amid Signs of Deteriorating Economic and Industry Conditions ....................................................... 93

III.        The Merger Closes .................................................................. 114

            A.       Uses of the Proceeds of the Merger Financing ...... 116

IV.         As A Result of the Merger, LyondellBasell Was Left with Unreasonably Small Capital ..................................................... 118

            A.       Reasonableness of Projections ................................. 119

            B.       LyondellBasell's Highly Leveraged Capital Structure.......................... 122

            C.       Foreseeable Contingencies ...................................... 123

V.          LyondellBasell's Liquidity Failure Upon the Merger ............. 124

VI.         Upon the Merger, LyondellBasell was Insolvent ................... 132

VII.        Upon the Merger, LyondellBasell Incurred Debts that Were Beyond its Ability to Repay.......................................................... 135

**COUNT I - INTENTIONAL FRAUDULENT TRANSFER -**
    **(Against Transferees and the Class)**.................................................................... 136

**COUNT II – CONSTRUCTIVE FRAUDULENT TRANSFER -**
    **(Against Transferees and the Class)**.................................................................... 136

**PRAYER FOR RELIEF**........................................................................................................ 137

## **COMPLAINT**

Plaintiff, Edward S. Weisfelner, as Litigation Trustee for the LB Litigation Trust (the "LB Litigation Trust"), through his undersigned counsel, as and for his Complaint, alleges as follows:

1.      This action arises from the December 2007 acquisition, led by financier Leonard Blavatnik ("Blavatnik"), of Lyondell Chemical Company ("Lyondell"), formerly North America's third-largest independent, publicly-traded chemical company, by Blavatnik-controlled Basell AF S.C.A., a Luxembourg entity, thereafter renamed LyondellBasell Industries AF S.C.A. (prior to its acquisition of Lyondell, "Basell," and, thereafter, "LBI").  On July 16, 2007, the board of directors of Lyondell, headed by chairperson Dan F. Smith ("Smith"), authorized a cash out merger of Lyondell shareholders (the "Merger" or the "Transaction") pursuant to which Lyondell would be acquired by Basell.  In connection with the Merger, approximately $12.5 billion was paid to Lyondell shareholders as merger consideration (the "Merger Consideration"). Every dollar that went to shareholders and every dollar used to pay the approximately $1 billion in transaction fees charged by affiliates, advisors, and professionals in connection with the Transaction, was funded with debt leveraged against the assets of Lyondell and its operating subsidiaries.   As a direct consequence of the Merger, LBI, Lyondell's corporate parent, LyondellBasell Finance Company ("LB Finance"), Lyondell, and many of the respective direct and indirect subsidiaries and affiliates of LBI and Lyondell, including all of Lyondell's major operating subsidiaries (collectively, "LyondellBasell") filed for bankruptcy.[1]

2.      In this action, Plaintiff, as Trustee, for and on behalf of the beneficiaries of the LB Litigation Trust, seeks to have set aside and to recover as fraudulent transfers payments of the

---

[1] The bankruptcy cases were filed in the United States Bankruptcy Court for the Southern District of New York, Case No. 09-10023 (REG) on January 6, 2009 and April 24, 2009.

Merger Consideration paid upon the Merger (the "Shareholder Payments").[2] Recovery is sought against (i) named defendants, each of whom, upon information and belief, is believed to have received payments of Merger Consideration, and (ii) the members of a class of persons who, directly or, indirectly through one or more mediate transferors, received Merger Consideration (as hereinafter defined with greater particularity, the "Class"). The named defendants and the members of the Class are referred to collectively herein as the "Transferees." The named defendants against whom the claims are asserted both in their individual capacities and as representatives of the Class (the "Class Representatives") are identified in paragraphs 13-68.

3.      The $48 per share price paid to Lyondell shareholders pursuant to the Merger was a "blowout price" that resulted in a windfall to Lyondell shareholders and management. Prior to being put into play by Blavatnik, Lyondell's stock price had languished for years, struggling to occasionally rise above $30 per share. As a result of the Merger, Smith walked away with over $100 million, most of it as a result of stock and options issued to him pursuant to various management incentive plans. Blavatnik, for his part, was willing to pay this exorbitant price only because he had so little of his own money at stake. Moreover, Blavatnik himself was a very major beneficiary of this "blowout price" since shortly before Basell entered into an agreement to acquire Lyondell, Blavatnik had acquired, through a Delaware entity, rights to nearly 10% of Lyondell's stock (the "Toe-Hold Position"), $1.2 billion of the eventual $12.5 billion distribution

---

[2] Pursuant to this action, the Trustee seeks to avoid and recover all Shareholder Payments exclusive of those made to: (1) the Secured Lender Releasees and the Settling Defendant Releasees, as such persons are defined pursuant to that certain Third Amended and Restated Joint Chapter 11 Plan of Reorganization for the LyondellBasell Debtors, dated March 12, 2010 and confirmed by this Court on April 23, 2010 (the "Plan"); (2) Leonard Blavatnik and/or to certain affiliated persons, the recovery of which is sought by the Trustee pursuant to Counts I and II of that certain Amended Complaint filed in Weisfelner v. Blavatnik, et al. (Adv. Pro. No. 09-1375) (the "Non-Settling Defendants Action") (3) certain of Lyondell's former directors and officers, the recovery of which is sought by the Trustee pursuant to Counts III and IV of the Amended Complaint filed in the Non-Settling Defendants Action; and (4) any individual who served as an officer or employee of the Debtors as of December 15, 2009 that is entitled to a release in accordance with Section 11.8(a) or 11.8(b) of the Plan. The net amount of Shareholder Payments sought to be recovered pursuant to this action is estimated to be substantially in excess of $6 billion.

to shareholders.  Upon the Merger, using the proceeds of the acquisition financing with which he was saddling LyondellBasell, Blavatnik, through a complex series of transfers netted a tax-free windfall profit in excess of $333 million.[3]

4.    Even before the Transaction, Lyondell was over-leveraged in view of the nature of its business and its prospects.  Entirely foreseeably, it could not withstand the greater debt burden imposed by the Transaction.  For numerous reasons, the extremely leveraged capital structure that resulted from the Merger was both unreasonable and reckless for LyondellBasell.  First of all, both of LyondellBasell's major business segments, the manufacture of petrochemicals and petroleum refining, are highly capital intensive.  The maintenance and operation of the enormous and enormously complex major assets of these industries, *i.e.*, the petroleum refineries and the "crackers" that break hydrocarbons into commercially useable petrochemicals, carry with them correspondingly enormous fixed costs.

5.    Complicating the capital demands imposed by high fixed costs is the extreme cyclicality of the petrochemical industry and the petroleum refining industry.  During the cycle "peaks," participants in these industries invest excess earnings in increasing capacity.  When, as inevitably occurs, industrial capacity exceeds demand, margins and profits are squeezed and the industry heads towards a "trough."  When industry overcapacity coincides with declining demand, as in a recessionary economic environment, the industry downturn will be deeper and last longer.  During a downturn, earnings and margins decline as manufacturers of what are essentially commodity products are forced to lower prices, sometimes to below break even, to maintain market share.  The combination of high fixed costs and extreme cyclicality means that

---

[3] The same Blavatnik-controlled entity used for this series of transactions, Nell Limited, organized under the laws of Gibraltar, also received a $100 million "one time" transaction advisory fee upon the Merger plus a $25 million "management" fee – all purportedly tax-free.  Thus, as a result of Basell's acquisition of Lyondell, Blavatnik was over $458 million ahead on day one.

companies in these industries, if they hope to survive a cycle downturn, must be adequately capitalized to enable continued operations through such a downturn. LBI was not. Its highly leveraged balance sheet and massive interest burdens left it unable to make it through the predicted industry cycle.

6.      LBI's highly leveraged capital structure also was reckless from the perspective of liquidity. The working capital requirements of petrochemical producers and refining companies are subject to extreme changes due to the volatility of the market for crude oil and the other "feedstocks" that constitute the raw materials of the industry. A single dollar upswing in the price of crude oil translates into the immediate need for millions of dollars of additional working capital. A petrochemical producer must maintain a sufficient liquidity cushion to fund volatile cash needs and must do so even as margins are squeezed by declining demand. Even in a relatively robust environment, a petrochemicals producer whose capital structure and credit rating leave it unable to increase its short term borrowing to fund its working capital needs quickly may find itself out of money and out of luck.

7.      Finally, LBI's capital structure was particularly reckless in view of the timing of the Transaction. Long before the Merger, all leading industry analysts were forecasting that, due to worldwide overcapacity, the ongoing petrochemical cycle peak of circa 2004-2007, and the high margins contemporaneously being attained by petroleum refiners would end sometime in 2008 or 2009 and that these industries would then experience a supply driven downturn. Any divergence of opinion on the coming downturn was only with regard to exactly when the peaks in refining and petrochemicals would end, how long the downturn would last, and how deep the troughs would be. As explained herein, Lyondell and its operating subsidiaries, as well as Basell (and its subsidiaries), due to a variety of factors, were particularly disadvantaged, as compared

with their competitors, to withstand the stress of a downturn. Moreover, in the months before the closing, disturbances in the credit markets and other indicators of economic instability indicated the strong possibility, if not the likelihood, of an economic recession that would exacerbate the impact of oversupply on the affected industries. Ignoring all reason, the highly leveraged capital structure created pursuant to the Merger was imposed on LBI even as all indicators showed that both of its industry segments were past the peak and were heading into the downturn.

8.      As had been entirely foreseeable at the time of the Merger and, indeed, while the Transaction was being negotiated, LBI was insufficiently capitalized to continue operations through a downturn and had insufficient liquidity to manage its volatile operating expenses. Exacerbating its already precarious condition, before the Merger, Basell, without securing additional financing, committed to the acquisition of approximately $1 billion in additional refining assets, most of which had to be paid for shortly after the closing of the Merger. Within weeks of the closing of the Merger, it was clear that LBI would be unable to meet its operating expenses and commitments from existing resources and would shortly be in a full-blown liquidity crisis. To avoid a complete collapse, Blavatnik made emergency funding available from his entity, Access Industries Holdings LLC ("Access Industries" or "Access"), labeling it a credit facility (the "Access Revolver"). Meanwhile, LBI itself negotiated to "upsize" its third party credit facilities with reluctant lenders who took the opportunity to extract further substantial fees. However, even these reckless and desperate measures were not enough. By November 2008, less than a year after the Merger was consummated, LBI collapsed under the weight of the debt foisted upon it by the Merger. Due to its overleveraged balance sheet and financial impairment, LBI was unable to fund its operations, or pay its creditors when due, and had no access to further borrowings. Blavatnik, having made sure that amounts drawn under the

5

Access Revolver in October 2008 had been repaid (thereby cutting his own losses), decided not to come to the aid of ailing LBI, and blocked any further funding from the Access Revolver. Less than a year after the Transaction, LBI was planning for a bankruptcy filing and negotiating for bankruptcy financing with its existing lenders.

9.      The investment banks that initially committed to provide the approximately $22 billion used to fund the acquisition did so with the expectation that, after being paid approximately $260 million in transaction fees (in addition to other substantial fees), they could, in accordance with the then prevailing practice, quickly syndicate virtually all of the "junk" obligations being incurred and unload them off their own books.  This deal, however, turned out to be different.   Approximately two months after having signed loan commitments, the investment banks learned that Lyondell was materially missing its financial projections for 2007, and it became clear that the loan syndication effort was in trouble.  By mid-September 2007, the rosy projections of Lyondell and Basell earnings that had been reverse engineered to attempt to sell the loans already looked like a pipe dream.  The financing package was drastically re-priced, restructured, and re-sized in an effort to spruce it up for the syndication market.  Notwithstanding these efforts and contrary to the plans of their internal credit committees, at the closing of the Merger, the banks who had originated the loans and undertaken to act as lead arrangers for their syndication were left holding most of the "junk."  And while the re-pricing and restructuring of the financing package did not avail the arranging banks in their syndication efforts, it substantially increased the leverage and therefore the risk associated with the Transaction.

10.      Obligors on the debt incurred to finance Lyondell's acquisition included Lyondell, its operating subsidiaries, LBI, and certain LBI affiliates.  Obligations to repay the acquisition financing were secured by, *inter alia*, first and second liens on substantially all of the

6

assets of the obligors in favor of the lenders providing the Merger Financing (as hereinafter defined). Although the obligor entities became liable for the repayment of the Merger Financing, to the extent that the proceeds were paid to Lyondell shareholders or used to refinance the debt of affiliates, these entities did not receive any substantive value (let alone reasonably equivalent value) in consideration for the obligations incurred. Nor, to such extent, did these obligors receive value for the liens that they granted to secure the repayment of these obligations.

11.      The LB Litigation Trust hereby seeks relief pursuant to Section 548 of the Bankruptcy Code from the fraudulent transfers of LyondellBasell's assets and property to the Transferees that occurred upon the Merger which transfers were made with the intent to hinder, delay or defraud creditors and/or were made without receiving reasonably equivalent value or fair consideration in exchange and resulted in LBI being rendered insolvent, left with unreasonably small capital, and unable to pay its debts when they became due.

## THE PARTIES

### I.      The Plaintiff

12.      Plaintiff Edward S. Weisfelner, as Litigation Trustee of the LB Litigation Trust, has been designated to, among other things, prosecute and resolve claims against the Transferees and the Class pursuant to the Plan on behalf of the LB Litigation Trust.

### II.      The Transferees

13.      The Defendant Class Representatives. Alleged below, and in paragraphs 14-68, on information and belief, are: (i) the names of the defendant Class Representatives, (ii) to the extent available, their last known addresses, (iii) to the extent available, the number of Shares in which they held, as of the date of the Merger, a legal and/or beneficial interest, and (iv) to the

7

extent available, the amount of the Shareholder Payment(s) transferred to them, directly or

indirectly, by LyondellBasell.

| Name | Address | Shares | Shareholder Payments |
|---|---|---|---|
| A HOLMES & H HOLMES TTEE THE HOLMES FAMILY TRUST U/A DTD 03/06/1992 | 2631 SUTTON COURT HOUSTON, TX 77027 | 23,289 | $1,117,872.00 |
| ALFRED R HOFMANN CHARLES SCHWAB & CO INC CUST IRA CONTRIBUTORY | 3209 IRIS DR RAPID CITY, SD 57702 | 5,000 | $240,000.00 |
| ALPINE ASSOCIATES | 100 UNION AVENUE SUITE 7 CRESSKILL, NJ 07626 | 475,000 | $22,800,000.00 |
| AMERICAN BOARD OF PSYCHIATRY | 2150 E. LAKE COOK ROAD STE 900 BUFFALO GROVE, IL 60089 | 6,650 | $319,200.00 |
| ARBOR PLACE LIMITED PARTNERSHIP A PARTNERSHIP | PO BOX 986 SALEM, MA 1970 | 12,100 | $580,800.00 |
| BACAP EQUITY FUND XXI | 767 FIFTH AVENUE NEW YORK, NY 10017 | 26,950 | $1,293,600.00 |
| BEAR STEARNS & CO. F/A/O GABELLI ASSOCIATES | 1 METROTECH CENTER BROOKLYN, NY 11201 | 50,000 | $2,400,000.00 |
| BEAR STEARNS SECURITIES CORP. – FIRST NY SECURITIES / BRITALLY CAPITAL, A/K/A J.P. MORGAN CLEARING CORP. | 1 METROTECH CENTER BROOKLYN, NY 11201 | 33,355 | $1,601,040.00 |
| BEAR STEARNS SECURITIES CORP. F/A/O FNY SEC/HLW GROUP, A/K/A J.P. MORGAN CLEARING CORP. | 1 METROTECH CENTER NORTH BROOKLYN, NY 11201 | 732,400 | $35,155,200.00 |
| BELLSOUTH GROUPLIFE TRUST – S& | c/o DVP BANK: BANK OF NEW YORK MELLON | 6,400 | $307,200.00 |
| BELLSOUTH HEALTHCARE S&P 400 | c/o BANK OF NEW YORK MELLON ONE WALL STREET NEW YORK, NY 10286 | 16,600 | $796,800.00 |
| BERNARD V FULTZ TTEE | U/W ANDERSON B KIBBLE HUNTINGTON NATIONAL BANK HUNTINGTON CENTER HC 0534 COLUMBUS OH 43287 | 6,000 | $288,000.00 |
| BGC INTERNATIONAL BROKER DEALER CREDIT ACCOUNT | C/O CT CORPORATION SYSTEM 111 EIGHTH AVENUE | 121,800 | $5,846,400.00 |

8

| | NEW YORK, NY 10011 | | |
|---|---|---|---|
| BLOWITZ-RIDGEWAY FOUNDATION DANIEL L. KLINE | 1701 E. WOODFIELD ROAD #201 SCHAUMBURG, IL 60173 | 5,900 | $283,200.00 |
| BURL SWAFFORD AND RUTH SWAFFORD JT TEN | 7110 EUDORA STREET DALLAS, TX 75230 | 10,544 | $506,112.00 |
| CAPTAIN ASSOCIATES | 6 PELLINGTON CT PINE BROOK, NJ 07058 | 5,600 | $268,800.00 |
| CATO ENTERPRISES LLC ARBITRAGE ACCOUNT | #2 WOODLAND DRIVE CRANBURY, NJ 08512 | 10,000 | $480,000.00 |
| CLERICS-COB GREAT LAKES ADVISORS ROBERT E. ERICKSON C.S.V PROVINCIAL TREASURER | 1212 EAST EUCLID AVENUE ARLINGTON HEIGHTS, IL 60004 | 6,300 | $302,400.00 |
| CPU SHARE PLANS PTY LTD <MIC ESAS A/C> | GPO BOX 1501 SYDNEY NSW 2001 AUSTRALIA | 9,256 | $444,288.00 |
| CRAWFORD COMPANY LLC (KIASTONE HOLDINGS LTD.) | 11 HOPE STREET DOUGLAS ISLE OF MAN IM1 1AQ UNITED KINGDOM | 10,000 | $480,000.00 |
| CROWELL WEEDON AND CO. OMNIBUS ACCOUNT | C/O NATIONAL REGISTERED AGENTS, INC. 875 AVENUE OF THE AMERICAS S-501 NEW YORK, NY 10001 | 12,300 | $590,400.00 |
| D LIGHT & J LIGHT TTEE DOUGLAS M & JUDITH A LIGHT REV U/A DTD 02/06/1995 | 48733 HIDDEN OAKS UTICA, MI 48317 | 8,000 | $384,000.00 |
| DAVENPORT PRIVATE CAPITAL LLC | 2821 N E 40TH STREET LIGHTHOUSE PT, FL 33064 | 8,000 | $384,000.00 |
| DAVID LESHNER | 70 LAKE FOREST DR HUDSON, OH 44236 | 5,000 | $240,000.00 |
| DAVID R. JOHNSEN AND AMALIA G. JOHNSEN (JT TEN WROS) | 1011 13TH STREET WILMETTE, IL 60091 | 41,696 | $2,001,408.00 |
| DAVID S MACALLASTER CHARLES SCHWAB & CO INC CUST IRA CONTRIBUTORY | 2 SUTTON PL S, APT 9D NEW YORK, NY 10022 | 5,000 | $240,000.00 |
| DAVID S OWENS & JULIE ANN OWENS JT TEN | 1726 CACTUS BLF SAN ANTONIO, TX 78258 | 10,000 | $480,000.00 |
| DEAN COUGHENOUR | 525 WESTVIEW DRIVE MANHATTAN, KS 66502 | 5,500 | $264,000.00 |
| DENIS P. KELLEHER | C/O WALL STREET INVESTMENT SERVICES 17 BATTERY PLACE, 11TH FLOOR NEW YORK, NY 10004 | 10,000 | $480,000.00 |

| | | | |
|---|---|---|---|
| DIANE L ABBEY | 1035 FIFTH AVENUE APT. 11C NEW YORK, NY 11028 | 5,000 | $240,000.00 |
| DIANE PELLEGRINO CHARLES SCHWAB & CO INC CUST IRA ROLLOVER | 7 RITA PL FARMINGDALE, NY 11735 | 5,521.853 | $265,048.96 |
| DOFT & CO., INC. FIRM ACCOUNT | DOFT & CO. INC. 55 E. 59TH STREET SUITE 12A NEW YORK, NY 10022 | 62,672 | $3,008,256.00 |
| DOFT & CO., INC. FIRM ACCOUNT | DOFT & CO. INC. 55 E. 59TH STREET SUITE 12A NEW YORK, NY 10022 | 30,900 | $1,483,200.00 |
| DONALD G GOODWIN TTEE THE DONALD G GOODWIN LIVING TR U/A DTD 12/23/1996 | 16492 SOMERSET LN HUNTINGTON BEACH, CA 92649 | 5,000 | $240,000.00 |
| DONALD M BALCUNS LIVING TRUST DONALD M BALCUNS AND JENNIE ANNE BALCUNS | PO BOX 2515 MONTAUK, NY 11954 | 6,500 | $312,000.00 |
| ELISABETH H. DOFT | DOFT & CO. INC. 55 E. 59TH STREET SUITE 12A NEW YORK, NY 10022 | 12,000 | $576,000.00 |
| EPISCOPAL CORP IA DIOCESAN FUND JOY | 225 37TH STREET DES MOINES, IA 50312 | 7,000 | $336,000.00 |
| ERIC A SILVA | 114 S PLUM CREST CIR THE WOODLANDS, TX 77382 | 8,109 | $389,232.00 |
| FISHBEIN ADVISORY CO, A SOLE PROPRIETORSHIP | P O  BOX 2070 AQUEBOGUE LI, NY 11931 | 6,700 | $321,600.00 |
| GEZA SZAYER PAULETTE SZAYER JT TEN TOD DTD 10/24/2008 | #7 ADDINGTON PLACE COTO DE CAZA, CA 92679 | 7,000 | $336,000.00 |
| GULFSTREAM MARKETING INC. | 26 BARTOW POINT SAVANNAH, GA 34104 | 10,000 | $480,000.00 |
| HILARY L SHANE | 78 LIGHTHOUSE DR JUPITER, FL  33469 | 5,500 | $264,000.00 |
| HTB INVESTMENTS LLC | PO BOX 10337 NEW ORLEANS, LA 70181 | 5,000 | $240,000.00 |
| IRA FBO VELLO A KUUSKRAA DB SECURITIES INC CUSTODIAN DTD 01/17/03 | 3811 ARGYLE TERRACE WASHINGTON, DC 20011 | 5,500 | $264,000.00 |
| IRA FBO, JANET F. ROSS VFTC AS CUSTODIAN | 220 TOWER LANE PENN VALLEY, PA 19072 | 14,000 | $672,000.00 |
| JACK H CAIN & ESTHER CAIN TTEE CAIN TRUST U/A DTD 06/08/1988 | 3770 MOSSWOOD DR LAFAYETTE, CA 94549 | 5,900 | $283,200.00 |

10

| JACK H CAIN CHARLES SCHWAB & CO INC CUST IRA ROLLOVER | 3770 MOSSWOOD DR LAFAYETTE, CA 94549 | 5,000 | $240,000.00 |
|---|---|---|---|
| JAMES FLOYD BISSET CHARLES SCHWAB & CO INC CUST IRA CONTRIBUTORY | 636 RIM ROCK PASS CANYON LAKE, TX 78133 | 5,425.774 | $260,437.13 |
| JAMES SIEGEL | PO BOX 7102 KETCHUM, ID 83340 | 7,500 | $360,000.00 |
| JENNIE ANNE BALCUNS AND DONALD M BALCUNS | PO BOX 2515 MONTAUK, NY 11954 | 6,500 | $312,000.00 |
| JESUS CHAGOYA & ROSE MARY CHAGOYA JT TEN | 27 HALFMOON CT THE WOODLANDS, TX 77380 | 5,326 | $255,648.00 |
| JOHN E HAYNES | PO BOX 4054 KINGSPORT, TN 37665 | 9,723 | $466,704.00 |
| JOHN M FOX & MARCELLA F FOX JT TEN | 240 GAYLORD ST DENVER, CO 80206 | 6,000 | $288,000.00 |
| JOSEPH DIBENEDETTO JR TTEE JOSEPH DIBENEDETTO JR MD INC DEF CONT U/A DTD 10/01/84 ACCOUNT 1 | 193 WATERMAN ST PROVIDENCE, RI 2906 | 10,000 | $480,000.00 |
| JOSEPH IAVICOLI CHARLES SCHWAB & CO INC CUST IRA ROLLOVER | 10144 WINSTEAD CINCINNATI, OH 45231 | 5,000 | $240,000.00 |
| KDC MERGER ARBITRAGE MASTER | KELLNER DILEO & COMPANY 900 THIRD AVENUE SUITE 1000 NEW YORK, NY 10022 | 100,000 | $4,800,000.00 |
| KERMIT R MEADE | 6 PELLINGTON CT PINE BROOK, NJ 07058 | 18,800 | $902,400.00 |
| KEVIN D JOHNSON | 50 PALM AVE SAN RAFAEL, CA 94901 | 5,000 | $240,000.00 |
| KIRK E HEYNE & KAREN A TWITCHELL TEN/COM | 9 COURTLANDT PL HOUSTON, TX 77006 | 15,125 | $726,000.00 |
| LAMPOST BLUE CHIP FUND LP | 7777 W GLADES ROAD STE 213 BOCA RATON, FL 33434 | 6,700 | $321,600.00 |
| LAURA N TUCKER | 14235 FAULKEY GULLY HOUSTON, TX 77070 | 13,500 | $648,000.00 |
| LI CHEN & ANDRE SCHARKOWSKI JT TEN WROS | 19509 SE 27TH PL SAMMAMISH,WA 98075 | 5,000 | $240,000.00 |
| LI CHEN & ANDRE SCHARKOWSKI JT TEN WROS | 19509 SE 27TH PL SAMMAMISH, WA 98075 | 5,000 | $240,000.00 |
| LOUIS S ROUSE & MARY A ROUSE JT TEN | 7433 BAYSWATER PLACE CINCINNATI, OH 45255 | 5,470 | $262,560.00 |
| M HAKAN & R SALKIN TTEE MICHAEL J. | 410 PALM AVENUE SUITE B4 | 5,000 | $240,000.00 |

| | | | |
|---|---|---|---|
| HAKAN$CHARITABLE RE U/A DTD 12/20/1995 | CARPINTERIA, CA 93013 | | |
| M NISITA & L NISITA TTEE MAURIZIO NISITA REV TRUST U/A DTD 02/14/2005 | 4972 BAYBRIDGE BLVD ESTERO, FL 33928 | 5,000 | $240,000.00 |
| MARY B ORD UTA CHARLES SCHWAB & CO INC IRA CONTRIBUTORY DTD 10/06/91 | PO BOX 2249 KIRKLAND, WA 98083 | 5,750 | $276,000.00 |
| MARYL I EBRITE TTEE MARYL I W EBRITE REV TRUST U/A DTD 01/25/96 | 11114 OLD CARRIAGE RD GLEN ARM, MD 21057 | 5,000 | $240,000.00 |
| MASONS ANNUITY SIERRA/GLENMEDE | | 9,855 | $473,040.00 |
| MASONS PEN SIERRA/GLENMEDE | | 8,267 | $396,816.00 |
| MATTHEW J ANDERSON | 6003 29TH AVE NE SEATTLE, WA 98115 | 6,500 | $312,000.00 |
| MICHAEL EDWARD DOKUPIL | | 7,000 | $336,000.00 |
| MICHAEL JARRETT IRA | 3096 HEATHER RD BROOMALL, PA 19008 | 9,094 | $436,512.00 |
| MIKE MEHMET MUSTAFOGLU CHARLES SCHWAB & CO INC CUST IRA CONTRIBUTORY | 14007 AUBREY ROAD BEVERLY HILLS, CA 90210 | 5,000 | $240,000.00 |
| MUGC MTBJ PT33, A/K/A MITSUBISHI UFJ TRUST & BANKING CORPORATION (U.S.A.) | MITSUBISHI UFJ TRUST AND BANKING CORPORATION (USA) 420 FIFTH AVENUE 6TH FLOOR NEW YORK, NY 10018 | 69,700 | $3,345,600.00 |
| MTBJ PT 13, A/K/A MITSUBISHI UFJ TRUST & BANKING CORPORATION (U.S.A.) | MITSUBISHI UFJ TRUST AND BANKING CORPORATION (USA) 420 FIFTH AVENUE, 6TH FLOOR NEW YORK, NY 10018 | 29,300 | $1,406,400.00 |
| MJR PARTNERS | 55 EAST 59TH STREET ROOM 12A NEW YORK, NY 10022 | 60,000 | $2,880,000.00 |
| NEIL T EIGEN & PATRICIA S EIGEN JT TEN | 465 PARK AVE APT 15B NEW YORK NY 10022 | 19,000 | $912,000.00 |
| NEIL T EIGEN CHARLES SCHWAB & CO INC CUST IRA ROLLOVER | 465 PARK AVE APT 15B NEW YORK NY 10022 | 5,700 | $273,600.00 |
| OHIO CARPENTERS MIDCAP | STATE STREET BANK, STATE STREET FINANCIAL CENTER ONE LINCOLN STREET BOSTON, MA 02111 | 24,400 | $1,171,200.00 |

| | | | |
|---|---|---|---|
| OP&F / INTECH | | 51,900 | $2,491,200.00 |
| OTHO S.A. SPRAGUE MEMORIAL INST ATTN: JIM ALEXANDER ALEXANDER & ASSOCIATES | 2129 CENTRAL PARK AVENUE EVANSTON, IL 60201 | 6,500 | $312,000.00 |
| PEDRO ALBERTO GARZA CANTU & E VILLARREAL DE GARZA JT TEN | ZARAGOTA PTE.310 CADEREYTA JIMINEZ NUEVO LEON, MEXICO | 5,000 | $240,000.00 |
| PERSHING SECURITIES LTD | CAPSTAN HOUSE 1 CLOVE CRESCENT LONDON E14 2BH UNITED KINGDOM | 5,120 | $245,760.00 |
| PETER RANDALL ZIERHUT  GAYLE M ZIERHUT JT TEN | 17912 MITCHELL S IRVINE, CA 92614 | 6,000 | $288,000.00 |
| PULSE TRADING INC. | 2 LIBERTY SQUARE 2ND FLOOR BOSTON, MA 02109 | 169,294 | $8,126,112.00 |
| R EMERY & D EMERY TTEE ROBERT L & DANA M EMERY FAMILY U/A DTD 06/22/1998 | 3522 CLAY STREET SAN FRANCISCO, CA 94118 | 9,146.049 | $439,010.33 |
| R MOLEY & E MOLEY TTEE THE RICHARD MICHAEL MOLEY ELI U/A DTD 09/29/1989 | PO BOX 4316 CARMEL BY THE SEA, CA 93921 | 5,000 | $240,000.00 |
| RAY R IRANI TTEE RAY R IRANI DECL OF TRUST U/A DTD 11/13/1990 | 10889 WILSHIRE BLVD STE 1600 LOS ANGELES, CA 90024 | 5,382 | $258,336.00 |
| RICKERT C. HENRIKSEN AND ZHEYLA M. HENRIKSEN COMMUNITY PROPERTY | 3248 H STREET SACRAMENTO, CA 95816 | 12,700 | $609,600.00 |
| RIVERTON EQUITY LP-HARRIS LCV IMA C/O MR. CHRIS JEROME | P.O. BOX 259 BARRON, WI 54812 | 8,500 | $408,000.00 |
| ROBERT H KRAMER & HALINA J KRAMER TEN ENT WROS | 109 WILLOW RD BARRINGTON, IL 60010 | 5,600 | $268,800.00 |
| ROBERT S BRIDGES & LINDA A BRIDGES JT TEN | 303 W SPREADING OAKS AVE FRIENDSWOOD, TX 77546 | 10,500 | $504,000.00 |
| ROBERT T WILLIAMSON CHARLES SCHWAB & CO INC CUST IRA ROLLOVER | 1242 SW PINE ISLAND RD. # 42-294 CAPE CORAL, FL 33991 | 6,000 | $288,000.00 |
| RONALD E WYMAN TTEE RONALD E WYMAN REVOCABLE TRUST U/A DTD 01/17/2006 | 2412 SOUTH AVE E NORTH ST PAUL, MN 55109 | 10,000 | $480,000.00 |
| SACRAMENTO EMPLOYEES RETIREMENT SYSTEM RUSSELL | ALLIANCEBERNSTEIN 1345 AVENUE OF THE AMERICAS NEW YORK, NY 10105 | 18,840 | $904,320.00 |

13

| SANDRA G MONTRONE | LYFORD CAY N7776 NASSAU BAHAMAS | 8,000 | $384,000.00 |
|---|---|---|---|
| SANDRA A SMITH TEN/COM | 3221 AVALON PL HOUSTON, TX 77019 | 33,405 | $1,603,440.00 |
| SANDRA A SMITH TEN/COM | 3221 AVALON PL HOUSTON, TX 77019 | 274,480 | $13,175,040.00 |
| SANFORD SAUL WADLER | 680 CANYON CREST RD E SAN RAMON, CA 94583 | 7,000 | $336,000.00 |
| SANO INVESTMENTS LLC | 65 WILLOWBROOK BOULEVARD 4TH FLOOR WAYNE, NJ 02470 | 60,627 | $2,910,096.00 |
| SERS/SSGA PASS | C/O STATE STREET GLOBAL ADVISORS, ONE LINCOLN STREET STATE STREET FINANCIAL CENTER BOSTON, MA 02111 | 21,776 | $1,045,248.00 |
| SHAUN BRIDGMOHAN | 13306 WESTBURY WAY GOSHEN, KY 40026-8421 | 5,000 | $240,000.00 |
| SHIRLEY R SABIN TR UA 06-25-1981 SHIRLEY R SABIN TRUST | 7360 S ORIOLE BLVD APT 303 DELRAY BEACH, FL 33446 | 5,000 | $240,000.00 |
| SOUTHERN CALIFORNIA EDISON NUC | C/O DVP BANK: CIBC MELLON | 5,057 | $242,736.00 |
| STANLEY FROMMER ROSLIND FROMMER JT TEN | WOODSTOCK, GA 30189-2572 | 5,000 | $240,000.00 |
| STEVEN FRIEDMAN TTEE YOUNG FAMILY 89 TRUST U/A DTD 12/20/1989 C/O EOS PARTNERS | 320 PARK AVE NEW YORK, NY 10022 | 5,000 | $240,000.00 |
| STIFEL NICOLAUS CUSTODIAN FOR SCENERY HILL ASSOCIATES INC FBO JOHN SAUERACKER | PO BOX 639 ISLE OF PALMS, SC 29451 | 5,000 | $240,000.00 |
| THE LYON FOUNDATION ATTN:  MR. JOHN F. KANE | P.O. BOX 546 BARTLESVILLE, OK 74005 | 9,800 | $470,400.00 |
| THOMAS GWINFORD BARTON CHARLES SCHWAB & CO INC CUST IRA ROLLOVER | 9405 SE 33RD ST MERCER ISLAND, WA 98040 | 7,500 | $360,000.00 |
| THOMAS MARTIN O'MALLEY | 608 SUNFLOWER CT SAN RAMON, CA 94582 | 5,000 | $240,000.00 |
| TIMOTHY ORD & MARY B ORD JT TEN | PO BOX 2249 KIRKLAND, WA 98083 | 10,000 | $480,000.00 |
| TIMOTHY ORD UTA CHARLES SCHWAB & CO INC IRA CONTRIBUTORY DTD 10/04/91 | PO BOX 2249 KIRKLAND, WA 98083 | 5,750 | $276,000.00 |

| | | | |
|---|---|---|---|
| TIMOTHY ORD UTA CHARLES SCHWAB & CO INC IRA ROLLOVER DTD 01/14/97 | PO BOX 2249 KIRKLAND, WA 98083 | 8,500 | $408,000.00 |
| TOM C EVANS CHARLES SCHWAB & CO INC CUST ROTH CONVERSION IRA | 1220 N BASCOM AVE APT 27 SAN JOSE, CA 95128 | 8,123.017 | $389,904.80 |
| TRACK DATA CORPORATION | 95 ROCKWELL PLACE BROOKLYN, NY 11217 | 57,700 | $2,769,600.00 |
| UNITED METH HOMES & SER FNDTN | 1415 FOSTER AVENUE CHICAGO, IL 60640 | 5,500 | $264,000.00 |
| VA BIRTH RELATED INJ-GREAT LAKES ADV | | 6,550 | $314,400.00 |
| VICKI M WADLER LIVING TRUST UAD 10/10/02 VICKI M WADLER TTEE | 3514 ROSINCRESS DR SAN RAMON, CA 94582 | 7,000 | $336,000.00 |
| VINCENT DE CICCO | 2821 NE 40TH STREE LIGHTHOUSE POINT, FL 33064 | 10,000 | $480,000.00 |
| VINCENT MARK RAFANELLI TTEE V MARK RAFANELLI LIV TR U/A DTD 07/07/2004 | 3697 MT. DIABLO BLVD. STE. 250 LAFAYETTE, CA 94549 | 15,000 | $720,000.00 |
| VIRGINIA L LYON | 500 SOUTHERN BLVD CHATHAM, NJ 7928 | 9,000 | $432,000.00 |
| WALTER E. HENDRICKS | | 10,750 | $516,000.00 |
| WENGLN PARTNERS LP A PARTNERSHIP | OLD TAPPAN, NJ 7675 | 12,000 | $576,000.00 |
| WILLIAM J HARKINSON & SARAH A HARKINSON TEN/COM | 5109 PALOMAR LN DALLAS, TX 75229 | 32,339.442 | $1,552,293.22 |
| WILLIAM J HUGHES CHARLES SCHWAB & CO INC CUST IRA CONTRIBUTORY | 1371 SALVADORE CT MARCO ISLAND, FL 34145 | 7,786.912 | $373,771.77 |
| WILLIAM LUKE BOSWELL & AGNES HAFNER BOSWELL JT TEN | 5815 GRAVES LAKE DRIVE CINCINNATI, OH 45243 | 10,000.000 | $480,000.00 |
| WORKING WOMANS HOME ASSOC | 2473 ROSEMONT PL MONTGOMERY, AL 36106 | 6,100.000 | $292,800.00 |























III.    **The Shareholder Defendants**

14.     Defendants State Street Bank & Trust, Fiduciary – State Street Bank, State Street Bank – Trust Custody, State Street Bank - IBT/BGI, State Street Bank – SPDR's, State Street Bank & Trust Co/IBT, (collectively, a/k/a State Street Bank & Trust Company), and all other persons having a beneficial interest in the 23,338,854 Shares registered to Street Bank & Trust, Fiduciary – State Street Bank, State Street Bank – Trust Custody, State Street Bank - IBT/BGI, State Street Bank – SPDR's, State Street Bank & Trust Co/IBT (collectively, "State Street")

26

registered holders of 23,338,854 Shares at the time of the Merger. State Street is a corporate entity, having its head office at State Street Financial Center, One Lincoln Street, Boston, Massachusetts 02111. At the time of the Merger, State Street held in several accounts, respectively, 14,912,721 Shares, 89,460 Shares, 183,087 Shares, 7,883,158 Shares, 26,269 Shares and 244,159 Shares and, as a result, received, upon information and belief, Shareholder Payments in the aggregate amount of $1,120,264,992.00.

15.     Defendant National Financial Services, and all other persons having a beneficial interest in the 6,663,320 Shares registered to National Financial Services at the time of the Merger (collectively, "NFS") was, at the time of the Merger, a registered holder of 6,663,320 Shares. NFS is a corporate entity, that has its head office and conducts business at 200 Liberty Street, New York, New York 10281. At the time of the Merger, NFS held 6,663,320 Shares and, as a result, received a Shareholder Payment in the amount of $319,839,360.00.

16.     Defendant Brown Brothers Harriman, a/k/a Brown Brothers Harriman & Co., and all other persons having a beneficial interest in the 5,477,950 Shares registered to Brown Brothers Harriman at the time of the Merger (collectively, "Brown Brothers") was, upon information and belief, at the time of the Merger, a registered holder of 5,447,950 Shares. Brown Brothers is a corporate entity, that has its head office and conducts business at 140 Broadway, New York, New York 10005. At the time of the Merger, Brown Brothers received a Shareholder Payment in the amount of $262,941,600.00.

17.     Defendant Northern Trust Company and all other persons having a beneficial interest in the 4,761,854 Shares registered to Northern Trust Company at the time of the Merger (collectively, "Northern Trust") was, at the time of the Merger, a registered holder of 4,761,854 Shares. Northern Trust is a corporate entity, having its head office at 50 South LaSalle Street,

Chicago, Illinois 60603.  At the time of the Merger, Northern Trust received a Shareholder Payment in the amount of $228,568,992.00.

18.    Defendant Ingalls & Snyder LLC, and all other persons having a beneficial interest in the 4,052,580 Shares registered to Ingalls & Snyder LLC at the time of the Merger (collectively, "Ingalls") was, at the time of the Merger, a registered holder of 4,052,580 Shares. Ingalls is located at 61 Broadway, New York, New York 10006.  At the time of the Merger, Ingalls received a Shareholder Payment in the amount of $194,523,840.

19.    Defendant U.S. Bank N.A. and all other persons having a beneficial interest in the 2,441,753 Shares registered to U.S. Bank N.A. at the time of the Merger (collectively, "US Bank") was, at the time of the Merger, a registered holder of 2,441,753 Shares.  U.S. Bank is located at U.S. Bancorp Center, 800 Nicollet Mall, Minneapolis, Minnesota 55402.  At the time of the Merger, U.S. Bank received a Shareholder Payment in the amount of $117,204,144.00.

20.    Defendant RBC Dominion Securities and all other persons having a beneficial interest in the 2,435,516 Shares registered to RBC Dominion Securities at the time of the Merger (collectively, "RBC") was, at the time of the Merger, a registered holder of 2,435,516 Shares. RBC is located at 46579 Expedition Drive, Suite 200, Montréal, MD H3C 3A9 Canada.  At the time of the Merger, RBC received Shareholder Payments in the aggregate amount of $116,904,768.00.

21.    Defendant PNC Bank, N.A., a/k/a National City Bank, and all other persons having a beneficial interest in the 1,880,016 Shares registered to PNC Bank, N.A. at the time of the Merger (collectively, "PNC") was, at the time of the Merger, a registered holder of 1,880,016 Shares.  PNC is located at One PNC Plaza, 249 Fifth Avenue, Pittsburgh, Pennsylvania 15222.

At the time of the Merger, PNC received a Shareholder Payment in the amount of $90,240,768.00.

22.     Defendant CDS Clearing Deposit and all other persons having a beneficial interest in the 1,338,168 Shares registered to CDS Clearing Deposit at the time of the Merger (collectively, "CDS") was, at the time of the Merger, a registered holder of 1,338,168 Shares. CDS is located at 85 Richmond Street West, Toronto, Ontario, M5H 2C9.  At the time of the Merger, CDS received a Shareholder Payment in the amount of $64,232,064.00.

23.     Defendant Abbey National Securities and all other persons having a beneficial interest in the 1,290,600 Shares registered to Abbey National Securities at the time of the Merger (collectively, "Abbey") was, at the time of the Merger, a registered holder of 1,290,600 Shares. Abbey is located at 400 Atlantic Avenue, Stamford, CT 06901.  At the time of the Merger, Abbey received a Shareholder Payment in the amount of $61,948,800.00.

24.     Defendant First Clearing, LLC and all other persons having a beneficial interest in the 874,390 Shares registered to First Clearing LLC at the time of the Merger (collectively, "First Clearing") was, at the time of the Merger, a registered holder of 874,390 Shares.  First Clearing  is a corporate entity, having its head office at One North Jefferson Avenue, St. Louis, Missouri 63103.  First Clearing has a New York agent for service of process c/o Corporation Service Company, 80 State Street, Albany, New York 12207. At the time of the Merger, First Clearing received a Shareholder Payment in the amount of $41,970,720.00.

25.     Defendant Calyon Securities (USA) and all other persons having a beneficial interest in the 558,000 Shares registered to Calyon Securities (USA) at the time of the Merger (collectively, "Calyon") was, at the time of the Merger, a registered holder of 558,000 Shares. Calyon is located at c/o Crédit Agricole CIB Building, 1301 Avenue of the Americas, New York,

New York 10019.  At the time of the Merger, Calyon received a Shareholder Payment in the amount of $26,784,000.00.

26.     Defendant Comerica Bank and all other persons having a beneficial interest in the 312,407 Shares registered to Comerica Bank at the time of the Merger (collectively, "Comerica") was, at the time of the Merger, a registered holder of 312,407 Shares.  Comerica is located at Comerica Corporate Headquarters, Comerica Bank Tower, 1717 Main Street, Dallas, Texas 75201.  Comerica has a New York agent for service of process c/o CT Corporation System, 111 Eighth Avenue, New York, New York 10011.  At the time of the Merger, Comerica received a Shareholder Payment in the amount of $14,995,536.00.

27.     Defendant Scottrade, Inc. and all other persons having a beneficial interest in the 304,914 Shares registered to Scottrade, Inc. at the time of the Merger (collectively, "Scottrade") was, at the time of the Merger, a registered holder of 304,914 Shares.  Scottrade is located at 12800 Corporate Hill Drive, #250, St. Louis, Missouri 63131.  Scottrade has a New York agent for service of process c/o CT Corporation System, 111 Eighth Avenue, New York, New York 10011. At the time of the Merger, Scottrade received a Shareholder Payment in the amount of $14,635,872.00.

28.     Defendant Regions Bank and all other persons having a beneficial interest in the 177,155 Shares registered to Regions Bank at the time of the Merger (collectively, "Regions") was, at the time of the Merger, a registered holder of 177,155 Shares.  Regions is located at c/o Regions Financial Corporation, 1900 Fifth Avenue North, Birmingham, Alabama 35203.  At the time of the Merger, Regions received a Shareholder Payment in the amount of $8,503,440.00.

29.     Defendant Edward D. Jones, a/k/a Edward D. Jones & Co., L.P., and all other persons having a beneficial interest in the 146,217 Shares registered to Edward D. Jones at the

time of the Merger (collectively, "Jones") was, at the time of the Merger, a registered holder of 146,217 Shares. Jones is located at Edward Jones, 12555 Manchester Road, St. Louis, Missouri 63131. At the time of the Merger, Jones received a Shareholder Payment in the amount of $7,018,416.00.

30.    Defendant Sumitomo Trust & Banking and all other persons having a beneficial interest in the 132,879 Shares registered to Sumitomo Trust & Banking at the time of the Merger (collectively, "Sumitomo") was, at the time of the Merger, a registered holder of 132,879 Shares. Sumitomo is located at Sumitomo Mitsui Banking Corporation, 277 Park Avenue, New York, New York 10172. At the time of the Merger, Sumitomo received a Shareholder Payment in the amount of $6,378,192.00.

31.    Defendant Swiss American Securities, a/k/a Swiss American Securities, Inc., and all other persons having a beneficial interest in the 128,348 Shares registered to Swiss American Securities at the time of the Merger (collectively, "Swiss American") was, at the time of the Merger, a registered holder of 128,348 Shares. Swiss American is located at 12 East 49th Street, New York, New York 10017. At the time of the Merger, Swiss American received a Shareholder Payment in the amount of $6,160,704.00.

32.    Defendant Robert W. Baird & Co. and all other persons having a beneficial interest in the 127,715 Shares registered to Robert W. Baird & Co. at the time of the Merger (collectively, "Baird") was, at the time of the Merger, a registered holder of 127,215 Shares. Baird is located at 777 East Wisconsin Avenue, Milwaukee, Wisconsin 53202. Baird has a New York agent for service of process c/o National Registered Agent, Inc., 875 Avenue of the Americas, Suite 501, New York, New York 10001. At the time of the Merger, Baird received a Shareholder Payment in the amount of $6,130,320.00.

31

33.    Defendants Amalgamated Bank and Amalgamated Bank CRGO and all other persons having a beneficial interest in the 118,603 Shares registered to Amalgamated Bank and Amalgamated Bank CRGO at the time of the Merger (collectively, "Amalgamated Bank") were, at the time of the Merger, registered holders of 118,603 Shares.  Amalgamated Bank  is a corporate entity, that has its head office and conducts business at 275 7th Avenue, New York, New York 10001.   At the time of the Merger, Amalgamated Bank received an aggregate Shareholder Payment in the amount of $5,692,944.00 of Merger Consideration.

34.    Defendant TD Waterhouse Canada and all other persons having a beneficial interest in the 116,827 Shares registered to TD Waterhouse Canada at the time of the Merger (collectively, "TD Waterhouse") was, at the time of the Merger, a registered holder of 116,827 Shares.  TD Waterhouse is located at 55 King Street West, Toronto Dominion Centre, Toronto, Ontario, M5K 1A2 Canada.  TD Waterhouse has a New York agent for service of process c/o Corporation Service Company, 80 State Street, New York, New York 12207.  At the time of the Merger, TD Waterhouse received, upon information and belief, a Shareholder Payment in the amount of $5,607,696.00.

35.    Defendant H&R Block Financial Advisors, n/k/a Ameriprise Advisor Services, Inc., and all other persons having a beneficial interest in the 110,189 Shares registered to H&R Block Financial Advisors at the time of the Merger (collectively, "H&R Block") was, at the time of the Merger, a registered holder of 110,189 Shares.  H&R Block is located at One H&R Block Way, Kansas City, Missouri 64105.   At the time of the Merger, H&R Block received a Shareholder Payment in the amount of $5,289,072.00.

36.    Defendant American Enterprise Investment Services and all other persons having a beneficial interest in the 93,422 Shares registered to American Enterprise Investment Services

at the time of the Merger (collectively, "American Enterprise") was, at the time of the Merger, a registered holder of 93,422 Shares. American Enterprise is located at 70400 AXP Financial Center, Minneapolis, Minnesota 55474. At the time of the Merger, American Enterprise Shares received a Shareholder Payment in the amount of $4,484,256.00.

37.     Defendant Scotia Capital, a/k/a Scotia Capital Inc., and all other persons having a beneficial interest in the 88,500 Shares registered to Scotia Capital at the time of the Merger (collectively, "Scotia"), was at the time of the Merger, a registered holder of 88,500 Shares. Scotia is located at 40 King Street West, Scotia Plaza, Toronto, Ontario M5W 2-X6 Canada. Scotia has a New York agent for service of process c/o Lawrence Jacob, One Liberty Plaza, 165 Broadway, New York, New York 10006. At the time of the Merger, Scotia received a Shareholder Payment in the amount of $4,248,000.00.

38.     Defendant Mizuho Trust & Banking Co., a/k/a Mizuho Trust and Banking Co., Ltd., and all other persons having a beneficial interest in the 73,459 Shares registered to Mizuho Trust & Banking Co. at the time of the Merger (collectively, "Mizuho") was, at the time of the Merger, a registered holder of 73,459 Shares. Mizoho is located at Mizuho Trust and Banking Co., Ltd, 1-2-1, Yaesu, Chuo-ku, Tokyo 103-8670, Japan. At the time of the Merger, Mizoho received a Shareholder Payment in the amount of $3,526,032.00.

39.     Defendant National City Bank and all other persons having a beneficial interest in the 67,631 Shares registered to National City Bank at the time of the Merger (collectively, "National City") was, at the time of the Merger, a registered holder of 67,631 Shares. National City is located at 1900 East Ninth Street, Locator 2101, Cleveland, Ohio 44114. At the time of the Merger, National City received a Shareholder Payment in the amount of $3,246,288.00.

40.    Defendant Cantor Clearing Services and all other persons having a beneficial interest in the 65,300 Shares registered to Cantor Clearing Services at the time of the Merger (collectively, "Cantor") was, at the time of the Merger, a registered holder of 65,300 Shares. Cantor is a corporate entity, that has its head office and conducts business at Cantor Prime Services, 110 East 59th Street, New York, New York 10022.  At the time of the Merger, Cantor received a Shareholder Payment in the amount of $3,134,400.00.

41.    Defendant Union Bank of California NA, n/k/a Union Bank, N.A. and all other persons having a beneficial interest in the 56,633 Shares registered to Union Bank of California NA at the time of the Merger (collectively, "Union Bank") was, at the time of the Merger, a registered holder of 56,633 Shares.  Union Bank is located at 400 California Street, 1st Floor, San Francisco, California 94104.  At the time of the Merger, Union Bank received a Shareholder Payment in the amount of $2,718,384.00.

42.    Defendant Trustmark National Bank and all other persons having a beneficial interest in the 52,793 Shares registered to Trustmark National Bank at the time of the Merger (collectively, "Trustmark") was, at the time of the Merger, a registered holder of 52,793 Shares. Trustmark is located at Trustmark Corporation, 248 East Capitol Street, Jackson, Mississippi 39201.  At the time of the Merger, Trustmark received a Shareholder Payment in the amount of $2,534,064.00.

43.    Defendant NBCN Inc. and all other persons having a beneficial interest in the 52,541 Shares registered to NBCN Inc. at the time of the Merger (collectively, "NBCN") was, at the time of the Merger, a registered holder of 52,541 Shares.  NBCN is located at 250 Yonge Street, Suite 1900, Toronto, Ontario M5B 2L7 Canada.  At the time of the Merger, NBCN received a Shareholder Payment in the amount of $2,521,968.00.

34

44.    Defendant Southwest Securities, Inc. and all other persons having a beneficial interest in the 51,098 Shares registered to Southwest Securities, Inc. at the time of the Merger (collectively, "Southwest") was, at the time of the Merger, a registered holder of 51,098 Shares. Southwest is a corporate entity, having its head office at 1833 Forest Drive, Annapolis, Maryland 21401. At the time of the Merger, Southwest received a Shareholder Payment in the amount of $2,452,704.00.

45.    Defendant Morgan Keegan & Co. and all other persons having a beneficial interest in the 46,303 Shares registered to Morgan Keegan & Co. at the time of the Merger (collectively, "Morgan Keegan") was, at the time of the Merger, a registered holder of 46,303 Shares.  Morgan Keegan is a corporate entity, having its head office at 50 North Front Street, Morgan Keegan Tower, Memphis, Tennessee 38103. At the time of the Merger, Morgan Keegan received a Shareholder Payment in the amount of $2,222,544.00.

46.    Defendant The Fifth Third Bank and all other persons having a beneficial interest in the 36,054 Shares registered to The Fifth Third Bank at the time of the Merger (collectively, "Fifth Third Bank") was, at the time of the Merger, a registered holder of 36,054 Shares.  Fifth Third Bank  is a corporate entity, having its head office at Fifth Third Center, Cincinnati, Ohio 45263.  Fifth Third Bank has a New York agent for service of process c/o Corporation Service Company, 80 State Street, Albany, New York 12207. At the time of the Merger, Fifth Third Bank received a Shareholder Payment in the amount of $1,730,592.00.

47.    Defendants BMO Nesbitt Burns, a/k/a BMP Nesbitt Burns Inc., and BMO Nesbitt Burns SA, a/k/a BMP Nesbitt Brusn Trading Corp. S.A., and all other persons having a beneficial interest in the 31,839 Shares registered to BMO Nesbitt Burns and BMO Nesbitt Burns SA at the time of the Merger (collectively, "BMO") were, at the time of the Merger,

35

registered holders of 31,839 Shares.  BMO is located at 1 First Canadian Place, Toronto, Ontario M5X 1H3.  BMO has a New York agent for service of process c/o Michael G. Zeiss, c/o The Corporation, 430 Park Avenue, 15th Floor, New York, New York 10022. At the time of the Merger, BMO received an aggregate Shareholder Payment in the amount of $1,528,272.00.

48.    Defendant Comm. Bank of Kansas and all other persons having a beneficial interest in the 30,586 Shares registered to Comm. Bank of Kansas at the time of the Merger (collectively, "Comm. Bank") was, at the time of the Merger, a registered holder of 30,586 Shares.  The address of Comm. Bank is presently unknown.  At the time of the Merger, Comm. Bank received a Shareholder Payment in the amount of $1,468,128.00.

49.    Defendants Bank of Nova Scotia TAX and Bank of Nova Scotia WMF/CDS and all other persons having a beneficial interest in the 27,900 Shares registered to Novia Scotia TAX and Bank of Nova Scotia WMF/CDS at the time of the Merger (collectively, "Bank of Nova Scotia") were, at the time of the Merger, registered holders of 27,900 Shares.  Bank of Nova Scotia is located at 40 King Street West, Scotia Plaza, Toronto, Ontario M5W 2-X6 Canada.  At the time of the Merger, Bank of Nova Scotia received an aggregate Shareholder Payment in the amount of $1,339,200.00.

50.    Defendant Stern Agee & Leach and all other persons having a beneficial interest in the 22,196 Shares registered to Stern Agee & Leach at the time of the Merger (collectively, "Stern Agee") was, at the time of the Merger, a registered holder of 22,196 Shares.  Stern Agee is a corporate entity, having its head office at 800 Shades Creek Parkway, Suite 700, Birmingham, Alabama 35209.  At the time of the Merger, Stern Agee received a Shareholder Payment in the amount of $1,065,408.00.

36

51.    Defendant Wedbush Morgan Securities and all other persons having a beneficial interest in the 21,141 Shares registered to Wedbush Morgan Securities at the time of the Merger (collectively, "Wedbush") was, at the time of the Merger, a registered holder of 21,141 Shares. Wedbush is located at 1000 Wilshire Boulevard, Los Angeles, California 90017.  At the time of the Merger, Wedbush received a Shareholder Payment in the amount of $1,014,768.00.

52.    Defendant Bank of Tokyo - Mitsubishi and all other persons having a beneficial interest in the 20,700 Shares registered to Bank of Tokyo - Mitsubishi at the time of the Merger (collectively, "Bank of Tokyo") was, at the time of the Merger, a registered holder of 20,700 Shares.  Bank of Tokyo is located at 1251 Avenue of the Americas, New York, New York 10020.  At the time of the Merger, Bank of Tokyo received a Shareholder Payment in the amount of $993,600.00.

53.    Defendant D.A. Davidson & Co. and all other persons having a beneficial interest in the 19,522 Shares registered to D.A. Davidson & Co. at the time of the Merger (collectively, "D.A. Davidson") was, at the time of the Merger, a registered holder of 19,522 Shares.  D.A. Davidson is located at Davidson Companies, 8 Third Street North, Great Falls, Montana 59401. D.A. Davidson has a New York agent for service of process c/o CT Corporation System, 111 Eighth Avenue, New York, New York 10011. At the time of the Merger, D.A. Davidson received a Shareholder Payment in the amount of $937,056.00.

54.    Defendant Primevest Financial Services and all other persons having a beneficial interest in the 19,175 Shares registered to Primevest Financial Services at the time of the Merger (collectively, "Primevest") was, at the time of the Merger, a registered holder of 19,175 Shares. Primevest is located at 400 1st Street South, Suite 300, St. Cloud, Minnesota 56301. Primevest has a New York agent for service of process c/o CT Corporation System, 111 Eighth Avenue,

New York, New York 10011. At the time of the Merger, Primevest received a Shareholder Payment in the amount of $920,400.00.

55.     Defendant Timber Hill LLC and all other persons having a beneficial interest in the 17,631 Shares registered to Timber Hill LLC at the time of the Merger (collectively, " "Timber Hill") was, at the time of the Merger, a registered holder of 17,631 Shares.  Timber Hill is located at Timber Hill LLC / IBG LLC, 8 Greenwich Office Park, Greenwich, Connecticut 06831.  At the time of the Merger, Timber Hill received a Shareholder Payment in the amount of $846,288.00.

56.     Defendant Optionsxpress, Inc. and all other persons having a beneficial interest in the 16,089 Shares registered to Optionsxpress, Inc. at the time of the Merger (collectively, "Optionsxpress") was, at the time of the Merger, a registered holder of 16,089 Shares. Optionsxpress is located at 311 West Monroe Street, Suite 1000, Chicago, Illinois 60606. Optionsxpress has a New York agent for service of process c/o Rong Nie, 228 Park Avenue S #85556, New York, New York 10003. At the time of the Merger, Optionsxpress received a Shareholder Payment in the amount of $772,272.00.

57.     Defendant International Brokerage Retail Equity and all other persons having a beneficial interest in the 15,680 Shares registered to International Brokerage Equity at the time of the Merger (collectively, "IBRE") was, at the time of the Merger, a registered holder of 15,680 Shares.  The address of IBRE is presently unknown.  At the time of the Merger, IBRE received a Shareholder Payment in the amount of $752,640.00.

58.     Defendant Keybank National Association and all other persons having a beneficial interest in the 14,675 Shares registered to Keybank National Association at the time of the Merger (collectively, "Keybank") was, at the time of the Merger, a registered holder of

38

14,675 Shares.  Keybank is located at 4900 Teideman Road, Society National Bank, Brooklyn, Ohio 44114.  At the time of the Merger, Keybank received a Shareholder Payment in the amount of $704,400.00.

59.    Defendant Folio (FN) Investments, Inc. and all other persons having a beneficial interest in the 14,188 Shares registered to Folio (FN) Investments, Inc. at the time of the Merger (collectively, "Folio") was, at the time of the Merger, a registered holder of 14,188 Shares.  Folio is located at 8180 Greensboro Drive, 8th Floor, McLean, Virginia 22102.  At the time of the Merger, Folio received a Shareholder Payment in the amount of $681,024.00.

60.    Defendant Stephens Inc. and all other persons having a beneficial interest in the 13,340 Shares registered to Stephens Inc. at the time of the Merger (collectively, "Stephens") was, at the time of the Merger, a registered holder of 13,340 Shares.  Stephens is located at 111 Center Street, Little Rock, Arkansas 72201.  At the time of the Merger, Stephens received a Shareholder Payment in the amount of $640,320.00.

61.    Defendant Ferris, Baker Watts, a/k/a Ferris, Baker Watts, Incorporated, and all other persons having a beneficial interest in the 11,775 Shares registered to Ferris, Baker Watts at the time of the Merger (collectively, "Ferris") was, at the time of the Merger, a registered holder of 11,775 Shares.  Ferris is located at 1700 Pennsylvania Avenue NW, Suite 700, Washington DC 20005.  At the time of the Merger, Ferris received a Shareholder Payment in the amount of $565,200.00.

62.    Defendants Morgan Stanley & Co., Incorporated and Morgan Stanley/Retail (collectively "Morgan Stanley") and all other persons having a beneficial interest in the 15,766,519 Shares registered to Morgan Stanley & Co., Incorporated and Morgan Stanley/Retail at the time of the Merger (together with Morgan Stanley, the "Morgan Stanley Holders") were, at

39

the time of the Merger, registered holders of 15,766,519 Shares.  Morgan Stanley is a corporate

entity, that has its head office and conducts business at 1585 Broadway, New York, New York

10036.  Morgan Stanley & Co. Incorporated and Morgan Stanley/Retail are named herein solely

in their capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial

holders of 15,766,519 Shares.  At the time of the Merger, the Morgan Stanley Holders received

an aggregate Shareholder Payment in the amount of $756,792,912.00.

63.    Defendants Credit Suisse Securities US and Credit Suisse Securities/IA, a/k/a

Credit Suisse Securities (USA) LLC, (collectively, "Credit Suisse") and all other persons having

a beneficial interest in the 10,826,487 Shares registered to Credit Suisse Securities US and Credit

Suisse Securities/IA at the time of the Merger (together with Credit Suisse, the "Credit Suisse

Holders") were, at the time of the Merger, registered holders of 10,826,487 Shares.  Credit

Suisse is a corporate entity, having its head office at 11 Madison Avenue, New York, New York

10010.  Credit Suisse Securities US and Credit Suisse Securities/IA are named herein solely in

their capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial

holders of 10,826,487 Shares.  At the time of the Merger, the Credit Suisse Holders received an

aggregate Shareholder Payment in the amount of $519,671,376.00.

64.    Defendant Deutsche Bank Securities, a/k/a Deutsche Bank Securities Inc.,

("Deutsche Bank") and all other persons having a beneficial interest in the 9,321,761 Shares

registered to Deutsche Bank Securities at the time of the Merger (together with Deutsche Bank,

the "Deutsche Bank Holders") was, at the time of the Merger, a registered holder of 9,321,761

Shares.  Deutsche Bank  is a corporate entity, that has its head office and conducts business at 60

Wall Street, New York, New York 10005.  Deutsche Bank Securities is named herein solely in

its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders

40

of 9,321,761 Shares.  At the time of the Merger, the Deutsche Bank Holders received a Shareholder Payment in the amount of $447,444,528.00.

65.    Defendant Custodial Trust Company ("Custodial Trust") and all other persons having a beneficial interest in the 480,613 Shares registered to Custodial Trust Company at the time of the Merger (together with Custodial Trust, the "Custodial Trust Holders") was, at the time of the Merger, a registered holder of 480,613 Shares.  Custodial Trust is a corporate entity, having its head office at 101 Carnegie Center, Princeton, New Jersey 08540.  Custodial Trust Company is named herein solely in its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of 480,613 Shares.  At the time of the Merger, the Custodial Trust Holders received a Shareholder Payment in the amount of $23,069,424.00.

66.    Defendants Wells Fargo Bank, N.A. and Wells Fargo Investment LLC (collectively, "Wells Fargo") and all other persons having a beneficial interest in the 323,781 Shares registered to Wells Fargo Bank, N.A. and Wells Fargo Investment LLC at the time of the Merger (together with Wells Fargo, the "Wells Fargo Holders") were, at the time of the Merger, registered holders of 323,781 Shares.  Wells Fargo is a corporate entity, having its head office at 420 Montgomery Street, San Francisco, California 94163.  Wells Fargo Bank, N.A. and Wells Fargo Investment LLC are named herein solely in their capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of 323,781 Shares.  Wells has a New York agent for service of process c/o Corporation Service Company, 80 State Street, Albany, New York 12207. At the time of the Merger, the Wells Fargo Holders received an aggregate Shareholder Payment of $15,541,488.00.

67.    Defendant AG Edwards & Sons ("AG Edwards") and all other persons having a beneficial interest in the 283,871 Shares registered to AG Edwards & Sons at the time of the

41

Merger (together with AG Edwards, the "AG Edwards Holders") was, at the time of the Merger, a registered holder of Shares. AG Edwards is located at c/o Wells Fargo & Company, 420 Montgomery Street, San Francisco, California 94163. AG Edwards & Sons is named herein solely in its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of 283,871 Shares. At the time of the Merger, the AG Edwards Holders received a Shareholder Payment in the amount of $13,625,808.00.

68.     Defendant Wachovia Bank N.A. ("Wachovia") and all other persons having a beneficial interest in the 148,871 Shares registered to Wachovia Bank N.A. at the time of the Merger (together with Wachovia, the "Wachovia Holders") was, at the time of the Merger, a registered holder of 148,871 Shares. Wachovia is located at c/o Wells Fargo & Co., 420 Montgomery Street, San Francisco, California 94163. Wachovia Bank N.A. is named herein solely in its capacity as custodian, trustee, agent, representative or nominee on behalf of beneficial holders of Shares. At the time of the Merger, the Wachovia Holders received a Shareholder Payment in the amount of $7,145,808.00.

## NON-PARTIES

69.     Citibank, N.A. ("Citibank"), is referenced in its capacity as (i) predecessor administrative agent under the Senior Credit Facility (as hereinafter defined), and individually as lender thereunder; (ii) collateral agent under the Bridge Loan Facility (as hereinafter defined); and (iii) in such other capacities as it has acted under the Senior Credit Facility or the Bridge Loan Facility.

70.     Citibank International plc is referenced in its capacity as predecessor European administrative agent under the Senior Credit Facility and individually as lender thereunder.

71.     Citigroup Global Markets Inc. is referenced in its capacity as a joint lead arranger under the Senior Credit Facility and individually as lender thereunder.

72.     Goldman Sachs Credit Partners, L.P. ("Goldman"), is referenced in its capacity as (i) a joint lead arranger under the Senior Credit Facility and individually as lender thereunder and (ii) a joint lead arranger under the Bridge Loan Facility and individually as lender thereunder.

73.     Goldman Sachs International is referenced in its capacity as a joint lead arranger under the Senior Credit Facility and individually as lender thereunder.

74.     Merrill, Lynch, Pierce, Fenner & Smith Incorporated ("Merrill" or "Merrill Lynch") is referenced in its capacity as (i) investment banking advisor, through its Global Markets and Investment Banking Group, to Access and Blavatnik for the Lyondell acquisition, (ii) a joint lead arranger under the Senior Credit Facility and individually as lender thereunder and (ii) a joint lead arranger under the Bridge Loan Facility and individually as lender thereunder.

75.     Merrill Capital Corporation is referenced in its capacity as (i) a joint lead arranger under the Senior Credit Facility and individually as lender thereunder and (ii) administrative agent under the Bridge Loan Facility.

76.     ABN AMRO Inc. ("ABN AMRO") is referenced in its capacity as (i) a joint lead arranger under the Senior Credit Facility and individually as lender thereunder and (ii) a joint lead arranger under the Bridge Loan Facility and individually as lender thereunder.

77.     ABN AMRO Bank N.V. is referenced in its capacity as a joint lead arranger under the Senior Credit Facility and individually as lender thereunder.

78.     UBS Securities, LLC ("UBS"), is referenced in its capacity as (i) a joint lead arranger under the Senior Credit Facility and individually as lender thereunder and (ii) a joint lead arranger under the Bridge Loan Facility and individually as lender thereunder.

79.     Access Industries, Inc. upon information and belief, is an entity organized under the laws of Delaware under the control of Blavatnik.

80.     Nell Limited is an entity organized under the laws of Gibraltar under the control of Blavatnik.  As of the date of the Merger, Blavatnik had a 97.3% ownership interest in NAG Investments LLC, which in turn had at least a 96.5% interest in Nell Limited.  Other members of Nell Limited included Access Industries.

81.     Leonard Blavatnik, at all relevant times, was Chairman and President of Access Industries and a member of the Supervisory Board of LBI.  Blavatnik controlled Basell and later LBI through his ownership and control over Access and the related entities.

82.     Dan F. Smith served as the Chief Executive Officer and a Director of Lyondell prior to the Merger, and was the only inside director of Lyondell.

83.     Lincoln Benet, at all relevant times, was Chief Executive Officer of Access Industries, a manager of AI Chemical Investments LLC ("AI Chemical") and  a member of the Supervisory Board of LBI effective December 20, 2007.

84.     T. Kevin DeNicola, at all relevant times, was Chief Financial Officer of Lyondell.

85.     Edward J. Dineen, at all relevant times, was Senior Vice President of the Chemicals and Polymers segment of Lyondell, and a board member of Lyondell Chemical Company, as of March 28, 2008.

86.     W. Norman Phillips, at all relevant times, was former Senior Vice President of the Fuels and Pipelines segment of Lyondell.

44

87.    Stephen I. Chazen, at all relevant times, was member of the board of directors of Lyondell and Senior Executive Vice President and Chief Financial Officer of Occidental Petroleum Corporation.

88.    Alan Bigman was Chief Financial Officer of Basell, at all times relevant prior to December 20, 2007, including the period prior to the execution of the Merger Agreement on or about July 15, 2007 through the closing of the Merger on December 20, 2007, a representative of LyondellBasell Industries AF GP S.à.r.l. (the "GP"), the general partner of LBI (prior to the Merger, known as "Basell AF GP S.à.r.l.") and was a board member of Lyondell Chemical Company as of March 28, 2008.

89.    Philip Kassin was Head of Mergers and Acquisitions and Financing of Access Industries at all times relevant prior to December 20, 2007, including the period prior to the execution of the Merger Agreement on or about July 15, 2007 through the closing of the Merger on December 20, 2007, a representative of the GP, and upon information and belief, effective December 20, 2007, was a member of the Supervisory Board of LBI.

90.    Volker Trautz, at all relevant times, was Chief Executive Officer of Basell and later LBI.

91.    Ajay Patel, at all relevant times, was a Vice President of Mergers and Acquisitions at Access.

## JURISDICTION AND VENUE

92.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1409(a).  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H).

93.    This adversary proceeding is commenced pursuant to 11 U.S.C. §§ 548 and 550, to recover fraudulent transfers.

## DEFENDANT CLASS ALLEGATIONS

94.     Plaintiff brings this action as a defendant class action pursuant to, *inter alia*, Federal Rule of Civil Procedure 23(a), (b)(1)(B) and (b)(3) made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7023, on behalf of a class, consisting of all persons or entities who, directly, or indirectly through one or more mediate transferors, received Shareholder Payments (the "Class"). Excluded from the Class are: (i) the Secured Lender Releasees and the Settling Defendant Releasees, as defined in the Plan, (ii) persons against whom claims under 11 U.S.C. § 548 are asserted in the Non-Settling Defendants Action; and (iii) any individual who served as an officer or employee of the Debtors as of December 15, 2009 that is entitled to a release in accordance with Section 11.8(A) or (B) of the Plan.

95.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to the Plaintiff at this time, and can only be ascertained through appropriate discovery, upon information and belief, the Plaintiff states that there are thousands of members of the Class.  Upon information and belief, the identity of Transferees who are members of the Class that were not the registered holders of Shares, and who received Shareholder Payments indirectly through one or more mediate Transferees, may be ascertained by the records of registered shareholders or other persons from or through whom Shareholder Payments were made and, to the extent not made aware of the pendency of this action as a result of the Trustee's filing, may be notified of the pendency of this action pursuant to an appropriate notice of this Complaint, as directed by the Court.

96.     Any claims against and claimed defenses of the named representatives of the Class (the "Class Representatives") are typical of the claims against and claimed defenses of the

46

unnamed members of the Class.  The claims against and claimed defenses of each member of the Class arise out of the same factual circumstances involving the Merger and the transfer of Merger Consideration to shareholders of Lyondell in connection with the Merger.

97.     There are numerous questions of law and fact that are common to the unnamed members of the Class, and that predominate over any questions affecting only individual members of the Class, including, but not limited to:

a.     Whether the Merger was approved by the Dan Smith led Board of Lyondell with the knowledge that the transactions that would be executed in connection therewith, including the making of the Shareholder Payments, would result in the insolvency, financial demise and bankruptcy of LyondellBasell;

b.     Whether the modifications to pre-existing LyondellBasell earnings projections made during the months of May, June and July 2007 were made with the intent to hinder, delay or defraud the creditors of LyondellBasell;

c.     Whether the modifications to pre-existing LyondellBasell earnings projections made during the months of May, June and July 2007 were developed using valid methodologies and relevant and reliable forecasts and data or were fabricated and manipulated for the purpose of achieving an inflated price for Lyondell;

d.     Whether the knowledge of Dan Smith, Lyondell's then CEO and Chairman, regarding the fabricated and manipulated so-called "refreshed" earnings projections should be imputed, *inter alia*, to Lyondell;

e.     Whether in view of the capital structure that would result from the Merger, the economic conditions prevailing at the time of the Merger and the then forecasted outlook for petrochemicals and refining, the post-Merger financial demise of LyondellBasell was foreseeable at the time of the Merger;

f.     Whether the financial demise of LyondellBasell in the final months of 2008 and the filing of bankruptcy by LyondellBasell in January 2009 were the result of the Merger or, in the alternative, were the result of supervening events such as hurricanes, increased commodities prices and industrial accidents;

47

g.    Whether LyondellBasell received reasonably equivalent value in exchange for the Shareholder Payments made to Transferees;

h.    Whether, at the time that the Shareholder Payments were made to the Transferees, LyondellBasell was insolvent, or became insolvent as a result of the Shareholder Payments;

i.    Whether LyondellBasell, at the time that the Shareholder Payments were made, was engaged or was about to engage in a business or transaction for which remaining assets were unreasonably small in relation to the business or transaction; and

j.    Whether LyondellBasell, at the time the Shareholder Payments were made, intended, believed, or reasonably should have believed that they would incur debts beyond their ability to pay such debts as they became due.

98.    The Class Representatives will fairly and adequately protect and represent the interests of the unnamed members of the Class and have as much incentive to vigorously defend against the Plaintiff's claims as any unnamed class member would.

## FACTUAL BACKGROUND

### I.    Lyondell Shareholders Are Cashed Out in a Highly Leveraged Acquisition

#### A.    Lyondell – History and Background

99.    Incorporated in 1985 as a subsidiary of the Atlantic Richfield Company ("ARCO"), Lyondell initially consisted of an aggregation of assets that no longer fit within ARCO's business plan and for which it had been unsuccessful in finding a buyer.  Hoping to create a viable company, Lyondell managers deployed a strategy of opportunistic acquisitions, picking up assets being cast off by the major petrochemical companies who were exiting intermediate petrochemical manufacturing.

100.    After going public in 1989, the strategy continued, and during the ten year period from 1996 through 2006, Lyondell management grew revenues from $5.1 billion to $22.2 billion.  Growth was principally realized through acquisitions. These acquisitions included,

48

without limitation, the acquisition of ARCO Chemical (for approximately $8 billion in 1998), the creation of the Equistar Joint Venture in 1997, and the subsequent consolidation of those joint venture assets through buyouts of Lyondell's partner's interests in 2002 and 2004; and the acquisition of Millennium Chemicals in 2004.   In 1993, Lyondell diversified into petroleum refining through the creation of the joint venture with CITGO Petroleum Corporation ("CITGO").   In 2006, it greatly increased its investment in petroleum refining by buying out CITGO's interest in the joint venture and becoming the sole owner of a refinery on the Gulf Coast (the "Houston Refinery") formerly owned jointly with CITGO.

101.   By 2006, Lyondell was the third largest independent chemical company in the United States with facilities in several states, and a minor presence in Japan and France, although, as discussed below, its high cost structure, older facilities, and strategically poorly located operations put it at a competitive disadvantage to its global competitors.

102.   Characteristic of a company whose principal business was the manufacture of commodity petrochemicals, Lyondell's profits and earnings had tracked the peaks and troughs of the industry as a whole and had historically been very volatile.   Lyondell's EBITDA (*i.e.*, earnings before interest, taxes, depreciation, and amortization) for 2003, a "trough" year for the petrochemicals industry, was only approximately 24% of what it had been in 1995, a "peak" year.   Lyondell's historical stock prices reflected the company's earnings volatility and other investor concerns, such as its high leverage, which was the result of its acquisition activity. Offered to the public at $30 per share in 1989, Lyondell stock was an aftermarket disaster.   It peaked at approximately $36 per share in 1998 only to fall back to much lower levels and thereafter languished for years until it was again buoyed by a peak in the petrochemical and

refining industry cycles.  The chart below details Lyondell stock prices (high and low points) for

the years from 1999 through 2006, the year of Blavatnik's initial bid:

### Lyondell Stock Price (USD)

| YEAR | HIGH | LOW |
| --- | --- | --- |
| 1999 | 22.50 | 11.25 |
| 2000 | 19.50 | 8.43 |
| 2001 | 17.95 | 9.45 |
| 2002 | 17.59 | 10.33 |
| 2003 | 17.10 | 10.96 |
| 2004 | 29.59 | 14.58 |
| 2005 | 35.65 | 22.30 |
| 2006 | 27.60 | 18.86 |

103.    Since 2000, Lyondell management had included de-levering as a keystone of their

business strategy to enhance shareholder value.  Consistent with this objective, Lyondell used

cash flow from operations to repay more than $2.5 billion of debt from September 2004 to

December 2006.  Following the increase in the debt related to the acquisition of CITGO's

interest in Houston Refinery in August 2006, Lyondell increased its debt-repayment target from

$3 billion to $5 billion.  Nonetheless, Lyondell continued to be highly levered for a commodities

petrochemical producer.

104.    In 2006, and consistently continuing through 2007, petrochemicals industry

analysts predicted that, largely due to slowing demand growth and massive, low cost capacity

coming on line, the high margins then being experienced would begin to decline through 2007-

2008 as the industry headed into a supply driven downturn, bottoming out to a "trough" during

2010-2011.  Refining industry analysts likewise foresaw that the historically high margins of that

industry would contract in the coming years.  Lyondell was by no means ideally positioned to

withstand a squeeze on its earnings; its balance sheet for the year ended December 31, 2006 included approximately $8 billion of long-term debt, and Lyondell's debt to EBITDA ratio, a key credit metric, was at 3.4x for the year-end, one of the highest among comparable companies. Understandably, Lyondell's publicly stated financial goal for 2007 was "to enhance its financial flexibility by improving its balance sheet through debt reduction and by maintaining a strong liquidity position, with an ultimate goal of achieving an investment-grade credit rating." An investment-grade credit rating would further enhance Lyondell's flexibility and liquidity, critical to maintaining a sound financial condition through a downturn.

105.    Lyondell management's objectives of "improving its balance sheet," "maintaining a strong liquidity position," and "achieving an investment grade credit rating" were not to be realized.  Instead, Lyondell's management, presented with an opportunity to "cash out" while earnings were still high and before the company would skid into the next downturn, seized on that opportunity.  By the end of 2008, following the Transaction, LBI became the most highly leveraged petrochemical chemical producer, by far and bar none, with a total debt to EBITDA ratio of 7x.  In contrast, the median 2008 debt to EBITDA ratio for major petrochemical producers was 2.3x.

**B.**        **Blavatnik Seeks to Make a Major Petrochemicals Acquisition**

106.    In 1986, Leonard Blavatnik founded Access Industries, an international industrial group based in New York, of which he remains Chairman and President.

107.    Blavatnik, a self-described "strategic investor," became a public figure in connection with his role in the Soviet privatization auctions of the 1990s.  The privatization process resulted in the transfer of much of the vast industrial wealth of the former Soviet Union to an oligarchy of new multi-billionaire industrialists.  Blavatnik, whose net worth reportedly exceeds $7.5 billion, is frequently identified on lists of the world's wealthiest individuals.  The

full extent of his holdings, much of which is held by or through private companies, is not a matter of public record.

108.    Through Access and its affiliates and in conjunction with joint venturers, Blavatnik accumulated a portfolio of investments in a broad range of basic and advanced industries. After acquiring substantial assets in Russia, Blavatnik expanded his business interests to Europe and the United States. His investment portfolio, much of which has been acquired through highly-leveraged transactions, includes stakes in oil, coal, aluminum, petrochemicals and plastics, telecommunications, media, and real estate.

109.    By 2004-2005, low interest rates, loosening lending standards, and the post-Enron/WorldCom regulatory tightening on publicly held companies had given rise to the largest private equity boom the world had ever seen. Equity sponsors, funds, and "strategic" investors alike were on the lookout for acquisition targets that could be bought with borrowed money, would generate cash flows to pay for themselves, and could then be drained of their cash and/or sold at a profit.

110.    Whereas the conventional wisdom had been that only certain industries and only selected targets with low debt loads and stable cash flows were suitable candidates for highly-leveraged acquisitions, by 2005, these suitability criteria had been cast aside and almost any company with EBITDA could become the subject of a leveraged acquisition strategy. Investment bankers eager to generate their "deal" fees and confident that the non-investment grade or "junk" markets would buy whatever they were selling, competed in an overheated private equity market to sell "financing packages" for leveraged acquisitions. The rewards for the investment bankers and the institutions that originated these loans were great. Once securing a leveraged financing transaction and earning multi-million dollar fees for investment banking

services, the financing parties earned additional fees through the syndication of the loans and in their roles as administrative and collateral agents for the banks, institutions, and funds that held the loans. Generally, the financing parties who originated the loans would then sell most of the loans through syndication, keeping for themselves only the highest quality (most secure, best priced) piece of the loan and freeing up their own balance sheets to do the next deal, earn the next round of fees, and on and on.

111. Blavatnik was an active and eager participant in this investment market. On May 5, 2005, Access, through its affiliate Nell Acquisition S.à.r.l. (yet another Blavatnik-controlled entity) acquired Netherlands-based Basell from Royal Dutch Shell plc and the BASF Group in a highly-leveraged transaction. Access made this acquisition after several months of detailed due diligence after entering into a confidentiality agreement with Basell. Basell, a Luxembourg limited partnership, was an international chemicals company, then self-described as the world's largest manufacturer and marketer of polypropylene and advanced polyolefins, and a major European manufacturer and marketer of polyethylene. Eighty percent of the financing for the €4.5 billion price paid by Access for Basell was debt. Access's only contribution to Basell's equity was approximately €860 million in cash.

112. Once having acquired Basell, Blavatnik and his team at Access, including Philip Kassin, Senior Vice President and head of Mergers and Acquisitions and Financing, were on the lookout to leverage the investment in Basell by using it as an equity stake for much larger leveraged transactions. Blavatnik's strategy was to capitalize on the cheap money available in the non-investment grade credit markets to acquire, using maximum leverage and minimum equity, one or more major petrochemicals producers, thereby amassing a global petrochemical conglomerate. Counting on the spread between cheap long term money and return on assets

53

acquired, Blavatnik's strategy was to rely on earnings to service debt and reduce the debt load, freeing up cash to be distributed to him in the form of shareholder distributions or management fees. During the period from its acquisition by Blavatnik until December 20, 2007, when Basell was used as the platform for the acquisition of Lyondell, Blavatnik-controlled Access affiliates took out approximately €340.5 million (or $463 million) of cash from Basell in the form of dividends and management fees.

113.   While the overall strategy was simple, the pronounced cyclicality of the petrochemical industry and the refinery industry heightened the risk involved in a highly leveraged acquisition. Rather than enjoying stable cash flows that can be counted upon to cover fixed costs and charges (such as the costs of plant operation and maintenance as well as interest payments on mountains of acquisition financing), petrochemicals and refining had long been defined by their peaks and troughs in earnings.

114.   At the peak of a petrochemical cycle, limits on the capacity of existing plants to convert petrochemical "feedstocks" (most importantly crude oil and naphtha, a natural gas) into ethylene, propylene, and other products used in a wide range of industrial applications permit manufacturers to obtain high margins on their products. These high margins, in turn, result in increased investment in production as excess profits are reinvested in new capacity. When, eventually, this new capacity exceeds demand, overcapacity drives margins down and the industry heads into the next trough. Additional earnings volatility results from macroeconomic forces and changes in the prices of feedstocks. During 1993, the deepest trough in recent petrochemicals history, cash margins on ethylene, a major primary petrochemical commodity, dropped to approximately 13% of margins seen three years before, a reduction of 87%. In the subsequent peak in the ethylene cycle, margins shot up almost 1100% from 1993 levels (from

1.4 cents per pound to 16.8 cents per pound) only to drop again to 2.9 cents a pound in 2002. And during the more recent petrochemical industry trough of 2002, the drop in certain industry commodity spreads was even worse than in 1993.

115.   The petroleum refining industry is also subject to pronounced business cycles, experienced by industry participants in the form of extreme changes in the "crack spread" – the price differential between refined petroleum products (such as gasoline) and the crude oil from which they are derived.  The refinery industry is also subject to disruptions in the market due to geopolitical developments and natural disasters.  For example, in August and September 2005, back to back hurricanes rocked the energy infrastructure of Louisiana and Texas, disrupting as much as 30% of U.S. refining capacity.  More recently, the oil spill in the Gulf of Mexico, which may now be the single largest oil spill in United States history, could ultimately affect the petrochemical and refining industries located in that region and beyond, as some analysts are already forecasting the price of oil to increase to $100/barrel.

116.   A company that has both petrochemical assets and refinery assets is subject to both cycles.  Historically, petrochemical cycles occur over a five to seven-year period; petroleum refining cycles have been longer.  If both industries are in a downturn at the same time, the financial performance of a company relying on both petrochemical and refining assets will be doubly devastated.

117.   Notwithstanding that cash flows from a petrochemicals company could not reasonably be expected to be stable or necessarily predictable, Blavatnik was intent on acquiring major petrochemical assets in one or more highly leveraged transactions.  Given that the petrochemicals industry was poised for a downturn, Blavatnik's strategy was essentially a gamble on the timing and severity of the next downcycle.  If, after being acquired, the earnings

of the acquired company would remain strong enough for long enough, sufficient debt could be

paid off before the trough to enable the company to continue to fund its operations.  If successful

in maintaining ownership of assets through the turn of the petrochemical cycle, Blavatnik's

upside would be great.  Blavatnik could emerge on the other side of a trough with substantial

equity in a major global petrochemical company poised to generate robust earnings as the

industry heads toward the next peak.  If, as it turned out, he overleveraged and could not finance

his business through a downturn, because of his minimal equity investment, the pain would

largely be felt by others, namely the creditors of Lyondell and Basell.

### C.    Access Targets Lyondell for Acquisition

118.    By the spring of 2006, Access had identified Lyondell among several other

possible acquisition targets, including Huntsman International, LLC ("Huntsman"), a major

petrochemical company.

119.    Lyondell was much larger than Basell, with revenues for fiscal year 2005 of

approximately $18.6 billion, compared to Basell's approximately €8.6 billion in revenues

(approximately $10.2 billion).

120.    Although Blavatnik may have targeted Lyondell even earlier, the origins of the

acquisition of Lyondell by Basell can be traced to April 2006 when Lyondell was exploring the

alternatives of either selling its 58.7% interest in the Houston Refinery, or buying out its joint

venture partner, CITGO, an indirect subsidiary of the national oil company of Venezuela.

Blavatnik saw the auction process for the Houston Refinery as a means to learn more about

Lyondell and place Access in a better position to potentially acquire the whole company.

121.    On April 10, 2006, Blavatnik and Kassin arranged an introductory meeting in

New York with Dan F. Smith, Lyondell's President and Chief Executive Officer.  Signaling

Access's interests in acquiring Lyondell, Kassin also informed Smith that he had plans to meet

with Stephen I. Chazen, Senior Executive Vice President and Chief Financial Officer of Occidental Petroleum Corporation ("Occidental Petroleum") and a Director of Lyondell. Occidental Petroleum held, at the time, a significant percentage of Lyondell's outstanding stock.

122.   After the meeting, Blavatnik e-mailed Kassin asking him to prepare leveraged buyout models for Lyondell "with non-stupid prices (*i.e.* not 30 [per share])."

123.   Kassin called Smith on April 19, 2006 to follow up on the initial meeting and to request a further meeting in Houston to discuss the interest of Access in exploring a potential acquisition of Lyondell by Basell.  Smith, who had headed Lyondell while it pursued its strategy of growth through acquisitions, indicated that Lyondell was not for sale.

124.   Undeterred, on April 24, 2006, Kassin, acting on Blavatnik's instructions, contacted Smith to make an offer to purchase Lyondell for $24 to $27 per share.  Smith brought Blavatnik's offer to the attention of the Lyondell board at a regular meeting held on May 4, 2006.  At the same meeting, Chazen informed the board that representatives of Access had approached him in his capacity as Chief Financial Officer of Occidental Petroleum regarding an interest in Lyondell.  The board discussed the indication of interest and determined that the proposed price range, which was approximately 10% above the range at which shares of Lyondell had recently been trading, was insufficient.

125.   Weeks later, in early June 2006, Kassin was advised by Smith that Access's offer was deemed by the board to have been too low to warrant a formal response.  According to Smith, if Access wanted to negotiate, it would have to offer at least a 20% premium over the most recent closing price of its stock.  As of that time, the price of Lyondell stock had actually fallen a bit – back to approximately $24 per share.  Taking its cue from Smith's suggestion regarding a 20% premium, Access decided to analyze a possible acquisition of Lyondell for $28

per share.  Access provided Merrill, Blavatnik's investment banking advisor for the Transaction,

with substantive analyses for various acquisition scenarios, which Merrill used to model various

alternative structures for acquiring Lyondell at $28 per share.

126.    Shortly thereafter, Merrill prepared "discussion materials" for the acquisition of

Lyondell, including financial models of three variations of a leveraged acquisition of Lyondell at

$28 per share: an all cash acquisition of Lyondell assuming Lyondell had sold the Houston

Refinery; an all cash acquisition assuming Lyondell's full ownership of the Houston Refinery;

and, finally, a part stock, part cash acquisition.  Projections for Lyondell earnings used in this

modeling were derived from data from industry analyst Chemical Market Associates, Inc.

("CMAI") and from what were characterized by Merrill as "Wall Street" analysts.  Merrill's

projections for Lyondell, excluding the Houston Refinery segment, were as follows:

### EBITDA (in millions of $)

| YEAR | 2006 | 2007 | 2008 | 2009 | 2010 |
|------|------|------|------|------|------|
| CMAI Case | 3,316 | 3,140 | 2,744 | 2,511 | 2,165 |
| Analyst Consensus | 3,308 | 3,339 | 3,017 | 2,729 | 2,327 |

127.    As reflected in this presentation, earnings from Lyondell's chemicals operations

were expected to peak in 2006-2007 and to decline materially thereafter.

128.    In a summary to the materials headed "Why This Transaction Makes Sense,"

Merrill, which stood to be paid millions of dollars of fees from this transaction, claimed the

"timing was right" given the stage in the industry cycle and the "strength in the leveraged finance

market."

129.    On August 10, 2006, Access made its first formal bid to purchase Lyondell,

proposing in a written offer to acquire all of the outstanding shares of Lyondell for a cash price

of $26.50 to $28.50 per share. The letter attached the "highly confident letter" that Access requested Merrill to provide on July 23, 2006 in which Merrill expressed its opinion that it could procure adequate financing to finance the Merger and indicated that Access itself would provide up to $1 billion of cash as part of the financing of the proposed transaction. Access's offer letter, which was signed by Volker Trautz, CEO of Basell (on behalf of Basell), and Blavatnik (on behalf of Access), indicated that Access and Basell would need 30-45 days of due diligence "[w]ith the cooperation of Lyondell's management team" before signing a definite merger agreement.

130.    On August 14, 2006, a special meeting of the Lyondell board of directors was held to discuss the Access offer. After discussion, the board instructed Smith to advise Access and Basell that the proposal was not in the best interests of Lyondell's shareholders and that it did not wish to explore the proposal further. The rejection was communicated in writing to Access.

131.    Following its rejection of Access's offer, Lyondell announced that it would not be selling the Houston Refinery but would instead be acquiring CITGO's joint venture interest at a price of $2.1 billion. Lyondell management, anticipating a possible economic/industry downturn and tightening of the credit markets, planned to use Lyondell's increased share of the earnings from the Houston Refinery (which it would now own 100%) to continue its long-term de-levering strategy to pay down "as quickly as possible" another $2 billion of debt. However, at least one director, Chazen, expressed a belief to Smith that the refining industry was heading for a downturn. Meanwhile, the stock price for Lyondell began to edge upwards slightly. Responding to these developments, Access, while continuing to monitor Lyondell, turned its acquisition efforts elsewhere for the next several months.

132.    In February 2007, the price of Shares climbed past $30 per share and began trading in ranges not seen since mid-2005.  Rather than discouraging Blavatnik's interest in Lyondell, its rising stock price apparently resulted in a concern that an opportunity was being lost.  Abandoning his previous position that a $30 per share offering price for Lyondell would be "stupid," on February 28, 2007, Blavatnik emailed Kassin and Ajay Patel, a Vice President of Mergers & Acquisitions at Access, asking them to prepare models based on an acquisition of Lyondell at $35 to $38 per share.

133.    Merrill was requested to assist Access by updating its June 2006 financial models for the proposed acquisition, which had assumed a price per share for Lyondell of $28, with revised models based on a price per share of $38.  Presentation materials, dated March 27, 2007, were prepared by Merrill Global Markets.  The March 27, 2007 presentation materials included "Base Case" projections and valuations for the combined Lyondell/Basell enterprise.  Merrill's March 27, 2007 "Base Case" EBITDA projections for Lyondell on a standalone basis (the "March 2007 Projections") were as follows:

### EBITDA (in millions of $)

| YEAR | 2007 | 2008 | 2009 | 2010 | 2011 |
|------|------|------|------|------|------|
| Chemicals | 1,877 | 1,533 | 1,031 | 809 | 848 |
| Refining | 1,187 | 1,219 | 1,294 | 1,258 | 1,132 |
| Total | 3,064 | 2,752 | 2,325 | 2,067 | 1,980 |

134.    The March 2007 projections for Lyondell's petrochemical operations were identified by Merrill as having been developed from market sources and industry analyst CMAI. Consistent with Merrill's mid-2006 presentation, Lyondell's earnings from its chemicals

operations were projected to decline materially after 2007. Refining projections were derived from data available from the "data room" used at the time of the CITGO auction. These showed that earnings from refining were anticipated to be essentially flat during the five year projection period of 2007-2011 although declining significantly after 2009. With respect to Basell's earnings projections, Merrill relied on Basell management forecasts which were flat even past 2009.

135.    The materials included a "Downside Case," which, without explanation, was calculated by decreasing "Base Case" assumptions by 15% with respect to Basell – a downside case much less severe than previous historical troughs. Merrill stated a "Base Case" valuation of Basell and Lyondell combined at between $23.2 billion and $27.2 billion compared to the "Base Case" valuation that it had included in its June 2006 presentation of between $21.3 billion and $27.7 billion. Embodied in this combined enterprise valuation was a "mark to market" value of Basell equity of between $3.9 and $4.6 billion, purportedly based upon the public trading multiples of its peer group. Access and Blavatnik knew that the valuation of Basell's equity was without credible basis.

136.    In its "Executive Summary," Merrill laid out the various claimed rationales for the deal. One deal driver was cheap, easy money available through "covenant lite" credit arrangements. Quite simply, according to the Executive Summary, the main deal driver was the fact that the debt could be sold to the credit markets: "given…[t]he historically high aggressiveness in the financing markets at the current time, we believe an acquisition of [Lyondell] could be accomplished with no incremental cash equity from [Access] at prices in the upper $30s."

137.   The other deal driver was simple greed.   According to Merrill, without any "incremental cash equity" from Access other than its investment in Basell, five years out from an acquisition of Lyondell, Access's incremental equity "would be in the range of $4 billion to $8 billion."   Thus, according to Merrill, while the transaction would result in "a meaningfully higher equity risk," the upside potential was enormous.

138.   From March 27, 2007 through July 10, 2007, Merrill prepared successive presentations for Access that included EBITDA projections for Lyondell for the five year projection period.   During this period, Merrill's projections of Lyondell's future earnings remained substantially unchanged from the March 2007 Projections.

139.   Notwithstanding that the time horizon for the forecasted industry/economic downturn was closer (and that there was, therefore, less remaining time to benefit from earnings at peak levels) and that Lyondell at $38 per share would cost approximately $2.5 billion, or 36%, more than Lyondell at $28 per share nine months prior, the analysis set forth in the March 27 presentation materials was strongly bullish.   According to the Merrill presentation materials, Lyondell, a company which had yet to attract other potential suitors, purportedly was "the single most attractive transformation acquisition opportunity for [Basell]."   The increase in Lyondell's stock price was "explained" by Lyondell's acquisition of CITGO's interest in the Houston Refinery, the recent sale of Lyondell's titanium dioxide (Ti02) assets for $1.2 billion, analysts' projections, and increases in the stock prices of Lyondell's publicly traded peers.   Echoing the sentiments (discussed below) of Lincoln Benet, CEO of Access, the Merrill materials presented an acquisition of Lyondell as a gamble that offered a big pay out if Lyondell could survive a "downside scenario."   According to Merrill, in terms that Merrill knew would resonate with Access and Blavatnik, the transaction could be financed "with 100% debt."

140.   A related Merrill "Executive Summary," dated April 10, 2007, touted the deal, purporting to answer the questions "Why Hugo?"[4] and "Why Now?" Succinctly stated, the answer was, "Because you can." In this document, the proposed transaction was characterized as a way to capitalize on "[h]igh levels of leverage at historically low spreads," "covenant lite structures" and "acceptance of aggressive rollover of equity." Access, using privately held Basell as equity (which, based on unrealistic earnings projections that failed to reflect the forecasted downturn, was given a preposterously high and artificial valuation), had the ability to exploit the current credit market conditions to acquire equity in Lyondell purportedly worth billions of dollars for itself without risking any substantial capital of its own. Merrill and other lead arrangers could then off-load the junk into the market and earn huge fees.

141.   After receiving the March 27 presentation materials, Access asked Merrill to provide an analysis of whether, if the forecasted industry downturn turned out to be more severe than analysts were then projecting, the combined companies would be able to cover their debt expenses and meet their other financial obligations. In response to this request, Merrill supplemented the presentation materials with a "Credit Stress Test" that illustrated, according to Merrill, "the resilience of the proposed capital structure."

142.   Merrill's Credit Stress Test was based on a purchase price for Lyondell common stock of $38 per share and total funded acquisition debt in the amount of $19.6 billion, a significant feature of which was "Pay in Kind" or "PIK" notes, which would allow the company to meet its obligation to pay interest through the issuance of additional notes in lieu of cash. As an analytical tool for purposes of testing the credit, the Credit Stress Test modified forecasts for years 2007 through 2013 to replicate historical trough conditions seen in 1993, described erroneously as the deepest trough in recent history.

---

[4] "Hugo" was a code name used to describe the Lyondell acquisition.

143.     The Credit Stress Test analysis showed that, on the assumption of a $38 purchase price and the use of PIK notes, the combined enterprise could satisfy its interest payments under the assumed capital structure.  However, the actual terms of the Transaction in December 2007 did not conform to the assumptions used for the Credit Stress Test.  Had a "Credit Stress Test" been applied to actual terms of the Transaction – *i.e.*, with a $48 per share purchase price, the capital structure that was actually put into place upon the Merger (which did not include PIK notes), and incorporating the capital expenditures and capital requirements projected or anticipated as of the closing date of the Merger – LBI would have failed the Credit Stress Test.

144.     As set forth more fully below, the deal terms materially changed after March 27, 2007, with the purchase price escalating from $38 per share to $48 per share, after Blavatnik lost out to an entity controlled by Apollo Management, L.P. ("Apollo") in bidding for Huntsman. With Blavatnik determined to do the deal at any price provided only that he was not required to invest any "incremental equity," Merrill did not re-do the previous "Credit Stress Test" to reflect these changes to its assumptions.

**D.       Blavatnik Acquires the Toe-Hold Position in Lyondell**

145.     Merrill's March 27 materials and their supplements also included tactical advice on the acquisition, including the suggestion that Access proceed with the acquisition of Lyondell by first establishing a toe-hold of up to 14.9% in Lyondell.  In this connection, Merrill brought to Access's attention the fact that Occidental Petroleum, whose Senior Executive Vice President and CFO, Chazen, sat on Lyondell's board, had acquired a block of Shares in connection with a sale of assets, and was in the process of disposing of its Lyondell holdings, which consisted of 20,997,020 shares.

146.    In an e-mail dated April 5, 2007, Lincoln Benet suggested that Access should acquire a block of Lyondell stock that was "big enough to matter," and should focus on acquiring an existing stake of Lyondell stock as a precursor to a Lyondell bid.  Merrill advised the Access representatives that Access stood to make a profit on such a block of shares either upon an Access buyout of Lyondell or a buyout by a third party.

147.    For the sole purpose of acquiring the Toe-Hold Position, Blavatnik formed AI Chemical, with Benet, Access's Chief Executive Officer as one of its Managers.  On May 4, 2007, Occidental Petroleum, through its affiliate Occidental Chemical Holding Corporation ("OCHC"), entered into agreements with Merrill Lynch by which Occidental Petroleum would divest itself of 20,990,070 shares of Lyondell common stock.  On the same day, AI Chemical entered into a postpaid share forward transaction with Merrill Lynch (the "Merrill Lynch Agreement"), with an effective date of May 9, 2007.  The Merrill Lynch Agreement gave AI Chemical until May 9, 2008 to elect to either physically settle the contract for a price of $32.11 per share or to settle the transaction  (*i.e.*, to receive or pay the change in the value of the underlying shares).  At the time AI Chemical entered into the Merrill Lynch Agreement, Blavatnik was the sole member of AI Chemical, and the option on the Toe-Hold Shares was apparently AI Chemical's sole asset.

148.    On May 11, 2007, Blavatnik and AI Chemical filed a Schedule 13D reporting having entered into the Merrill Lynch Agreement. The Schedule 13D disclosed that Blavatnik and AI Chemical might seek to engage in discussions with Lyondell concerning the possible acquisition of all the shares of Lyondell and a possible merger between Lyondell and affiliates of AI Chemical, including Access or Basell.  On May 11, 2007, Lyondell received a letter sent on

65

behalf of AI Chemical and Blavatnik, stating that Blavatnik, through AI Chemical, might acquire over 50% of the outstanding stock of Lyondell.

149.   The day Blavatnik and AI Chemical filed the Schedule 13D, Lyondell's stock closed at $36.75 per share, up 11% from the day before.

150.   At around the same time that Blavatnik signaled his interest in acquiring Lyondell, Smith rejected an overture from Apollo to consider a "going private" transaction. Although Smith claimed that he rejected the Apollo proposal for a management-led LBO as inconsistent with management's fiduciary duties, in reality he had no interest in a management buy-out.  This is  because Smith knew that the company could not sustain the level of debt such a transaction would require and that, if he participated in a management-led LBO, he would be left with substantial holdings of Lyondell stock.  He determined that it would be far better to be bought out in a leveraged transaction than to be left, in a management-led LBO, with a company crippled by acquisition debt.

151.   Indeed, Smith acknowledged as much in 2007 when he testified that he would not lead a management led buyout because, "if you do a leveraged buyout stand-alone and you try to finance this with the valuation you've got in earnings, there will come a year in the very near future that you won't be able to pay the interest bill.  There's just too much variation in the numbers…."

152.   When Blavatnik's acquisition of the Toe-Hold Position was made public, Smith, speaking at a conference in Las Vegas, spoke about the implications of a leveraged buy out of Lyondell by an equity sponsor, such as Access, as the markets had anticipated in light of the Schedule 13D filing.  Smith admitted that such a transaction could "enrich the shareholders" but observed the very different impact on Lyondell creditors.  Smith continued: "If you're a

66

bondholder, I am not sure you get enriched in that situation.  If you think you are going to have a down cycle in the chemical markets, I don't think you want to add $8 billion, $10 billion debt to this and live through that."

153.    In response to the news that Blavatnik had acquired the Toe-Hold Position and disclosure that Lyondell was a potential acquisition target, Smith saw his opportunity to cash out. To maximize shareholder (and management) profits from a buy-out, Smith knew it would be necessary to hype Lyondell's earnings capacity.   In recent years however, Lyondell had not attempted to develop accurate earnings projections (essential to any valuation), and, indeed, Smith had grown deeply skeptical of the ability to accurately project Lyondell earnings. Annually, however, since at least 2003, Lyondell had engaged in an annual planning process, known internally as the Long Range Plan (the "LRP"), which included the preparation of projections for use in the context of strategic and capital expenditure planning.  Shortly after the announcement of the acquisition of the Toe-Hold Position, Smith decided that it was necessary to "refresh" the earnings projections included in the then current LRP.   Such "refreshed" numbers were later to be used by Smith to support a valuation for Lyondell that he hoped would justify the exorbitant  price he demanded.

E.      **The Long Range Plan**

154.    The LRP process commonly began during the summer months and was completed by the end of each calendar year.   The primary purposes of the LRP process were business planning and to focus on strategy and resource allocation.   The LRP process culminated with approval by the board of an annual budget for capital expenditures.  As a component of the LRP process, EBITDA projections were developed for each of the major business divisions.  Notably,

the earnings projections included in the LRP were not intended for use in valuing the company, for obtaining financing, or for an M&A transaction.

155.    There was broad internal participation in the LRP process.  Participants included Norman Phillips and Edward Dineen, the heads of  business units (refining and chemicals) and Karen Twitchell, the company's treasurer.  Twitchell reviewed projected cash flows, the sources and uses of cash, and provided input on the reasonableness of certain assumptions used in the LRP.  An ongoing operational group referred to as the Business Performance Analysis and Reporting group ("BPAR"), also participated.  In addition, back office departments, such as human resources, also provided information that went into the LRP.

156.    To initiate the process, the officer group, working under Smith's direction, obtained input from outside consultants to provide views on macroeconomic indicators, such as global GDP growth, regional GDP growth, crude oil forecasts, natural gas forecasts, and interest rates.  The officer group and Smith would then formulate a view on the various macroeconomic indicators discussed with the consultants.  In order to develop these projections, among other things, the business units utilized outside consultants to formulate views on where the particular business was heading in the near term.  The business units would either have meetings with the consultants, or they would reference materials published by the consultants.  The heads of each business segment were to utilize the agreed upon assumptions in order to develop plans for their respective business units.

157.    According to management, the LRP process was a full bottoms-up analysis of Lyondell's businesses and operations.  Heads of each business unit would apply the assumptions developed by management to their particular unit.  EBITDA projections would be developed starting at the plant level and then be aggregated to develop a unit projection.  Each business unit

would develop projections on volumes, margins, prices, operating rates, and capital spending that it felt was necessary or believed would be helpful to the overall business.

158.    The process involved multiple meetings within each business unit, with Dineen and Phillips reviewing the initial numbers and providing questions and comments on those initial projections, and each business unit going through the same process.  Manufacturing, which is responsible for the day to day operation of Lyondell's plants, provided estimates for turnarounds, safety, environmental improvements, plant process, and cost improvements.

159.    After each business unit finalized its analysis, the numbers were provided to corporate development, which would create the actual LRP.  Creation of the LRP was followed by numerous presentations by the heads of each unit to senior management, and, much like the process within the business units, there was back and forth between senior management and the business heads about various aspects of the LRP.  Ultimately, the LRP was presented to the Lyondell Board of Directors and the first year of the LRP was incorporated as the capital budget for the following year.

160.    The Lyondell Capital Budget and Operating Plan for years 2007 through 2011, dated December 6, 2006 (the "2007 Long Range Plan"), the last LRP prior to the Transaction, contained the following projections for EBITDA:

## EBITDA (in millions of $)

| YEAR | 2007 | 2008 | 2009 | 2010 | 2011 |
|------|------|------|------|------|------|
| EC&D[5] Segment | 1,465 | 1,295 | 599 | 564 | 518 |
| PO&RP[6] Segment | 712 | 657 | 664 | 701 | 676 |

[5] Ethylene, Co-Products & Derivatives
[6] Propylene Oxide and Related Products

69

| Refining Segment | <u>1,333</u> | <u>1,324</u> | <u>1,375</u> | <u>1,110</u> | <u>932</u> |
|---|---|---|---|---|---|
| Total | 3,510 | 3,276 | 2,638 | 2,375 | 2,126 |

161.    Upon information and belief, in the Spring of 2007, on or after April 24, 2007, Lyondell made its annual presentation to ratings agencies and provided a five-year EBITDA projection for each of its business segments (the "Spring 2007 Ratings Agency Presentation").

162.    The EBITDA projections in the Spring 2007 Ratings Agency Presentation had been adjusted downward from the 2007 Long Range Plan to reflect that the company had been failing to meet its projections for earnings from both refining and petrochemcials for the current year.    The LRP projections for 2007 and those used in the Spring 2007 Ratings Agency Presentation are contrasted below:

### EBITDA (in millions of $)

|  | **<u>LRP</u>** | **Spring 2007 Ratings Agency Presentation** |
|---|---|---|
| EC&D Segment | 1,465 | 1,330 |
| PORP Segment | 712 | 650 |
| Refining Segment | 1,333 | 1,270 |
| Total EBITDA | 3,510 | 3,250 |

**F.    Smith Directs the Creation of "Refreshed" EBITDA Projections**

163.    Although the projections for year 2007 were lowered in the Spring 2007 Ratings Agency Presentation from those found for those segments in the 2007 Long Range Plan, earnings projected for 2008-2011 remained the same since, according to Smith, "management's perspective for 2008-2011 had not changed."    According to Smith, other than the Spring 2007

Rating Agency Projections, Lyondell did not provide any financial projections outside the Company during the first half of 2007.

164.    Despite having been of the view that nothing had changed to alter the outlook for 2008-2011 since the development of the 2007 LRP, in response to Blavatnik's acquisition of the Toe-Hold Position, Smith determined that he needed to "refresh" the projections that had been included in the LRP, since they were too low to justify the high price at which he wanted to sell Lyondell to Blavatnik.

165.    The perfunctory process by which Lyondell "refreshed" its projections was improvised in response to the perceived opportunity presented by Blavatnik's interest in Lyondell and bore no resemblance to the LRP process.  Rather than broadly involving all levels of management, the preparation of refreshed projections involved a small inner circle, selected by Smith, and was completed in a "very compressed time period," and it is unclear if Smith's small inner circle did anything other than adopt the results desired by Smith to generate improved, manipulated LRP projections.  No bottoms-up, plant-by-plant analysis of earnings was undertaken.  Unlike the LRP process, which was designed to be used to for planning purposes, refreshing the LRP projections had no purpose other than to justify a high price for Lyondell.

166.    On June 18, 2007, less than two weeks after a meeting in London between Trautz and Smith during which the two had discussed a potential transaction and Smith told Trautz that he needed an offer of $48 per share, Robert Salvin of Lyondell, who had been enlisted by Smith to assist in coming up with new projections, provided Kevin DeNicola, then Chief Financial

71

Officer of Lyondell, with two new sets of projections called "Today's View" and "Alternate View" as follows: [7]

### EBITDA (in millions of $)

| Refining | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|
| 2007 Long Range Plan | 1,333 | 1,324 | 1,376 | 1,110 | 933 | 6,078 |
| Case 1 - "Today's View" | 1,700 | 1,700 | 1,600 | 1,500 | 1,300 | 7,800 |
| Case 2 - "Alternate View" | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 8,000 |

| EC&D | | | | | | |
|---|---|---|---|---|---|---|
| 2007 Long Range Plan | 1,465 | 1,295 | 599 | 564 | 518 | 4,441 |
| Case 1 - "Today's View" | 1,150 | 1,150 | 800 | 700 | 600 | 4,400 |
| Case 2 - "Alternate View" | 1,150 | 1,150 | 800 | 700 | 600 | 4,400 |

| PO&RP | | | | | | |
|---|---|---|---|---|---|---|
| 2007 Long Range Plan | 712 | 657 | 664 | 701 | 676 | 3,410 |
| Case 1 - "Today's View" | 712 | 657 | 664 | 701 | 676 | 3,410 |
| Case 2 - Alternate View | 712 | 657 | 664 | 701 | 676 | 3,410 |

| Total Company EBITDA | | | | | | |
|---|---|---|---|---|---|---|
| 2007 Long Range Plan | 3,510 | 3,276 | 2,639 | 2,375 | 2,125 | 13,925 |
| Case 1 - "Today's View" | 3,562 | 3,507 | 3,064 | 2,901 | 2,576 | 15,610 |
| Case 2 - "Alternate View" | 3,462 | 3,407 | 3,064 | 3,001 | 2,876 | 15,810 |

167.    As shown in the chart above, the "refreshed" projections for "Today's View" included $1.685 billion of additional EBITDA as compared to the EBITDA projections contained in the 2007 Long Range Plan. Management projections for Lyondell refining EBITDA show a significant increase in projected EBITDA for 2008 over 2007 ($1.7 billion compared to $1.279 billion, as reflected in the Spring 2007 Rating Agency Presentation), reflecting the apparent view that refining margins for 2008 would not merely remain at the high

---

[7] In its required public disclosures regarding the background of the Transaction, including its October 2007 proxy statement soliciting shareholder approval of the Merger, Lyondell failed to disclose the communications between Smith and Trautz that actually occurred at a June 7, 2007 London dinner meeting, and falsely stated that the $48 per share price was first raised on July 9, 2007.

2007 levels seen in the first half of 2007, but would actually increase significantly in 2008 (by about 14%) and remain above 2007 levels through 2009. Such projections were "developed" (actually, concocted) without any reliance on any third-party consultants or industry experts. In fact, the industry outlook implied by these projections was inconsistent with industry analysts' forecasts at the time, something known to Smith and his inner circle of Lyondell management confederates. Notably, and reflecting that, rather than being *bona fide* estimates developed using actual data, these projections had been pulled from a hat; the "refreshed" refining projections were round numbers, crudely reflecting the arbitrary nature of the "refreshed" projections.

168.    In reality, the new projections were based on little more than the purported and unfounded views of Smith himself, who was seen as the "driving force" behind the decision to acquire 100% ownership from CITGO of the Houston Refinery in the first instance. Having been responsible for the acquisition of the Houston Refinery, Smith purportedly believed that the high price paid by Lyondell for the refinery was justified by the prospects for continued high refining margins. By the time that Blavatnik acquired his Toe-Hold Position, however, Smith was aware that his views were contradicted by existing industry outlook and lacked any objective basis. Smith's unfounded industry outlook for refining was denominated as "Dan's spread," and represented Smith's purported view on the crack spread for heavy crude. In reality, "Dan's spread," which was referred to in a spreadsheet containing the new Lyondell EBITDA projections, was a combination of self-promotion and brazen fabrication.

169.    By way of background, the Maya 2-1-1 crack spread is a commonly used indicator of refining margins from "heavy sour" crude oil. The Maya 2-1-1 crack spread measures the difference between the cost of two barrels of Maya crude oil and the price of one gallon of gasoline and one gallon of home heating oil on the spot market.

73

170.   The Houston Refinery is a complex refinery, which means that it is able to refine a range of heavier high sulfur crude oils from which greater quantities of contaminants, such as sulfur, metals and organic acids must be removed.  The earnings potential of a complex refinery depends upon its ability to process lower cost heavy sour crude oil feedstock at costs that allow refined products to compete with products refined from lighter crudes.  The relative profitability of a simple versus complex refinery will depend on current market conditions, in particular the price differential between light and heavy crude oil, the incremental cost to refine that heavy crude oil and maintain the complex refining facility, and the value received for the lower valued byproducts such as petroleum coke and sulfur.

171.   However, according to information available in various contemporaneous industry publications, industry experts were forecasting declines in refining margins of anywhere between 3%-25%, based on, among other things, new additions to refining capacity, declining heavy crude oil output and the U.S. and Europe renewable fuels initiatives.  Both Purvin & Gertz ("P&G") and Turner Mason & Co. ("TMC"), the only industry consultants that are known to have developed forecasts specifically of the Maya 2-1-1 crack spread in 2007, projected that beginning in 2008 and continuing though the five year projection period, the Maya 2-1-1 crack spread would decline from levels seen in 2007.

172.   In preparing presentations for Access regarding the proposed acquisition of Lyondell by Basell between August 2006 and July 10, 2007, Merrill had incorporated EBITDA projections for the Houston Refinery derived from the data furnished to prospective bidders for the refinery in 2006.  Such projections were recognized by Merrill to be "in line with consensus estimates and projected peer performance."

173.    Merrill's "Wall Street Consensus" or Merrill's projections for the Houston Refinery (on a standalone basis), prior to July 15, 2007 are as set forth below:

## Houston Refinery EBITDA (in millions of $)

| Merrill Presentation | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|
| April 1, 2007 (100% Mark-to Market) | 1,187 | 1,219 | 1,294 | 1,258 | 1,132 | 6,090 |
| April 10, 2007 (credit stress test) | 1,069 | 975 | 906 | 755 | 566 | 4,271 |
| June 17, 2007 (CML 13K Base Case) | 1,187 | 1,219 | 1,294 | 1,258 | 1,132 | 6,090 |
| June 17, 2007 (ML 13K Downside Case) | 1,009 | 1,036 | 1,100 | 1,069 | 962 | 5,176 |
| July 9, 2007 | 1,187 | 1,219 | 1,294 | 1,258 | 1,132 | 6,090 |
| July 10, 2007 | 1,187 | 1,219 | 1,294 | 1,258 | 1,132 | 6,090 |

174.    The views of other analysts were similar.  On July 5, 2007, just two weeks after Lyondell's projections were "refreshed," Paul Smith, a Managing Director at Citibank, sent Robert Salvin and Mario Portela of Lyondell, a Citibank presentation entitled "Project Launcelot," in which Citibank set forth the Wall Street outlook for Lyondell's EBITDA. Citibank projected Houston Refinery EBITDA for 2007-2008 to be $640 million less than Smith's "Today's View."

175.    As is clear from the Merrill analysis, the broad consensus was that Lyondell would experience much lower EBITDA results from its refining operations than those concocted by Smith and his inner circle.

75

176.    The impact of speculative and unsupported projections for increased profitability

from the Houston Refinery, as Smith knew at the time in manipulating Lyondell's EBITDA

projections, was to add approximately $2.0 billion of additional projected EBITDA to the

already highly optimistic projections contained in the 2007 Long Range Plan.  The five year

projection period EBITDA from refining operations set forth in the management presentation

eventually presented to support the Merger included, overall, approximately $3 billion in

speculative EBITDA.

177.    The "refreshed" projections also included speculative and unsupported forecasts

for Lyondell EBITDA from petrochemical operations. Consistent with widely held industry

outlook of the petrochemicals industry cycle, in each year since 2003 (2003 through 2006),

Lyondell management had prepared a long range plan (five-year) showing that management

anticipated that EBITDA from petrochemical operations would decrease significantly from 2007

to 2008 and would continue to decline thereafter.

178.    Thus, management's 2004 LRP showed a decrease in Lyondell EBITDA

(excluding refining) for 2008 versus 2007 of approximately 29%; management's 2005 LRP

showed a decrease in Lyondell EBITDA (excluding refining) for 2008 versus 2007 of

approximately 32%; management's 2006 LRP showed a decrease in Lyondell EBITDA

(excluding refining) for 2008 versus 2007 of 15%; and finally, the 2007 Long Range Plan

showed a decrease in Lyondell EBITDA (excluding refining) for 2008 versus 2007 of 8.8%.  At

odds with management's previous outlook (and with the prevailing industry outlook), the

management projections for Lyondell EBITDA (excluding refining) in the refreshed projections

include almost no decrease in projected Lyondell  EBITDA (excluding refining) from 2007 to

2008.  In fact, the management projections for 2008 Lyondell EBITDA (excluding refining)

($1.806 billion) represented a 24% increase over actual 2007 Lyondell EBITDA (excluding refining).

179.    In addition to including an unsupported forecast of improved margins for 2008 over 2007, the "refreshed" petrochemical projection included unsupported improvements (relative to the 2007 Long Range Plan) for the later years in the projection period.  These improvements amounted to hundreds of millions of dollars of speculative earnings for which there was no support.

180.    The impact of the speculative and unsupported assumptions concerning the profitability of the Lyondell petrochemical operations was to add approximately an additional $1.6 billion of EBITDA to the already highly optimistic projections contained in the 2007 Long Range Plan.

181.    Overall, "Today's View" included an aggregate of $3.4 billion of EBITDA over the five-year period over and above the Merrill projections first presented to Access in March 2007 (and substantially unchanged thereafter until July 14, 2007), which Merrill had based on CMAI's updated 2007 industry outlook as well as other industry sources and the 2006 data room appraisals of the Houston Refinery.  "Today's View" and the Merrill view are compared below:

### EBITDA (in millions of $)

| YEAR | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|------|------|------|------|------|------|-------|
| "Today's View" | 3,562 | 3,507 | 3,064 | 2,901 | 2,576 | 15,610 |
| Merrill's Pre-July 2007 View | 3,064 | 2,752 | 2,325 | 2,067 | 1,980 | 12,188 |
| Difference | 498 | 755 | 739 | 834 | 596 | 3,422 |

### G.   **Blavatnik Turns His Attention to Huntsman**

182.    While Smith was "refreshing" Lyondell's projections in preparation for negotiations with Blavatnik, Blavatnik was exploring other acquisition opportunities. Blavatnik was internally known at Access as the "King of Optionality." Blavatnik had, as among potential acquisition targets, for some time also been actively pursuing Huntsman. After acquiring the Toe-Hold Position, Blavatnik kept his "options" regarding Lyondell on hold over the next several weeks while his Access deal team moved forward on another front with a potential acquisition of Huntsman. On June 26, 2007, after extensive negotiations and due diligence by Basell, Basell and Huntsman entered into a definitive agreement pursuant to which Basell committed to acquire Huntsman in a transaction valued at approximately $9.6 billion.

183.    Upon learning of the Huntsman deal, Smith became concerned as he believed that it was unlikely that Blavatnik would acquire both Huntsman and Lyondell. In fact, just after learning that Blavatnik entered into a definitive agreement with Huntsman, Smith remarked in an email to DeNicola, "[n]ow we will have to contend with Len and Peter [Huntsman]!" Despite the disappointment, the implications of the Huntsman deal for Lyondell were not lost on Smith. He commented that the premium that Blavatnik was paying for Huntsman "is equal to about 48 for us," the same number he floated to Trautz at their meeting on June 7, 2007 in London.

184.    In the hope that Lyondell was not completely off Blavatnik's radar, Smith wanted to know how the proposed financing structure of the Huntsman deal would be affected "if we were added to mix?"

185.    On July 4, 2007, Huntsman advised Access and Basell that Hexion Specialty Chemicals, Inc. ("Hexion"), an Apollo-controlled entity, had made a superior bid. Thereafter, on July 12, 2007, Huntsman backed out of its agreement with Basell, incurring a $200 million

contractual break-up fee (payable to Basell) in order to enable it to accept the higher offer from Hexion.

186.    Huntsman was not the only petrochemicals target to elude Blavatnik.  He also had failed in his efforts earlier in 2007 to acquire General Electric's plastics division, which Basell's competitor, Saudi Arabian Basic Industries (or "SABIC"), snatched up.  By early July 2007, there were already indications that the credit markets could be tightening.  The "King of Optionality," sensing his options were slipping away, resolved that he would close the deal to acquire Lyondell, whatever it took.

###    H.    Blavatnik's Renewed Pursuit of Lyondell

187.    Approximately a month prior to the break up of the Huntsman deal, Volker Trautz, the CEO of Basell, had flown to London at the request of Blavatnik and met with Smith (who was in London for a conference) on June 7, 2007.  During a private dinner meeting, Smith told Trautz that if Blavatnik "really want[s] to consolidate then [Blavatnik] can use Lyondell as a platform."  According to Trautz, Smith then began negotiating and "suggest[ed] a price of $48/share [for Lyondell] would be justified."  Trautz understood Smith to be communicating that if Blavatnik wanted to acquire Lyondell, he had to offer $48 per share.  On July 4, 2007, the very day that Access learned it was out-bid on the Huntsman deal by Apollo, Blavatnik contacted Smith directly to request a meeting about the Lyondell acquisition.

188.    On July 9, 2007, Smith and Blavatnik met privately in New York at Access's offices in Manhattan right before Smith flew to The Netherlands for a regularly scheduled Lyondell board meeting.  According to Lyondell's proxy statement soliciting shareholder consent to the Merger, on this occasion, Blavatnik initially suggested a price of $40 per share for Lyondell, which was then trading at $39.21 per share.  Smith suggested that if Blavatnik was

serious, he needed to make his best offer.  Smith had on a previous occasion indicated that the
Lyondell board would be looking for a 20% premium over market price, and had already
privately told Trautz in London on June 9, 2007 that $48 per share was an appropriate price to
purchase Lyondell.  Blavatnik requested that Smith contact him later that same day to further
discuss the matter.

189.    During the July 9 meeting, Blavatnik told Smith that if a deal was consummated,
Blavatnik intended to appoint Trautz as CEO of the combined companies.  Thus, Smith knew
before a deal was struck that he would no longer be chief executive of Lyondell.   Although
Blavatnik asked Smith to remain on as Chairman, Smith understood that such a position would
not allow him to "have much influence."  In reality, Smith was not concerned about his potential
role with the new company, with the consequences of the inflated projections he had engineered,
or with the consequences of LBI being unable to service its crushing debt.  Although he did not
formally decline the offer to remain as Chairman of the combined companies until October 2007,
for Smith, the transaction meant an opportunity to exit from his role as Lyondell's chief
executive, and cash out with an enormous personal fortune.

190.    Later, on July 9, Smith called Blavatnik from the airport.  After some discussion,
Blavatnik indicated to Smith that Basell could pay $48 per share if Lyondell could sign an
agreement by Monday, July 16, 2007 and agree to a $400 million break up fee.  Blavatnik said
the transaction would have fully committed financing and that consummation of the transaction
would not be conditioned on obtaining financing.  He gave Smith until July 11, 2007 to respond.
Smith responded that he would report that information to the Lyondell Board.  The Lyondell
Board had a meeting scheduled for July 10, at The Hague, The Netherlands.

191.    When word of Blavatnik's offer to acquire Lyondell at $48 per share reached his top executives, they were both incredulous and frightened.  On July 9, 2007, Kassin informed Patel by email that Blavatnik intended to sign an agreement with Lyondell by July 16.  Patel asked if Kassin was joking.  Kassin responded by email: "No I aint [sic] – last hour most bizarre in my carrer [sic]."

192.    In an email dated July 10, 2007, Kassin commented on the transaction to Bigman, Chief Financial Officer of Basell, "Not my idea.  I can't sleep thinking of this at $48." Bigman replied: "Me neither, woke up at 4:30." Bigman emailed his concerns to Blavatnik, even knowing it would be no use: "I know you've already made up your mind, but I am uncomfortable with the valuation—it's almost $5 billion more than we were offering a year ago and over $2 billion more than we were discussing just a few weeks ago."

193.    Merrill had been requested to update its June 12, 2007 analysis (which had assumed a per share price of between $38 and $42) to reflect an acquisition at between $45 and $50 per share.  Modeling the deal at these price ranges, based on its prior projections for earnings, showed the combined enterprise with ratios of debt to EBITDA in excess of 5x as it headed into the trough years.

194.    Because of concerns related to the amount of leverage in the proposed deal, on July 10, 2007, Merrill raised the idea of including a "market flex" provision into the financing commitment that would permit Merrill to require that Access provide an incremental equity contribution to the merged entities of $1 to $2 billion if such a feature was necessary to syndicate the loan.  Merrill also proposed issuance of PIK financing at the holding company level in order to lower the debt levels at the operating company level.  Although Access had proposed including up to $1 billion of cash as part of its unsuccessful August 2006 offer for Lyondell,

81

Patel promptly informed Merrill that such proposed financial structures were unnecessary and "wholly unacceptable." Access and Blavatnik no longer had any intention of putting their own cash or capital at risk in the deal.

195.     Writing to Blavatnik, Bigman acknowledged that Merrill having raised the need for a market flex provision was "another indication that we're on the edge here." In fact, the "all debt" financing of an acquisition of Lyondell was not "on the edge," but well over it. The extreme leverage being proposed would, upon the Merger, result in LBI being severely undercapitalized for the purposes of its combined businesses.

196.     Like Lyondell, Basell had an annual plan process which in November 2006 had resulted in the issuance of a 2007-2011 Basell Business Plan including EBITDA projections for the five year projection period.  By July 2007, these projections had already been adjusted upward at least once since the issuance of the 2007 Basell Business Plan.  Rather than reconsider, in view of projected high leverage, whether the combined entities would be adequately capitalized, on or prior to July 10, 2007, Access supplied Merrill with another upward adjustment of the Basell forecast including significantly higher earnings by Basell for all years during the period projected. These newly forecast earnings significantly reduced the earnings trough that Basell had earlier projected for 2009 and 2010.  These "updated" Basell EBITDA projections were updated yet again on or prior to July 14-15, 2007.  These upward adjustments to the projections found in the then current Basell business plan resulted in an aggregate increase in the projected EBITDA of Basell of 19% for the period.  These "updates" to the Basell EBITDA projections are shown in the table below:

### EBITDA (in millions of $)

| Basell Management Projections | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|
| 2006 Plan | 1,375 | 1,396 | 1,287 | 1,113 | 1,296 | 6,467 |
| July 9-10, 2007 Update | 1,675 | 1,483 | 1,353 | 1,158 | 1,358 | 7,027 |
| July 14-15, 2007 Update | <u>1,905</u> | <u>1,755</u> | <u>1,359</u> | <u>1,311</u> | <u>1,365</u> | <u>7,695</u> |
| Aggregate change ($) | 530 | 359 | 72 | 198 | 69 | 1,228 |
| Aggregate change (%) | 38.5 | 25.7 | 5.6 | 17.8 | 5.3 | 19 |

197.     The smaller, older and less efficient petrochemical plants operated in Europe by Basell would foreseeably be hit hard in the coming downturn. The Basell projections, however, had been prepared with a view to their use in connection with leveraging Basell to acquire additional assets.  As such, these projections largely ignored the forecasted downturn and failed to reflect the sharp decrease in earnings that many of Basell's facilities would foreseeably experience.  Notwithstanding the facially apparent failure to reflect the reality of the business cycle, the presentation materials prepared by Merrill for Access during the period when it was promoting the Transaction consistently reflect that Merrill (as was known or should have been known by Access) failed to subject Basell projections provided to it by Access to independent analysis by reference to industry analysts' forecasts of supply and demand for the petrochemical products manufactured by Basell.

198.     On July 10, 2007, Merrill, using the new, higher Basell projections, issued a revised presentation containing both "Base Case" and "Downside Case" financial models for the Transaction.

199.     On July 11, 2007, Benet emailed Blavatnik, Trautz, Bigman, Kassin, and Patel with his analysis of the proposed capital structure.  According to Benet, if Lyondell, considered

on a standalone basis, performed as forecasted by the "Base Case" projections that had been developed by Merrill using CMAI and other data, the combined enterprise would likely meet its debt service but its equity owners would essentially be "working for the banks." As Benet crunched the numbers, only if Lyondell materially outperformed the projections would the transaction make any sense.  He showed this by adjusting the Base Case to increase EBITDA by 15%, calling this the "Sensitivity Case."  Under this Sensitivity Case, Lyondell EBITDA would be $3.5 billion in 2007, as opposed to a "Base Case" EBITDA projection of approximately $3.1 billion.  As explained by Benet, the acquisition was a bet on the chance that Lyondell would materially overshoot Merrill's projections, even though Access had no evidence that would occur and knew that the petrochemical industry was poised to enter its next trough.  He explained: "[T]he rationale at this price [$48 per share] would be that we actually are buying the option on (a) the upside case equal to or greater than the Sensitivity, and (2) owning an enormous asset base into the next upswing."

200.    In reviewing Benet's analysis, Trautz asked Benet if he was correct "that we basicly [sic] at 48 per share can only justify the deal via synergies and the belief in the upside over the base case?" Benet confirmed that this was indeed his view:

> Correct.  For the next three years, the Base Case assumed average EBITDA of $2.3bn.  That's not enough for $48/share.
>
> We need to be expecting > $2.7bn to start paying down debt in the 'good times'.  And if we get $3bn it makes a real dent, which also provides cushion against a sharper downfall in the 'bad times'.
>
> If they were to make $3.5bn [for 2007], is > $2.7bn average for the next 3 years realistic or a pipedream?

201.    On July 10, 2007, the Lyondell Board met in The Hague, and Smith reported on his discussions with Blavatnik, and it was decided that the Board would convene a special meeting the following day to further discuss the matter.  At that meeting, the Lyondell Board

84

also reviewed the "refreshed" projections, the 2007 Long Range Plan, and historical analyses of Lyondell's performance. The "refreshed" projections had changed so dramatically from the 2007 Long Range Plan, that the Lyondell Board knew or should have known that that the "refreshed" numbers were inflated, unreasonable, and unachievable.

202.    The next day, a special meeting of the Lyondell Board was convened, again in The Hague, and Smith reported on discussions with Blavatnik since July 10th. The Lyondell Board was advised that Lyondell management wanted to schedule a special Board meeting "on the afternoon of Monday, July 16th," *i.e.*, the deadline set by Blavatnik for entering a definitive agreement. The Lyondell Board also discussed engagement of an investment banking firm to serve as financial advisor to Lyondell and authorized management to continue the discussions with Blavatnik regarding a possible transaction.

203.    On July 12, 2007, in anticipation of Lyondell's board accepting the $48 per share price, Access quickly lined up the lead bankers – in addition to Merrill, that would include Citibank and Goldman.

204.    Also on July 12, 2007, the Lyondell Board met again in The Hague, at which time it reconfirmed that it would have a special meeting on July 16, 2007. Given that Lyondell's Board was still in The Netherlands on July 12, along with Lyondell senior management, it was necessary for them to return to the United States to advance discussions.

205.    On or about July 12, 2007, Lyondell commenced providing materials to Basell and Access in response to the preliminary due diligence request of Basell and Access. Meetings between representatives of Lyondell and representatives of Basell and Access took place on July 13, 2007 through July 15, 2007 in New York and Houston to enable Basell and Access to review certain business, financial and legal matters.

206.    By this time, Kassin, who remained opposed to the deal, was resigned to the inevitability of the transaction going forward.  He commented in an email dated July 12, 2007:

> My job is to sign this up…I will make it happen if I have to kill
> myself…the real problem is – I hate the deal at $48 and am scared to
> death that the banks will ALL want new cash equity…I am trying to
> separate my two roles – one deal weasel who will get this signed up in
> record time…vs. Board member with fiduciary role for the
> shareholder…this one will be tough.

207.    However, Kassin and others within Access and Basell expressed their concerns regarding the accelerated pace of the deal.  Kassin remarked to Patel, in an email dated July 12, 2007, that: "There is no realism in the schedule whatsoever" and that "we should have bought Huntsman at 26/27 – not Hugo at 48."  At the same time, Kassin remarked to Bigman, Trautz and Patel in a separate email that the meetings between Lyondell and Basell needed to start as soon as possible the morning of July 13th, because "starting at 1 pm has us really losing half a day in a schedule that has no fat."  The next day, despite Access's efforts to expedite the process, a meeting that was scheduled to take place on Friday, July 13, 2007 was delayed, because, according to an email from Kassin, "the Hugo CFO just called me and they are still scrambling and have been really caught flatfooted."

208.    The sole due diligence meeting between Lyondell's management and the banks (*i.e.*, Merrill, Citibank, and Goldman) occurred at the offices of Skadden Arps in New York on Saturday, July 14, 2007.  During this meeting, Lyondell's management team gave a PowerPoint presentation (the "Lyondell Management Presentation") to representatives of Basell, Access, Citibank, Merrill and Goldman.  The EBITDA projections for years 2008 through 2011 contained in the Lyondell Management Presentation were identical to the "Today's View" contained in the June 18 spreadsheet from Robert Salvin of Lyondell, other than a downward

adjustment of $100 million for EC&D in 2010.   The EBITDA projections set forth in the Lyondell Management Presentation were as follows:

**EBITDA (in millions of $)**

| YEAR | 2007 (E) | 2008 | 2009 | 2010 | 2011 |
|------|----------|------|------|------|------|
| Refining | 1,568[8] | 1,700 | 1,600 | 1,500 | 1,300 |
| EC&D | 950 | 1,150 | 800 | 600 | 600 |
| PO& RP | 730[9] | 657 | 664 | 701 | 676 |
| Total | 3,248 | 3,507 | 3,064 | 2,801 | 2,576 |

209.   Unlike the EBITDA forecasts for 2008-2011 in the 2007 Long Range Plan and Merrill Lynch's July 10, 2007 Base Case for Lyondell, each of which fell considerably short of the average annual EBITDA of ">$2.7 bn," Access's Benet thought necessary to support the $48/share acquisition price and "start paying down debt in 'good times'," the inflated EBITDA in the Lyondell Management Presentation met this mark.

210.   The Lyondell Management Presentation also included quarterly EBITDA estimates for each quarter of 2007.   These showed that management now projected total EBITDA of $3.248 billion for the year ending 2007.   This 2007 projection included $818 million of EBITDA for the third quarter of 2007 and $916 million of EBITDA for the fourth quarter of 2007.

211.   Trautz, who attended the Lyondell Management Presentation at Skadden Arps, and was the most experienced and expert senior Basell representative present, did not find the internal Lyondell management projections at all credible.   He understood that Lyondell management, who would enrich themselves if the deal went forward, was highly motivated to

---

[8] Including "turn around adjustment."
[9] Including "adjustments."

87

pitch Lyondell as worth the $48 per share price.  For his part, Blavatnik did not attend these meetings, but received reports from members of his team who attended, including Trautz.

212.    From July 12, 2007 through July 15, 2007, the parties and their external and internal legal counsel prepared and negotiated the form of a definitive agreement for the transaction and related documentation.

213.    On July 14, 2007, Lyondell entered into an agreement with Deutsche Bank Securities, Inc. ("DBSI") to provide an opinion as to the financial fairness to Lyondell shareholders of the price to be paid for Lyondell common stock.

214.    On or about July 14, 2007, Access provided Merrill with the latest, newly updated projections for Basell EBITDA, increasing the EBITDA projected to be achieved by Basell for the five year period 2007 through 2011 by approximately $650 million (almost 10% over the most recent cumulative EBITDA provided to Merrill).  By Sunday, July 15, 2007, Merrill had generated a revised model of the Transaction, this time incorporating Lyondell management projections and "updated" Basell projections.  Merrill's new "Base Case" EBITDA projections (the "July 15 Base Case"), set forth in the table below side by side with Merrill's "Base Case" EBITDA projections of only a few days before (the "July 10 Base Case"), were materially higher.

| Fiscal Year | July 10 Base Case | July 15 Base Case | Percentage Change from July 10 to July 15 |
|---|---|---|---|
| 2007 | $4,839 | $5,375 | +11.1% |
| 2008 | $4,435 | $5,222 | +17.7% |
| 2009 | $3,878 | $4,281 | +10.4% |
| 2010 | $3,435 | $4,005 | +16.6% |
| 2011 | $3,538 | $3,906 | +10.4% |
| 2012 | $3,878 | $3,928 | +1.3% |
| 2013 | $4,144 | $4,090 | -1.3% |

215.   All too conveniently, the July 15 Base Case, unlike the old July 10, 2007 projections (dated only three business days earlier), showed the enterprise's combined EBITDA/debt ratios would stay comfortably below the "too risky" 5x levels which had prompted Merrill to raise the issue of requiring additional equity from Access.

216.   Since Blavatnik had insisted that the Merger agreement had to be signed by Monday, July 16, 2007, there was no time for Access to engage in further due diligence or reasoned analysis.   Instead, Access recklessly accepted Lyondell's internal "management projections" and used them to pump up the purported valuation of Lyondell.   Greased in this way, the transactional wheels continued to move forward.   The idea of obtaining a commitment from Access to support the merged entities with additional equity was apparently abandoned by Merrill.

217.   Due diligence done here by Access was perfunctory at best, and in material respects, nonexistent.[10]   Blavatnik had made up his mind—he wanted the deal.   And Lyondell management, having been offered a "blowout" price at $48 per share, was not only willing to oblige, but also did everything in its power to make a deal happen at any cost.

218.   On July 16, 2007, Access and Basell made a formal written proposal to Lyondell to acquire all of the common stock of Lyondell for a cash purchase price of $48 per share and outlined the other terms of Basell's offer, as reflected in the proposed form of merger agreement and the Commitment Letter (as defined below).   The proposal explained that the $48 per share price was a "compelling price" for Lyondell's shareholders because it represented:

- a 45% premium to the closing stock price of $33.07 on May 10th (the day prior to public disclosure of Access's agreement to acquire a 8% position in Lyondell)

- a 40% premium to the 52-week "unaffected" high closing price through May 10th of $34.18 (closing price on May 3, 2007)

---

[10] By contrast, in August 2006, Access/Basell advised Lyondell that it would require 30-45 days of diligence.

- a 128% premium to the 52-week unaffected low closing price through May 10th of $21.05 (closing price on June 13, 2006)

219.    Upon the Merger, each outstanding share of Lyondell common stock would be converted into the right to receive $48 in cash.  Later in the day on July 16, 2007, at a special meeting of the Lyondell Board, the proposed transaction was unanimously approved by the Lyondell Directors.  Notably, many of the Lyondell Directors, including Smith, stood to earn huge sums of money on the deal, and all the Lyondell Directors stood to make significant sums of money.  In addition to benefiting from the Merger to the extent of existing stockholdings, they would receive additional payments triggered by the Merger.  The chart below lists the amount of Lyondell stock, stock options, and derivatives that Dan Smith and the other Directors would be cashed out for upon the closing of the Merger:

| Directors | Common Stock | Stock Options | Phantom Stock | Deferred Stock Units | Total value (at $48/share) |
|---|---|---|---|---|---|
| Dan Smith | 370,996 ($17,807,808) | 1,180,400 ($36,973,979) | 54,864 ($2,633,472) | - | $57,415,259.00 |
| Eight Other Directors | 142,100 ($6,820,800) | 30,000 ($1,010,375) | 60,790 ($2,917,920) | 34,724 ($1,638,973) | $12,388,068 |

220.    Just two days after being retained by Lyondell, DBSI delivered its fairness opinion at the Lyondell board meeting on July 16, 2007.  In rendering its opinion, DBSI assumed that the financial forecasts and projections provided to it by Lyondell were reasonable, and thus expressed no view as to the reasonableness of such forecasts and projections, or the assumptions upon which they were based.[11]    In fact, DBSI did not assume responsibility for independently verifying *any* information that it relied upon, whether publicly available or furnished to it.  In

---

[11]   After July 17, 2007, DBSI raised concerns about inconsistencies between the EBITDA projections contained in the Lyondell Management Presentation and in the one page spreadsheet summarizing Lyondell's EBITDA projections through 2011 that was part of Salvin's email of June 18, 2007.

90

return for providing the Fairness Opinion, DBSI received a Transaction Fee of $35 million.  A large portion of this fee ($25 million) was dependent upon consummation of the Merger.

221.    Approximately $21 billion was necessary to complete the proposed acquisition including approximately (i) $12.5 billion of Merger Consideration to be paid in respect of the outstanding shares of Lyondell's common stock, (ii) $7.1 billion plus an additional approximately $500 million in related prepayment fees to refinance certain existing indebtedness of both legacy companies, (iii) approximately $574.6 million[12] to pay fees and expenses in connection with the Transaction and the financing agreements, and (iv) $337.3 million to pay amounts pursuant to various Lyondell benefit and incentive plans, stock option plans, and other equity based incentive programs, including certain change in control arrangements.

222.    On the same day as the three banks agreed to provide $21 billion of financing to enable Blavatnik to amass his global petrochemical company, Blavatnik caused Basell to issue a shareholder dividend in the amount of €75 million, draining Basell of the capital that it shortly would desperately need.  This was the second Basell cash dividend of 2007, the prior being a dividend on or about May 29, 2007, for €140 million.

223.    On or about July 16, 2007, the Supervisory Board of Basell (the equivalent to a board of directors) voted to approve the proposed acquisition.  At a deposition conducted in a Lyondell shareholder litigation following the signing of the Merger, Kassin, who served on Basell's Supervisory Board, claimed he voted against the transaction, later explaining that he found the $48 per share price "ludicrous," and could not, consistent with his fiduciary responsibility as a member of Basell's Supervisory Board, vote in favor of it.  According to Kassin, Trautz was also opposed to acquiring Lyondell at $48 per share.

---

[12] Including M&A advisory and financing Arranger fees, other professional fees, and costs and expenses.  Assumes $1.40/€.

224.   On or as of July 16, 2007, the parties executed and delivered the Agreement and Plan of Merger, dated as of July 16, 2007 among Basell, BIL Acquisition Holdings Limited, a wholly owned Delaware subsidiary of Basell, and Lyondell (the "Merger Agreement").

225.   As negotiated between Basell and Lyondell, the Merger Agreement had no "financing out" – Basell's obligation to close the Transaction was not conditioned on its ability to find the money to pay for it.  On the same day as it entered into the Merger Agreement, Basell obtained a commitment letter from Merrill, Citibank, and Goldman.  Pursuant to the commitment letter, the three co-lead banks committed to fund up to $14 billion of first lien secured credit facilities, including a $13 billion Term Loan, and up to $7 billion of second lien loans pursuant to a bridge facility.  Basell, at its option and in lieu of the bridge facility could issue up to $7 billion in principal amount of second lien notes and/or senior unsecured notes (at the option of the banks) in a private debt offering.  Merrill, Citibank, and Goldman were appointed as joint lead arrangers, bookrunners, and global coordinators for the first lien credit facilities.  ABN AMRO joined as a fourth lead arranger in early August.

226.   On July 17, 2007, prior to the opening of trading on the New York Stock Exchange, Lyondell and Basell issued a joint press release announcing the proposed transaction.

227.   On or about August 25, 2007, Basell made an irrevocable offer to purchase the Berre L'Etang Refinery ("Berre") from Royal Dutch Shell plc for a purchase price of approximately $947 million.  Basell made the commitment, which like the Merger, had no financing contingency, without funding in place to pay for this billion dollar asset and without a plan on how to finance the purchase.  Of course, Basell intended to fund the purchase of Berre with further borrowings.  The financing of the Berre acquisition remained an open issue throughout the fall of 2007, and Patel wrote to Twitchell on September 13, 2007 that "[n]o bank

or bondholder will just fund into this deal [without] a definitive answer on how the refinery will be financed."

228.   In October, when UBS agreed to join Merrill, Citibank, Goldman, and ABN AMRO (collectively, the "Lead Arrangers"), these parties agreed to increase the size of the commitment from $21 billion to $22 billion in exchange for various pricing concessions.  As the Lead Arrangers duly noted at the time, the additional $1 billion of funding, earmarked to pay for Berre and other assets Basell hoped to snap up, further increased the leverage at which the company would be forced to operate.

## II.      The Merger Occurs Amid Signs of Deteriorating Economic and Industry Conditions

229.   In mid-July 2007, when Basell entered into the Merger Agreement and contractually bound itself to buy Lyondell for $48 per share, all of the parties to the Merger Agreement knew the Merger was a gamble as to whether the combined companies would be able to generate sufficient earnings through a downturn in the industry cycle to fund operations and service the mountain of debt to be incurred.  The members of the Board of Directors of Lyondell knew that the entire transaction would be financed with debt;  Lyondell's Quarterly Report on Form 10-Q for the quarter ended June 30, 2007 (the "June 30, 2007 10-Q") contained the following disclosure regarding the impact of the planned Merger on Lyondell's financial condition and, inferentially, on its future access to the credit markets:

> Basell intends to finance the merger consideration with borrowings and, as a result, Lyondell would have become more levered, which would exacerbate the risks relating to Lyondell's level of debt.  In July 2007, Standard and Poor's Rating Services placed its credit rating for Lyondell, Equistar and Millenium debt on Credit Watch with negative implications and Moody's Investor Service placed the rating of Lyondell, Equistar and Millenium under review for possible down grade, *each as a result of the anticipated post-merger capital structure.*

(Emphasis added).

93

230.    The Lyondell Board also knew that the highly-leveraged company would face significant barriers in obtaining additional financing in the highly foreseeable event that the liquidity available through the financing put in place upon the Merger was insufficient. Lyondell's June 30, 2007 10-Q presented the leveraging of Lyondell pursuant to the Merger as a risk factor: "Lyondell's consolidated balance sheet is highly levered and, if the merger is completed, Lyondell may become more levered which would exacerbate the risks described herein."

231.    These risks were more specifically described to include the following:

> *Lyondell may not be able to obtain financing in the future for working capital, capital expenditures, acquisitions, debt service requirements or other purposes;* less levered competitors could have a competitive advantage because they have lower debt service requirements; and in the event of poor business conditions, Lyondell may be less able to take advantage of significant business opportunities and to react to changes in market or industry conditions than its competitors.

(Emphasis added).

232.    Thus it was clear, at the time of the signing of the Merger Agreement, that the economic enterprise created by combining Basell and Lyondell was severely disadvantaged by its proposed capital structure.

233.    Almost immediately following the signing of the Merger Agreement and long before the Merger closed, emerging operating results for Lyondell and other information demonstrated that the "Today's View" EBITDA projections which had been incorporated into the July 15 Base Case were, at a minimum, unreasonably and speculatively optimistic. Data available to the capital markets and to the managements of Lyondell, Access, and Basell, demonstrated that petrochemical manufacturers, unable to pass on increased feedstock costs,

were experiencing a strong compression of margins.  In short, the window to do a leveraged finance deal in petrochemicals had closed.

234.   The sobering reality for Lyondell was repeatedly confirmed and reconfirmed in the weeks and months leading to the December 20, 2007 closing.  Lyondell's final numbers for the second quarter were somewhat below its projections.  Lyondell's performance for the third quarter of 2007, however, departed sharply from the "refreshed" projections presented in the Lyondell Management Presentation.   Instead, these results looked remarkably like the "Downside Case" that analysts at Merrill and Citibank had included in their reports to their credit committees.  As the year moved into the fourth quarter, even the "Downside Case" was looking unduly optimistic.  Clouding the prospects for strong earnings, crude oil prices, which had been rising steadily all year, were continuing to rise and there were growing concerns that increasing energy costs, among other factors, would trigger a recession.  For his part, Trautz was not surprised in the least that oil prices would continue to rise, and suspected, even before the Merger Agreement was signed, that the trend of increasing oil prices alone was likely to ensure that Lyondell would not meet its rosy projections for the second, third, and fourth fiscal quarters of 2007.  If this spike in oil prices occurred, and price increases could not be passed on to customers, margin squeeze could result in earnings in line with the Credit Stress Test scenario that had been run by Merrill in April 2007, which showed Lyondell's EBITDA for 2008 dropping to approximately $2.1 billion.

235.   With so much at stake in the continuation of robust earnings through 2007, once the Merger Agreement had been inked, Lyondell's operating results, including its final, adjusted EBITDA balances for the second quarter of 2007, emerging results of the third quarter and its revised earnings projections for the balance of the year, were eagerly awaited by Access and the

Lead Arrangers.  This data would be a centerpiece of the presentations to prospective lenders being prepared by the Lead Arrangers to syndicate the $21 billion in debt that they had committed themselves to fund.

236.   In actuality, as early as July 19th, just *three days* after signing the Merger Agreement, Lyondell management already knew that it would not meet its third quarter EBITDA projections for 2007.  Thereafter, the speculative nature of "Today's View" was exposed when it was estimated that Lyondell would miss its third quarter EBITDA projections for 2007 by $85 million or approximately 10%.   Ultimately, the third quarter miss, at $134 million, or approximately 16%, was even larger than estimated.

237.   Despite knowing by no later than mid-August that Lyondell would widely miss its third quarter projections, Smith did not disclose this information to anyone at Access until September 11, 2007.  On that date, Smith sent an email to Blavatnik with emerging results of the third quarter.  In that same email, Smith also informed Blavatnik that Lyondell was likely to miss its fourth quarter EBITDA projections by approximately $200 million, or approximately 22%. Smith provided no explanation for these significant misses.  Overall, actual EBITDA for 2007 would miss Lyondell management's EBITDA projections for 2007 by $376 million, and actual EBITDA for the second half of 2007 was 27% below the projections contained in the Lyondell Management Presentation.

238.   The reaction inside Access was alarm – Lyondell was materially missing projections that had been provided by Lyondell's management on July 14, 2007, merely two months earlier, and just prior to execution of the Merger Agreement.  The assumption underlying the Lyondell management projections that had been used by Merrill for its July 15 Base Case, that the strong performance of the first quarter of the year would be sustained through the year,

had been exposed as completely wrong. Blavatnik, noting the drop, responded to Smith's September 11 email stating, "Quite a change from your team's projections." At the same time, Blavatnik forwarded the results to Alan Bigman (Basell) and Philip Kassin (Access) asking, "Much below projected??" Kassin responded in two separate emails. In the first, he responded, "3rd qtr original projection was $818 mm." In the second email he wrote, "fyi – HERE WAS THE FORECAST THEY GAVE US WHEN WE SIGNED MERGER AGREEMENT."

239.    Patel, emailing Alan Bigman and others, raised the possibility that Basell consult with its attorneys to consider its "options." To Kassin, Patel ticked off a list of recent leveraged transactions ("Great, Harman, SLM, Genesco, Reddi Ice") that had been renegotiated or from which one party had sought to back away based on purported changes in circumstances.

240.    As the management teams for Lyondell, Basell, and Access prepared in late September 2007 to present updated pro forma financials to the banks financing the Merger, Bigman was gravely concerned. Emailing Kassin and Patel on September 24, Bigman stated that "Lyondell's shortfall is the number one problem we face—by a big margin." Patel responded, "the banks will be very, very troubled by the updated projections when they hear them on Wed." Lyondell management struggled to explain and minimize the significance of the earnings shortfall. Adjustments were made to the EBITDA balances to add back over $237 million to the EBITDA for the first two quarters, supposedly for "non-recurring costs." Watching the process of Lyondell scurrying to get ready to explain the status of the deal to the banks, commented Patel, was "like witnessing a slow motion train wreck." Kassin anticipated that banks who were planning to participate in the syndication would be "screaming bloody murder" and "requesting backup on Q3 and Q4 data for their credit comms." Kassin also warned Blavatnik to "expect more fireworks" from the banks after they receive the business plan and projections.

241.    Lyondell's poor performance provoked strong concerns about the banks' ability to syndicate the deal.  Although the banks' obligations to fund were not technically conditional on a successful syndication, a failed syndication would have repercussions on all parties. Access had a material interest in the successful syndication of the loans because, if syndication was unsuccessful, the banks had a variety of options, including the prerogative to increase interest rates on certain tranches of the Merger debt, to increase the commitment fees on undrawn portions of certain facilities, and otherwise re-tranche debt on terms more favorable to the banks.  To support the syndication, and notwithstanding the fact that the July 15 Base Case had been exposed as unrealistic, Basell and Access now had a common burden to present projections showing that earnings would be sufficient for LBI to finance its businesses though the expected earnings downturn.  Writing to Blavatnik on September 14, 2008, Kassin made clear that he understood that the objective for the upcoming presentation to be made to the Lead Arrangers was "to sell 20b in debt."

242.    Kassin also set out his roadmap of how to goose the projections to get to the necessary magic numbers.  First of all, Trautz and Bigman could not afford to be conservative so as to assure that projections would be met.   Second, Basell management needed to layer optimistic projections with purported "synergies" that would boost the projections.  "Synergies" – reduced costs of operations (either through the elimination of redundancy, greater efficiency, or other means) anticipated in connection with a business combination – are notoriously "soft" numbers, and here, for a number of reasons, Lyondell and Basell were ill suited to realize cost reductions due to claimed "synergies," had not done adequate due diligence on potential synergies, and were left to exaggerate or invent various potential synergies to attempt to compensate for the loss in EBITDA.

243.   Even if synergies are potentially available, it is always uncertain that management will be able to implement the necessary strategies to achieve them.  As pointed out by Trautz, "As an old M+A fox you know as well as I do the statistics.  Out of 100 mergers about 90 deliver the promised synergiies [*sic*] and even so about 50 fail." - Why? "wrong financing, [wrong] people," and the inability "to generate promised [*sic*] EBITDA" and to "master the cultural" shock.  Kassin acknowledged that this was all true but explained that in order "to achieve good execution on the financing and give the NewCo a better financial footing we need to 'sell' a realistic synergy scenario to the market . . . applying leverage to this number will be very helpful . . . erring on the side of being not too conservative helps here greatly."

244.   The financial projections of the combined companies developed for a September 26, 2007 presentation to lenders were a feat of reverse engineering.  Rather than meeting the July 15 Base Case of $3.4 billion of EBITDA for 2007, Lyondell's 2007 EBITDA would come in at no more than $2.7 billion.  The problem to overcome: sustaining the believability of the July 15 Base Case in the face of the emerging reality of Lyondell's poor performance for 2007.  Reflecting the consensus industry outlook, all of the prior projections of Lyondell's performance submitted by Merrill showed earnings peaking in 2007 and then plateauing or declining in 2008 and thereafter beginning a steeper descent into the anticipated trough in 2011.  However, if actual 2007 EBITDA for Lyondell were used as the starting point for this downward descent, projected earnings for each subsequent year would be materially and adversely impacted.  Such revised projections would clearly demonstrate that the combined companies were severely undercapitalized and would be unable to cover debt charges through the downturn.  Moreover, the reduced earnings projections would also impact the discounted cash flow analysis of LBI and show a company that was either insolvent or, at best, verging on insolvency.

245.    The solution to declining earnings?  First, ignore all available economic, industry and company indicators pointing to a continued decline in earnings and project a huge earnings spike for 2008.  Second, make up lost 2007 earnings in later years by adding "synergies," thus reducing the slope of the downward descent.  This intentional manipulation of projections is exactly what the interested parties to the transaction did.

246.    Below are (i) the EBITDA projections developed by Merrill dated July 10, 2007; (ii) Merrill projections dated July 15, 2007, incorporating Lyondell management projections supplied by Lyondell management on July 14, 2007 immediately prior to the signing of the Merger Agreement (which by September 11, 2007 were known to be materially inaccurate); and (iii) the "reverse engineered" projections developed in early September 2007 for a presentation to lenders on September 26, 2007 (the "September Projections").

247.    Strikingly apparent is the pronounced spike in earnings (not featured in the prior projections) that now was being projected to occur during 2008.  Lyondell thus projected a 23% increase in 2008 EBITDA versus 2007.  Notable also is (i) the impact of the projected 2008 spike on earnings projections for each successive year, and (ii) the slower descent of the slope.  Whereas the July 15 Base Case had shown EBITDA declining 31% from 2007, a "peak" year, to 2011, a "trough" year, the September Projections now showed a peak to trough decline of less than 10%.



**Lyondell EBITDA Projections**

248.    The 2008 earnings spike seen in the September Projections was unsupported by any reasoned analysis and inconsistent with industry forecasts.  The September Projections baselessly ignored industry forecasts that the decline from the 2005 peak in the margins (the "crack spread") for refined petroleum products generally, and particularly for the type of crude processed at the Houston Refinery, *i.e.*, "heavy sour," would continue during 2008 and thereafter.  This pressure on margins reflected by Lyondell's third and fourth quarter results was no fluke but was driven by factors that would foreseeably continue to depress margins over time.  First, gasoline demand was down due to high prices and the beginning of a weakening in the economy.   Second, and longer term, substantial new capacity to convert "heavy sour" was scheduled to come on line in 2009 and beyond.  Third, due to local conditions in Mexico and Venezuela, the production of "heavy sour" had declined, driving up its price and reducing the relative discount seen between heavy sour (which is more expensive to refine) and the higher

priced "light sweet" crudes.   Unaccountably and baselessly, the assumption underlying the September Projections was that the crack spread for heavy sour would increase materially (by 15%) in 2008 and remain, in subsequent years, at much higher levels than were being forecasted by industry analysts.  Thus, whereas third quarter projection for the Maya crack spread by Purvin & Gertz, a leading refinery forecasting firm, was $24.23 a barrel, projected EBITDA for LBI was based on a margin of $30.41 a barrel for this type of crude.   Reflecting the market's understanding that, due to declining demand and increased capacity, the refining cycle was heading toward a downturn, by the end of August 2007, the stock prices for publicly traded oil refining companies had declined by 20% to 25%, with both stock prices and margins projected to slide even further in the fourth quarter.

249.   Another unfounded assumption of the September Projections was that 2008 EBITDA for Lyondell's commodities chemicals business (EC&D) would increase by almost 50% over 2007 EBITDA from such business sector. No such increase was being forecast by analysts.   Moreover, the September Projections for this industry segment unreasonably overlooked Lyondell's disadvantages, relative to its competitors, including, without limitation, its dependence on liquid feedstocks (the prices of which were increasing) as opposed to natural gas feedstocks (which had remained relatively stable).   Rather than forecasting a surge in profitability for 2008, analysts, including CMAI had, during the course of 2007, grown increasingly bearish on basic petrochemicals, repeatedly adjusting downward projections on margins for leading petrochemical products such as ethylene and polyethylene.   Broader indications of industry prospects also pointed to 2007 being the end of the peak.  In July 2007, Standard & Poor's announced that the entire industry's average credit rating was deteriorating

and cut the credit ratings of two-thirds of the chemicals companies it covered to speculative status.

250.    For anyone to have projected future performance based on Lyondell materially outperforming its industry peers in 2008, as is implied by the projected 23% spike in refining EBITDA and the projected expansion of petrochemicals margins, was manifestly unreasonable, if not fraudulent.   In fact, in addition to the reasons stated above, for the additional reasons summarized below, all of which were known to Lyondell and Basell management, following the Merger, both historical Lyondell and the combined Lyondell and Basell companies were far more likely to underperform relative to their peers and be less able to compete in a downturn:

a.    Lyondell's Houston Refinery.  Lyondell's Houston Refinery, one of Lyondell's most important assets, had a significantly higher cost of production than its competitors and its profitability was dependent on, among other factors, the discount at which "heavy sour" crude could be purchased relative to lighter, sweeter grades.   As explained above, by 2007 it was known that any competitive advantage derived from the Houston Refinery's ability to refine "heavy sour" crude was diminishing due to the narrowing of this differential, a trend that was expected to continue.[13]

b.    Olefins (Ethylene, Propylene Butadiene, and Isobutylene).  Both Lyondell and Basell's olefin businesses were heavily exposed to the slower growing markets in North America and Western Europe, where their facilities were primarily based, and both lacked a significant low-cost business presence in the Middle East, exposing the combined company to substantial

---

[13] As noted above, Basell, prior to the Merger, had entered into a contract to purchase Berre. Although Berre used a lighter grade of crude than the Houston Refinery, it suffered from some of the same disadvantages as the Houston Refinery and its margins were also being compressed by declining demand and other factors. The closing of the acquisition of Berre occurred in April 2008, but the risks associated with such acquisition were known before the Merger. Moreover, as discussed below, Goldman told Access, before the closing of Berre, that it was "morally wrong" for Basell to acquire Berre and that Basell should "break" the deal. Basell spurned Goldman's request and acquired the refinery, further exacerbating Basell's liquidity problems.

additional risk in the olefin business during the next industry down-cycle.  Lyondell's and Basell's olefin assets were also older (relative to their competitors) and smaller (relative to their competitors).  They also were particularly economically vulnerable to shutdowns (*e.g.*, Basell's steam crackers).  Unlike its domestic competitors, moreover, Lyondell's olefin facilities, which are based in the United States, significantly rely on "heavy liquid feed" (*i.e.*, distillates from the Houston Refinery), which puts Lyondell's olefin business at a competitive disadvantage in the United States.

       c.     <u>Polyethylene (High and Low Density)</u>.  Both Lyondell and Basell, due to their primary presence in North America and Western Europe, were heavily exposed to slower growing markets in these regions and additional pressures due to environmental regulation and were not positioned to participate in developing higher margin products with their existing facilities.  Due to their relatively uncompetitive cost structure and their geographical footprint focused on North America and Europe, Lyondell and Basell were exposed to being harder hit by the next high density polyethylene industry downturn.  Lyondell's low density polyethylene business focused on lower margin products, which would be particularly vulnerable in the next downturn.  Both Lyondell and Basell had older, smaller scale facilities than their competitors.  In Lyondell's case, its facilities carried higher overhead relative to its competitors due to inefficiently operated facilities with high maintenance costs.  Basell suffered from the same infirmities (*i.e.*, its Frankfurt, Germany facility was old, small, and had a higher cost of production relative to its competitors).

       d.     <u>Propylene Oxide and Derivatives, Acetyls, and Aromatics</u>.  Lyondell's presence in each business sector had a competitive disadvantage.  For example, in Propylene Oxide, Lyondell was heavily dependent on co-product technology, which was facing pressure both from

significant competition and legislation at the time (*i.e.*, MTBE, which was being phased out as an oxygen aid for gasoline and is now banned in the United States, and co-product styrene, which was a poor industry performer).  In Acetyls, Lyondell had only a single production site compared to a global and growing presence for its key competitors (BP and Celanese Corporation).  And in Aromatics, Lyondell's business carried high unit costs due to its lack of scale compared to its competitors.

e.    Technology.  Basell's technology revenue, which relied heavily on capital, was likely to slow considerably due to the impending petrochemical industry trough, reducing investment in the technologies it licensed.

251.    The September Projections for the combined Lyondell and Basell entities were even more fanciful than the standalone projections for Lyondell.  In addition to the baseless spike in earnings for both its petrochemicals and refinery operations that Lyondell would supposedly enjoy in 2008, the September Projections for the combined companies (graphed below together with the July 10 Base Case and the July 15 Base Case) likewise ignored currently available information indicating the onset of a downturn and were inflated by incorporation of billions of dollars of projected earnings over the five-year projection period based on purported "synergies." Combined projected earnings for 2008 included $75 million of "synergies." Projected earnings for 2009 included $280 million in "synergies." Each subsequent year included $420 million in "synergies."



252.   Remarkably, the new projections actually showed combined EBITDA for 2008 to be 13.2% higher than for 2007, even though, as reflected by all prior projections, Wall Street and industry analysts were all projecting that earnings for petrochemicals and refining would trend downwards or remain flat during this period.  Even the highly optimistic Lyondell management projections incorporated into the July 15 Base Case showed a 3% decrease during this same period.

253.   The projected spike in Lyondell earnings for 2008 and inflated earnings for years 2009 through 2011 were entirely unreasonable, if not fraudulent, and were unsupported by factors intrinsic to Lyondell or Basell, conditions with respect to the industries in which they operated, or the overall economic outlook as forecasted at the time.  The synergies were pure speculation, added to bring earnings to where they needed to be rather than based on any expected cost-savings from the Merger.  According to Francesco Zerega of Basell, even $250 million (as opposed to $400 million) was a stretch.  In an email sent to Trautz and Bigman, Zerega wrote: "given the very limited market/product overlap between Basell and Hugo, a 400 m

USD longer term target is in my view very unlikely.   A number closer to the 250 m USD

ballpark would be in my view a more logical, challenging and stretching (but not unrealistic)

target for the transition team . . . if we talk about higher long term targets, we should also talk

about higher implementation costs."

254.   Lyondell's official third quarter results confirmed a material downward earnings

trend, which Smith had first disclosed to Access on September 11, 2007.   As disclosed to the

public in its report of third quarter earnings on Form 8-K dated October 25, 2007 (the "October

25, 2007 Form 8-K"), EBITDA was $684 million.   In order to have remained on target to meet

the July 15 Base Case projections for 2007 of $3.4 billion, EBITDA for the third quarter of 2007

should have been at least as high as for the preceding quarter.   Instead, the third quarter's $684

million EBITDA was a 23% drop from second quarter EBITDA.   In Lyondell's third quarter

earnings press release, Smith expressed concern for Lyondell's financial performance:

> Entering the quarter, we and many others in the industry expected
> that crude oil and ethane costs would plateau at then-current levels;
> however, they continued to escalate.   As a result, significant price
> increases were required just to offset the cost increases, and
> margins did not expand to levels that we believe reflect the
> supply/demand balance.   Refining results, while solid, reflected the
> fact that industry spreads declined from very strong early-summer
> levels earlier than usual.   This occurred despite record low gasoline
> and distillate inventories as measured by days of inventory.
> Unfortunately, crude oil and ethane prices have increased steadily
> throughout the year, and a certain amount of time is needed to pass
> increases of this magnitude through the chemical and polymer
> markets.   As a consequence, year-to-date results have not fully
> reflected existing industry operating rates.

255.   The outlook for the fourth quarter of 2007 was equally grim.   Lyondell's October

25, 2007 Form 8-K warned:

> Thus far in the fourth quarter, both crude oil and ethane price
> increases have accelerated, setting new highs.   Quarter to date, our
> refining spreads are slightly less than the third-quarter average as
> our heavy crude advantage has partially offset declines in base

> refining margins. In the ethylene, co-products and derivatives
> segment, record high raw material costs are offsetting the benefit
> of recent price increases, necessitating further pricing initiatives.
> In our propylene oxide and related products segment, oxygenated
> fuel (MTBE/ETBE) margins have declined following typical
> seasonal patterns.

256.    At the presentation to lenders that took place on or around September 26, 2007, mid-year operating results for Lyondell and Lyondell management's projections for the second half of the year were disclosed to the Lead Arrangers. According to Kassin, when Citibank and Merrill learned of Lyondell's mid-year results, they were shocked over how much Lyondell "missed [its] numbers."

257.    During October 2007, the Lead Arrangers began to formally solicit banks and other institutions to participate in senior secured facilities that would be used to finance the Merger. For this purpose, a Confidential Information Memorandum dated October 2007 (the "October CIM") and other materials were furnished to prospective lenders. Four tranches of loans were offered pursuant to the October CIM: $2.150 billion in asset-based loan facilities, a $1 billion revolving credit facility, a $2 billion Senior Secured Term Loan A, and a $9.450 billion Senior Secured Term Loan B. The remaining financing of the Merger – the $8 billion Bridge Loan Facility (as hereinafter defined) – was not included in this syndication effort. The October CIM was supplemented during November 2007 with a Confidential Information Memorandum (the "November CIM") prepared for purposes of soliciting participation in the $2.15 billion asset-based lending facilities.

258.    Not surprisingly, despite the parties' efforts to market the loan syndication, the banks that had been counted upon to participate in the first phase of the syndication were backing away. In an email from Patel to Bigman and others, Patel recalls that several banks whom they had counted on to significantly participate in the loan syndication, including HSBC, JP Morgan,

Credit Suisse, and Morgan Stanley, "ran for the hills." Unfortunately for Access, its efforts to secure participation by threatening to retaliate against banks who were not willing to participate materially in the loan syndication (*i.e.*, by either not allowing them into future Access deals or otherwise terminating business relationships) were not successful.

259.    Responding to the failed syndication effort, the Lead Arrangers presented Access with proposed modifications to the terms of the financing as it had been outlined in the Commitment Letter. Whereas the original $13 billion Commitment had consisted entirely of term loans and revolving loans, the Lead Arrangers now proposed to substitute $2.15 billion of receivables and inventory asset-based financing for $2.15 billion of the term loan/revolver financing. Such asset-based financing is a less flexible source of liquidity for the borrower than a committed term loan or revolver since borrowings thereunder are tied to a borrowing base of inventory and receivables. Due to the volatility of the commodities markets, dependency on an inventory based facility is particularly problematic for a petrochemical manufacturer such as Lyondell. If orders slow or the value of inventory declines, the borrower is unable to draw upon the facility because there will be insufficient current receivables and inventory to provide the borrowing base to support borrowings. When prices rise sharply, the size of the facility may quickly become inadequate to finance working capital needs. Then, if prices decline, receipt of cash from product sales may lag behind cash necessary to make required repayments as the borrowing base declines.

260.    In September 2007, the management of Lyondell, Access, and Basell knew that the $2.15 billion asset-based facilities being implemented were not the functional equivalent of a conventional senior term loan facility in the same nominal amount such as contemplated by the initial Commitment Letter. Moreover, crude oil prices, which had been approximately $50 a

barrel in January 2007, had risen steadily all during 2007, reaching $75 a barrel in September

2007.  From and after September 2007 through the December 20, 2007 closing of the Merger,

crude oil prices rose at an accelerated rate.  From the perspective of this pre-Merger period, and

more so as the year approached its end, it was unreasonable not to have available sufficient

liquidity in the event prices continued to rise and, instead, to rely on a short-term abatement of

price escalation to maintain the company in operation.  The critical need for LBI to have more

liquidity to address these rising prices could not have been clearer.  The increased liquidity needs

of LBI were ignored when the asset-based facilities were substituted for the term loan financing,

a substitution motivated not by the projected liquidity needs of LBI but by the fact that such

asset-based financing limited lender exposure and would be easier for the Lead Arrangers to

syndicate.  In the months to come, much of the incremental liquidity supposedly available under

these asset-based facilities would prove illusory and would vanish precisely when needed,

leaving the company with a liquidity shortfall in the range of $2 to $3 billion.  This liquidity

shortfall was entirely foreseeable to Blavatnik, Access, Lyondell and Basell management.

261.    In addition to structural changes made to the financing package, pricing

modifications were also made to enhance the potential salability of the loans.

262.    On November 20, 2007, the merger between Lyondell and Basell was approved at

a meeting of Lyondell shareholders.

263.    On November 28, 2007, S&P and Moody's simultaneously downgraded the debt

of both Basell and Lyondell, citing the substantial post-LBO increase in debt "at a mature state in

the petrochemical cycle."

264.    By the end of November 2007, of the $21.6 billion of financing committed to

fund the LBO, the Lead Arrangers had succeeded in securing participation only in the $2.15

billion asset-based loans.  According to Citibank's closing memorandum, "[t]he deal was mostly funded by underwriters at close with a handful of banks (5) coming in with small commitments."

265.   In the midst of the Lead Arrangers' failed efforts to syndicate their loans, on December 7, 2007, Blavatnik caused Basell to issue its third shareholder distribution of 2007, for €100 million, bringing the total amount of cash taken out of Basell in 2007 in the form of shareholder distributions to €315 (or approximately $430 million).

266.   On December 10, 2007, an article was published titled "Basell to Delay $21 Billion Lyondell Financing Plan."  In this article, Trautz is quoted as saying "We thought we would be going to the markets in October or November, now we think we will go in first or second quarter."  Trautz's comments caused more consternation among the Lead Arrangers, as observed by Kassin in an email dated December 10, 2007:

> "Uday [Merrill Lynch] just called to say that the banks are very unhappy with [Trautz's] comments…"
>
> "It gets worse . . . just released on Bloomberg . . . our phones are ringing off the hook."

267.   On December 11, 2007, Fitch followed S&P and Moody's with its own downgrade of the debt of Basell and Lyondell, citing substantial re-leveraging to facilitate the Transaction.

268.   Margins continued to tighten during the fourth quarter.  Rather than making up for prior lost earnings, Lyondell operated at a loss during the last quarter of 2007 and had unadjusted EBITDA for that period of approximately $613 million, off by approximately 33% from the Lyondell Management Presentation.  Actual EBITDA for Lyondell for all of 2007 was $2.7 billion, off 20% from the July 15 Base Case.

269.    Against the background of Lyondell's deteriorating third and fourth quarter performance and industry forecasts of a more severe downturn, it became more and more obvious as the scheduled date for the Merger approached that the earnings projections provided by Lyondell Management in connection with the Merger Agreement were, at a minimum, unreasonable and, in fact, inflated.

270.    The unreasonableness of management's projections for 2008 alone is strikingly apparent from the comparison, graphed below, of actual Lyondell adjusted EBITDA versus management projections for the three quarters preceding the Merger.  Ignoring a pattern of repeated, widening "misses" for each of three successive quarters in 2007, management's quarterly projections for 2008, prepared on or around November 2007 for "legacy" Lyondell following the Merger, were completely unreasonable.[14]



Lyondell Quarterly Adjusted EBITDA Projection Versus Actual

---

[14] Actual results presented below for 2008 adjusted EBITDA are based on publicly available data reported for Lyondell Chemical Company.  Estimated 2008 EBITDA represents estimated EBITDA generated from assets of certain former non-U.S. subsidiaries of Lyondell Chemical Company that were transferred following the Merger to non-U.S. subsidiaries of LBI. Actual EBITDA from these transferred entities is not available at the present time.

271.    During 2007, prior to the closing of the Merger, including during the period after the Merger Agreement was signed until the closing of the Merger, the petrochemical industry forecasts weakened progressively, due, *inter alia*, to the slowing economy, rising energy costs (which led to compressing of margins), weakening demand for chemicals, and announcements of increased capacity within the industry (by competitors of Lyondell and Basell).  Deteriorating industry and related business developments suggested that the next trough in the petrochemical industry would be longer and considerably deeper than anticipated at the beginning of 2007. Moreover, given the disadvantaged position of Lyondell and Basell compared to their competitors and their particular vulnerability to the next petrochemical industry trough, representatives of Lyondell, Basell, and Access, including Blavatnik, knew or should have known that the next petrochemical industry trough would much more severely and negatively impact the income and profitability of Lyondell and Basell than their more advantaged competitors.

272.    Indeed, in the midst of the liquidity crisis that occurred soon after the Merger, it was widely acknowledged within Access that Lyondell's "refreshed" projections had been prepared for selling purposes and could not be relied upon for purposes of estimating cash flows. As Javier Martinez, an associate at Access, stated in a March 11, 2008 email in which he advocated for updated projections to address the liquidity crisis:

> The one major outstanding issue is the projection update (surprise, surprise!). . . . This is important because currently liquidity position and models are being compared and contrasted to the July 2007 Base Case (which was mainly prepared by Lyondell for selling purposes anyway!) so it is difficult for them to understand what the situation is past the next month or so.

273.    In commenting on LBI's liquidity issues immediately after the Merger, Patel

noted that "[b]asically, 80% of the liquidity 'issue' is stuff that should have been incorporated

into forecast because it was [known] quite a while ago."

## III.    The Merger Closes

274.    On December 20, 2007 (the "Merger Closing"), pursuant to the Merger

Agreement, an indirect merger subsidiary of Basell was merged into Lyondell, and all of

Lyondell's 253,535,778 outstanding shares of common stock, including restricted stock, were

converted into the right to receive $48 in cash and Basell, which thereupon changed its name to

LyondellBasell Industries A.F. S.C.A., became, through an intermediate holding company, the

corporate parent of Lyondell.

275.    Also on December 20, 2007, Lyondell and certain affiliates entered into debt

facilities (the "Facilities") pursuant to which they incurred obligations in the approximate

amount of $20.7 billion (the "Obligations").  The Obligations were incurred under (i) a senior

credit facility (the "Senior Credit Facility")[15] providing term and revolving loans in the aggregate

amount of approximately $12.4 billion; (ii) a bridge loan facility (the "Bridge Loan Facility") [16]

---

[15] Entered into pursuant to a credit agreement (the "Senior Credit Agreement"), dated as of December 20, 2007, as
amended and restated on April 30, 2008, among Citibank, N.A., as administrative agent, Citibank International plc,
as European administrative agent, the lenders party thereto from time to time (the "Senior Lenders"), and Citigroup
Global Markets Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch, Pierce, Fenner & Smith  Inc., ABN
AMRO Inc., and UBS Securities LLC as joint lead arrangers (such parties to the Senior Credit Facility including
Deutsche Bank Trust Company Americas as successor to Citibank, N.A., as administrative agent, and Citibank
International plc, as European administrative agent, (the "Senior Credit Facility Lender Parties")), Lyondell, Basell
Holdings B.V. ("Basell Holdings"), Basell Finance Company B.V. ("Basell Finance"), and Basell Germany
Holdings GmbH ("Basell Germany") as borrowers (the "Senior Credit Facility Borrowers"), and certain direct and
indirect subsidiaries of the Senior Credit Facility Borrowers as guarantors (the  "Senior Credit Facility Subsidiary
Guarantors" or the "Subsidiary Guarantors"; and together with the Senior Credit Facility Borrowers, collectively,
the "Senior Credit Facility Obligors").  The Senior Credit Facility included, *inter alia*, a €1.3 billion, 7-year Senior
Secured German Term Loan B with Basell Germany as Borrower (the "German Term Loan B") and a $500 million,
6-year Senior Secured Dutch Term Loan A with Basell Holdings as Borrower (the "Dutch Term Loan A").
[16] Entered into pursuant to a bridge loan agreement (the "Bridge Loan Agreement"), dated as of December 20, 2007,
as amended and restated on April 30, 2008, and as further amended and restated on October 17, 2008, among M errill
Lynch Capital Corporation, as administrative agent; Citibank, N.A., as collateral agent; the lenders party thereto
from time to time (the "Bridge Lenders"); and Merrill Lynch, Pierce, Fenner & Smith Inc.; Goldman Sachs Credit
Partners, L.P.; Citigroup Global Markets Inc.; ABN AMRO Inc.; and UBS Securities LLC as joint lead arrangers

providing for second lien bridge term loans (the "Bridge Loans") in the aggregate amount of $8

billion; (iii) an inventory-based revolving credit facility (the "ABL Inventory Facility")[17]

providing for a $1 billion inventory-based revolving facility; and (iv) $1.15 billion receivables

securitization facility (the "ABL Receivables Facility" and, together with the ABL Inventory

Facility, the "ABL Facilities", and the ABL Facilities together with the Senior Credit Facilities

and the Bridge Loan Facility, the "Merger Financing").

276.    To secure repayment of the Obligations incurred under the Senior Credit Facility

(the "Senior Credit Facility Obligations"), the Senior Credit Facility Obligors (excluding

Millennium US Op Co LLC, Millennium Petrochemicals, Inc. and Milennium Specialty

Chemicals, Inc. which granted no security interests in their assets) granted security interests to

Citibank, N.A., as collateral agent, in certain of their real and personal property.  The Senior

Credit Facility Obligors that are U.S. entities granted security interests in certain of the real and

personal property, including: (a) all stock owned by each such Senior Credit Facility Obligor in

any wholly owned subsidiary of LBI; (b) all debt securities held by each such Senior Credit

Facility Obligor; (c) all payments, rights, privileges and proceeds of (a) and (b); and (d)

substantially all of each such Senior Credit Facility Obligor's personal property, including

equipment but not including accounts receivable, inventory and interests in any joint ventures.

LBI, Basell Holdings, Basell Finance, Basell Germany and certain affiliates (the "European

Obligors"), granted security interests to Citibank, N.A., as Senior Collateral Agent, in certain

---

(such parties, the "Bridge Loan Lender Parties"), LyondellBasell Finance Company, as borrower (the "Bridge Borrower"); and the Subsidiary Guarantors that guaranteed the Senior Credit Facility Obligations, as guarantors thereunder (the "Bridge Guarantors;" and together with the Bridge Borrower, the "Bridge Loan Obligors").

[17] Entered into pursuant to a credit agreement, dated as of December 20, 2007, among Citibank, N.A., as administrative agent and co-collateral agent, General Electric Capital Corporation, as co-collateral agent (along with Citibank, N.A., the "ABL Collateral Agents"), the lenders party thereto from time to time, Citigroup Global Markets Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch Capital Corporation, ABN AMRO Inc., and UBS Securities LLC, as joint lead arrangers; and Lyondell, Houston Refining, Equistar, and Basell USA Inc., as borrowers thereunder, providing for a $1 billion, 5-year Asset Based Inventory Revolving Credit Facility, $175 million of which was funded at closing.

equity and debt securities owned by the European Obligors and all rights related thereto, and in certain other personal property. Finally, pursuant to various pledge, charge, security and assignment agreements between themselves and Citibank, N.A., as Senior Collateral Agent, other subsidiaries of Basell granted to the Senior Collateral Agent a first priority security interest over various equity securities, as well as other real, personal and intellectual property (all of the foregoing described security interests and liens, the "Senior Liens").

277.   To secure the repayment of all obligations incurred under the Bridge Loan Facility, including the guarantee obligations thereunder (the "Bridge Loan Obligations"), LyondellBasell Finance Company and each of the Bridge Guarantors, including the European Obligors, granted to Citibank, N.A., as collateral agent (in such capacity, the "Bridge Collateral Agent"), a second priority (or third priority) security interest in substantially the same real and personal property that secured the Senior Credit Facility Obligations (the "Bridge Loan Liens").

278.   To secure obligations under the ABL, the ABL Obligors granted to the ABL Collateral Agents for the benefit of the ABL Lenders, (i) a first priority pledge of all equity interests owned by each ABL Obligor in, and all indebtedness owed to each ABL Obligor by LB Receivables I and Basell Capital Corporation and (ii) a first priority security interest in certain deposit accounts, all receivables and inventory, and related assets owned by each ABL Obligor (together, the "ABL Lien Transfers"). Further, the ABL was guaranteed on an unsecured basis by each U.S. subsidiary (the "ABL Guarantors") of each ABL Obligor (the "ABL Obligations").

A.   **Uses of the Proceeds of the Merger Financing**

279.   The proceeds of the Merger Financing were applied to fund the transactions contemplated in connection with the Merger as follows:

(i)   <u>Shareholder Payments.</u>   Approximately $12.5 billion to former shareholders of Lyondell as payment of Merger Consideration.

116

(ii)    <u>Refinancing of Pre-Existing Debt</u>.    Approximately $7.1 billion (net of $489 million of premiums and other breakage costs associated with the tender offers of Lyondell and Equistar public debt) was used to refinance pre-existing debt of Lyondell, Basell, and certain of their respective consolidated subsidiaries as follows:

(a)    $3.062 billion to repay the Lyondell 10½% Senior Unsecured Notes Due 2013 ("2013 Notes"), the Lyondell 8% Senior Unsecured Notes Due 2014 ("2014 Notes"), the Lyondell 8¼% Senior Unsecured Notes Due 2016 ("2016 Notes"), and the Lyondell 6⅞% Senior Unsecured Notes Due 2017 ("2017 Notes");

(b)    $1.753 billion to the repay the Lyondell Term Loan Due 2013 ("2013 Term Loan");

(c)    Approximately $858,811 to repay the Lyondell 10½% Senior Secured Notes Due 2013 ("2013 Secured Notes");

(d)    Approximately $1.475 billion to repay the Equistar 10.125% Senior Unsecured Notes Due 2008 ("2008 Notes"), the Equistar 8.75% Senior Unsecured Notes Due 2009 ("2009 Notes"), and the Equistar 10.625% Senior Unsecured Notes Due 2011 ("2011 Notes");

(e)    Approximately $301 million to repay the Equistar inventory-based credit facility;

(f)    Approximately $576 million to repay the Equistar accounts receivable securitization facility; and

(g)    Approximately €310.6 million to repay the Basell Multicurrency Revolving Senior Facility (the "Basell Senior Facility").

(iii)    <u>Payments to Lyondell Officers and Employees</u>.    The proceeds of the Facilities were also used to fund approximately $337.3 million of payments under various Lyondell benefit and incentive plans, stock option plans, and other equity based incentive programs triggered or accelerated by the change of control of Lyondell (the "Change of Control Payments"). Payments received by Lyondell Officers and Directors, set forth below included (i) Change of Control Payments and (ii) payments of Merger Consideration in respect of Lyondell common stock and vested stock options owned by them.

| Executives | Change of Control Payments[18] | Payments of Merger Consideration[19] |
|---|---|---|
| Dan F. Smith | $57,216,503 | $54,781,787 |
| T. Kevin DeNicola | $15,476,541 | $10,366,012 |
| Edward J. Dineen | $11,110,970 | $1,855,947 |
| W. Norman Phillips Jr. | $4,366,503 | $1,352,351 |
| | | |
| Eight Other Executives[20] | $70,681,499 | $25,639,888 |
| | | |
| **Total** | **$158,852,016** | **$93,995,985** |

| Non-employee Directors | Change of Control Payments | Payments of Merger Consideration |
|---|---|---|
| Ten Non-employee Directors | $13,537,523 | $5,607,686 |

    (iv)    <u>Transaction Fees and Expenses</u>.  Approximately $574.6 million to fund additional fees and expenses, including the following:

        (a)    $127,608,860 to Nell Limited by Basell AF S.C.A. as payment for (a) a purported one time transaction advisory fee ($100 million), (b) an annual management fee of $25 million, and (c) reimbursement of claimed expenses of $2.6 million.

## IV.    <u>As a Result of the Merger, LyondellBasell Was Left with Unreasonably Small Capital</u>

    280.    Given the cyclicality of Lyondell's business, Lyondell's fixed costs and working capital requirements, the business could not be reliably funded from earnings.  Lyondell needed a capital structure that would provide the necessary flexibility, including access to the credit markets, to keep the company afloat during a downturn.  In addition, according to Smith, Lyondell needed between $2 and $2.5 billion of "room" just to meet its working capital needs.

---

[18] For both the executives and non-employee directors, these amounts include payments made as a result of, or accelerated by, the Merger in connection with the following, where applicable: unvested stock options, restricted stock, cash payments made in connection with the award of restricted stock, performance units, a deferral plan, a supplemental executive retirement plan, a severance pay plan, and so-called welfare benefits.

[19] For both the executives and non-employee directors, these amounts include Lyondell common stock and vested stock options that the individuals held independent of the Merger, and that were cashed out in connection with the Merger.

[20] Actual amounts for these eight other executives are likely higher because the LB Creditor Trust has limited information for two of the executives.

Testifying at a deposition held on October 25, 2007, a little less than two months before the Merger would be consummated on December 20, 2007, Smith explained Lyondell's need for over $2 billion in available liquidity as a simple lesson learned from the commodities markets over the prior two years:

> That's about how much room you need with the crazy market that we deal in with crude oil and natural gas, et cetera, that we literally have seen cost of inputs rise more than $2 billion in each of the last two years. So our working capital has gone way higher. You've got to be able to finance the business. And then suddenly, if the earnings fall off, you're just stuck.

281.    "You've got to be able to finance the business." In failing to adequately capitalize LBI while incurring $22 billion of indebtedness to fund the Merger, $12.5 billion of which would flow out to Lyondell stockholders (including $1.2 billion to Blavatnik and over $100 million to Smith), the parties to the Merger recklessly or willfully overlooked this simple truth. Taking into appropriate account actual performance of Lyondell and Basell for 2007 and all available data which was known or should have been known by Lyondell, Basell, and Access management, Lyondell was insufficiently capitalized to provide it with the necessary liquidity to fund its operations through a downturn. When the cost of hydrocarbon inputs continued to rise after the Merger, as they had for the prior two years, LBI had to exhaust all available sources of liquidity to finance its working capital needs. And, when as had been widely forecasted, earnings did indeed fall off, LBI, unable to fund its operations or meet its obligations as they became due, was forced into bankruptcy.

## A.    Reasonableness of Projections

282.    The adequacy of the capitalization of the combined companies following the Transaction was premised on the EBITDA forecasted by the managements of the two companies

119

as stated in the July 15 Base Case, as subsequently modified (the "Management Projections").[21]

The Management Projections included $18.38 billion of cumulative EBITDA projected by the

managements of the two companies from the combined operations during the period 2008

through 2011 (the "Projection Period").

283.   EBITDA forecast in the Management Projections for each year of the Projection

Period are as follows:

### EBITDA (in millions of $)

| YEAR | 2008 | 2009 | 2010 | 2011 | Cumulative |
|---|---|---|---|---|---|
| Basell | 1,681 | 1,343 | 1,109 | 1,135 | 5,268 |
| Lyondell | 3,515 | 3,072 | 2,818 | 2,593 | 11,998 |
| Other | (18) | (18) | (18) | (18) | (72) |
| Net Synergies | 45 | 300 | 420 | 420 | 1,185 |
| | 5,223 | 4,697 | 4,329 | 4,130 | 18,379 |

284.   However, only cash flows that are reasonably anticipated should be considered in

assessing capital adequacy.  As described in detail, *supra*, the Management Projections were, at a

minimum, speculative, unsupported by objective data, and were at odds with the economic and

supply/demand forecasts of leading petrochemicals and refining industry analysts.  Ultimately,

based on information known at the time of the Transaction, the $18.38 billion of cumulative

---

[21] Limited modifications to EBITDA forecasts contained in the July 15 Base Case were made in the October CIM and the November CIM. The principal difference between the July 15 Base Case and the identical forecasts contained in the October and November CIMs are the EBITDA numbers given for 2007 and 2008. While the July 15 Base Case forecast $5.253 billion of EBITDA for 2007, the October CIM and the November CIM reflect a recognition that actual results for 2007 would fall short of the July 15 Base Case and show a revised EBITDA forecast for 2007 of $4.613 billion.  The October CIM and November CIM EBITDA forecasts for 2008 are also reduced relative to the July 15 Base Case by $155 million in the amount of synergies forecast for 2008 and Basell 2008 EBITDA was adjusted modestly downward by approximately $70 million. Apart from the limited adjustment in Basell's EBITDA forecast for 2008, the July 15 Base Case projections were virtually identical to the projections included the Management Projections in forecasting EBITDA for 2008-2011.

EBITDA included in the Management Projections exceeded, by between $5 and $6 billion (one third of the projected EBITDA), what could reasonably and prudently be relied upon as a source of the cash necessary to operate the businesses of LBI during the Projection Period.

285.    Three dozen EBITDA projections were prepared by Lyondell and Basell and their financial advisors or the Lead Arrangers during 2007 prior to the Transaction. of these, the Management Projections (which incorporate the July 15 Base Case with minimal changes) contain the most aggressive EBITDA forecasts for the Projection Period.  The Management Projections were recklessly used by management of Lyondell, Access, and Basell to support a premium price for the Merger, which was to be 100% financed with debt, and to support the syndication of the excessive Merger Financing, all to the detriment of LBI's other creditors.

286.    Various downside projections prepared by the Lead Arrangers, although not true downside cases in that they did not reflect the full range of foreseeable downside scenarios from the perspective of late 2007, more adequately demonstrated the reasonably foreseeable cash flows of LBI upon the close of the Transaction.  The downside cases included the April 10, 2007 Merrill Lynch "Credit Stress Test Case," the "July 10, 2007 Merrill Lynch Downside Case" and the July 15, 2007 "Citibank Downside Case."   In each of these cases, net cash flows on a cumulative basis were negative, indicating that LBI would be unable to meet its debt service obligations and/or fund capital expenditures over the five year period.  The annual net cash flows in the "Credit Stress Test Case" and "Citibank Downside Case" turn negative in 2009, with the net cash flows in the "Merrill Lynch Downside Case" turning negative in 2010.  All three cases continue to generate negative cash flow throughout the remainder of the projection period, except for the "Citibank Downside Case" which anticipates net cash flow turning positive in 2012, after reaching a $1 billion cumulative deficit over the preceding period.  The cumulative

debt service obligations alone with respect to the Merger Financing account for 77% to 93% of the cumulative EBITDA projected in the three downside cases.

287.    None of the three cases provide any meaningful level of cash flows to support or contribute to LBI's other liquidity needs, including the need to provide for reasonably foreseeable stresses and contingencies. The resulting debt to EBITDA leverage ratios indicates that LBI had far exceeded reasonable measures of debt capacity and would not be able to reasonably refinance its maturing long-term debt obligations on an arms' length basis over the course of the projection period, and that LBI would be anticipated to fail the debt service covenant requirements of the Merger Financing in the third quarter of 2008, the fourth quarter of 2008 and in each year from 2009-2012.

### B.      LyondellBasell's Highly Leveraged Capital Structure

288.    Following and as a result of the Transaction, and as assessed, *inter alia*, by reference to the historical liquidity of the two legacy companies and by liquidity levels maintained by comparable petrochemical and refining companies operating under the same conditions of volatility and cyclicality to which LBI was subject, LBI's leverage was too high to allow it to survive potential downturns in operating cash flows or to meet a wide range of reasonably foreseeable stresses and contingencies.  Due to its high leverage, LBI was unable to obtain an acceptable credit rating to maintain necessary trade credit and, as a consequence of the liens and restrictions imposed under the terms of the Merger Financing, had inadequate borrowing capacity to cover foreseeable stresses and contingencies.

289.    The debt burden of LBI was so much higher than the combined debt burden of Basell and Lyondell before the Transaction that it moved the combined company to the highest end of the range for virtually every leverage measure, as compared to the following comparable

companies in the chemicals and refining industries: BASF, Celanese, Dow, Eastman, Huntsman,

Nova, and Westlake (chemicals);  Alon USA, Frontier Oil, Holly, Sunoco, Tesoro, Valero and

Western (refining).  Following the Merger and as a result thereof, LBI was the lowest ranking

company among its peers, as measured by Liquidity to Current Liabilities, Liquidity to Tangible

Assets, Liquidity to Total Assets and  Liquidity to Current Assets.

290.    LBI's opening liquidity at the close of the Transaction was also considerably less

than the total combined historical liquidity of the legacy companies.   Between December 31,

2006 and September 30, 2007, the combined reported liquidity of Lyondell and Basell fell

between $3.3 and $3.9 billion, in comparison to the $1.323 billion in liquidity immediately after

the consummation of the Transaction (of which liquidity only $926 million was truly available

for use in funding operations).  Despite the increased size and debt burden of the combined

businesses, LBI's opening liquidity as of December 20, 2007 was far less than what legacy

Lyondell maintained by itself in the year prior to the Transaction and instead approximates the

level of liquidity that the smaller Basell maintained by itself over the same period.  Between

December 31, 2006 and September 30, 2007, the combined reported liquidity of Lyondell and

Basell was between 27.1% and 37.0% of outstanding debt.  In contrast, LBI's liquidity was 5.5%

of its outstanding debt after the consummation of the Transaction.

### C.    Foreseeable Contingencies

291.    The information available at the time of the Transaction confirmed that LBI's

liquidity was inadequate to address reasonably foreseeable contingencies.  Pricing of crude oil

options in late 2007 indicated significant expected volatility (even exceeding the expected

volatility of the S&P 500 stock market index).  The risk of a recession was anticipated and

estimated by Basell as 50% in March 2007.  Further, weather-related interruptions in service

were foreseeable, as LBI had fourteen plants along the Gulf Coast, a region vulnerable to the

dangers of hurricane activity.

292.   Evidencing the predictability of these contingencies, and their effect on liquidity

needs, in December 2006 Lyondell estimated contingent liquidity needs as follows:

| | |
|---|---|
| Unplanned Downtime (one plant) | $150-$350MM |
| Large Turnarounds | $75-175MM |
| Weather | $150-500MM |
| Margin Calls | $150-250MM |
| Working Capital | $200-400MM |
| | $725-$1675MM |

293.   In its Proxy Statement filed with the SEC prior to the Transaction, Lyondell

likewise recognized the risks associated with the projections it created, including:

- The availability, cost and price volatility of raw materials and utilities;

- Uncertainties associated with the U.S. and worldwide economies, including those due to political tensions in the Middle East and elsewhere;

- The cyclical nature of the chemical and refining industries; and

- Operating interruptions (including leaks, explosions, fires, weather-related incidents, mechanical failure, unscheduled downtime, and supplier disruptions).

294.   LBI's liquidity was insufficient to provide for these known risks.  Moreover, LBI

had a centralized cash management system, meaning that the unreasonably small capital of the

LBI corporate group resulted in unreasonably small capital for LBI and each of its direct and

indirect subsidiaries.

## V.   LyondellBasell's Liquidity Failure Upon the Merger

295.   As was reasonably foreseeable at the time, LBI's collapse started early.  Very

predictably, the spike in 2008 EBITDA, forecasted in response to Lyondell's disappointing

results for 2007, did not materialize.  Instead, predictably, the same factors that had adversely impacted Lyondell's earnings in each of the last three quarters of 2007, continued to squeeze the margins of LBI's chemicals business.  Similarly, LBI's forecasts (unsupported by industry analysts) of improved refining margins proved to be unfounded: margins on refining, a key profit driver for LBI, remained at the rates seen in 2007.  Earnings through the first four months of 2008, including income from joint ventures, fell behind the projections by $326 million.  By April 2008, LBI was forced to materially revise its pre-Merger forecasts downward to reflect its actual business performance.  Under these revised forecasts, the new "Base Case" was for $4.6 billion of EBITDA for 2008 versus $5.4 billion[22] of EBITDA for the September Projections used for syndication purposes.  Looking forward to future revisions to the business plan, management formulated an April 2008 "downside" case for the year projecting 2008 EBITDA at $4.3 billion – almost a full billion dollars below the July 15 Base Case.

296.    Moreover, from the effective time of the Merger until filing for Chapter 11, LBI was in an ongoing liquidity crisis from which it was unable to emerge.  As of the Merger closing, LBI's available liquidity (cash balances and unfunded portions of its facilities), less incremental constraints imposed by its credit facilities, and deductions for uncertainty of timing of cash receipts and distributions, was only $926 million.  And while a billion dollars may seem like a lot of money, for an operation of the size, complexity and volatility of LBI, a company materially larger even than Lyondell, $1 billion of liquidity was completely inadequate.  In a single day, cash outflows could reach $500 million, a reality that Karen Twitchell, LBI's treasurer, had to deal with on a day by day basis.  Twitchell's concerns regarding LBI's liquidity, however, fell on deaf ears.  This reality was known to Access, Basell, and Lyondell management well prior to the Merger. Within approximately 60 days after the closing of the Merger, liquidity

---

[22] Including Solvay Engineered Polymers, Inc., which LBI purchased in February 2008, and Berre.

actually available on a day-to-day basis, net of unfunded commitments, was *negative* $213 million.

297.    Within weeks after the Merger, LBI management was forced to seek to "upsize" its borrowing capacity by $600 million by finding funding for the "accordion" feature included in the ABL.   Also near the end of March 2008, the company sought to upsize its European accounts receivable asset-backed facility by $170 million.   With LBI's daily liquidity in the negative at the end of February 2008, it was fighting for its life, according to Kassin.

298.    Conditions worsened in March 2008; by March 13, 2008, there were concerns at LBI that by the end of March 2008, LBI's projected liquidity would be $153 million, well below the minimum liquidity needed to fund LBI's daily operations.   While waiting for additional funds to become available through the upsizing of the revolvers, Access, battling with LBI's lenders, was forced to make available what the parties characterized as a credit line (the Access Revolver) in order to meet LBI's immediate needs for liquidity.   So desperate was LBI for an additional $600 million in ABL financing that it agreed to a "LIBOR floor" on the term loan facility with an estimated incremental cost of $309 million.

299.    The liquidity crisis was largely the result of a failure to adequately account for contingencies – as Patel stated in a March 12, 2008 email, "as far as I can tell, only about $200 million of [the liquidity] crunch is due to rising oil, the rest is bad planning and pretending that all is well. . . . Basically, 80% of the liquidity 'issue' is stuff that should have been incorporated into forecast because it was [known] quite a while ago."

300.    The Lead Arrangers also expressed concern.   As Kassin noted in a March 16, 2008, email, referencing Citibank's view, "[p]eople at very high levels are flipped out and nervous regarding the LBI liquidity crunch."   In late March 2008, Goldman pressed Access to

"put in $500-$1,000 million of equity" into Basell, and advised Patel that the "level of angst in their shop is rising to high levels." Patel reported to Blavatnik and others in a March 19, 2008 email that Goldman was consumed with Lyondell's liquidity crisis, stating that Goldman believed that "It's 'morally wrong for LBI to buy [the] Berre [refinery] and they [*i.e.*, Basell] should just break' the deal [to purchase Berre]." Access worried that if the seller "sniff[ed]" the liquidity problems, they would "panic" and "you can kiss LBI . . . goodbye." However, instead of breaking the Berre deal, Access and Basell rejected Goldman's request and closed that transaction the following month, using approximately $600 million in borrowed funds from the banks that further depleted LBI's liquidity.

301.   On March 27, 2008, LBI, Basell Finance, and Lyondell agreed to the terms of the Access Revolver with Access Industries, which provided the Company with $750 million in revolving credit. Even as it was being put into place, the intention was to use the Access Revolver only as a last resort. Blavatnik had no interest in being a lender to LBI and from the perspective of the Lead Arrangers, who were still hoping to syndicate in a delayed launch, LBI's need to obtain emergency funding from an affiliate looked bad. The plan, however, was to delay a draw on the Access Revolver until the Lead Arrangers had succeeded in syndicating their loans.

302.   In an April 10, 2008 email to Kassin, Twitchell wrote: "No one is truly listening. This company needs more liquidity. The company's daily/monthly/quarterly cash flows are VERY volatile…bottom line is that this company needs more liquidity."

303.   LBI's persistent problems forced it to revise its planned debt reduction for 2008 from a $1.3 billion reduction to only a $300 million reduction. With an industry-wide trough

already underway, LBI's inability to pay down debt caused both S&P and Moody's to downgrade their outlooks on all ratings of LBI from stable to negative.

304.    At the same time, trade credit became restricted.   As Bigman stated in a September 2, 2008 email, between the closing of the Merger and September 2, 2008, LBI lost an estimated $420 million of trade credit - $180 million of which was lost since the S&P downgrade.

305.    LBI's available cash plummeted $1 billion in just two months from June to August 2008, and fell another $500 million by the middle of October.   Without the Access Revolver or the upsizing of the ABL Facility, by mid-October 2008, LBI's available cash was near $0.

306.    In the second half of 2008, EBITDA in LBI's chemicals businesses continued to decline, and its fuels business plunged over the precipice, off $780 million by October 2008, and off $1.4 billion by December 2008.

307.    By October 2008, the blame game between the Access team (Kassin and Patel) and the LBI team (Trautz and Bigman) was in full swing.   Patel and Kassin, worried about their reputations, exchanged frantic emails as they watched LBI management fail to avoid the impending collapse.

308.    In the last quarter of 2008, the punishingly high prices of raw materials began to drop.   And, because the ABL Inventory Facility generally permitted LBI to borrow only up to 75% of the inventory's value, eroding inventory values resulted in a severely diminished borrowing base and triggered LBI's obligation to repay the ABL Lenders.   The timing of this contraction in the borrowing base coincided with a steep decline in earnings during the second

half of 2008.  As receivables dried up, so too did the borrowing base under the ABL Receivables Facility.

309.    On October 15, 2008, Lyondell, unable to otherwise satisfy obligations then becoming due and unable to obtain financing from any other source, drew $300 million from the last resort Access Revolver.  Although Lyondell was clearly insolvent at the time, and had insufficient capital to continue operating, on October 16, 17, and 20, it repaid the $300 million in three payments of $100 million each.  Even as the cash starved company commenced its death dive, the priority remained to assure that risk to Blavatnik be minimized or non-existent.

310.    By the end of November 2008, LBI's earnings were significantly off in every division except Technology, which accounted for only an immaterial amount of earnings.  LBI's EBITDA was only approximately $2 billion, off 53% versus projected November year-to-date EBITDA in the LBI business plan.

311.    LBI began negotiating forbearance agreements with its lenders, eventually obtaining a forbearance of $281 million in principal, interest, and fees.

312.    On December 12, 2008, Twitchell e-mailed Richard Storey, Finance Director of Access, informing him that Lyondell would require funding under the Access Revolver in the amount of $100 million on December 29, and in the amount of $300 to $350 million on December 30 or 31 early in the morning.  She stated that Lyondell would be unable to repay the $300 million draw for several months.  Storey forwarded the e-mail to Benet and wrote, "This is a problem."

313.    On December 17, 2008, Access assigned the Access Revolver to AI International, a Luxembourg entity, so that it could fund any draws on the Access Revolver with offshore funds.  By this point in time, however, Blavatnik had already consulted with restructuring

129

advisors and been told a far greater infusion of funds than was potentially available under the Access Revolver was necessary to fund LBI's operations and allow it to meet its obligations into 2010.

314.   On December 17, 2008, a Managing Director at Lazard Ltd., who had been seeking to be retained for the restructuring of LBI, gave Blavatnik some personal advice.   The Managing Director told Blavatnik not to "put any more money into LBI until you know that you (possibly with a partner) are able to invest more than what is required.   In this case, we calculate that you need more than $3 billion." The Managing Director advised Blavatnik that if he only invested $1 billion in LBI, "based on the numbers we see, you won't save the existing equity and you probably won't get much of your $1 billion back."

315.   By mid-December 2008, LBI management was involved in emergency discussions with its lenders to prepare for a Chapter 11 filing and arrange financing to support LBI through bankruptcy proceedings, in which Blavatnik, through Access or another Blavatnik-controlled entity, would contribute part of such financing in an amount equal to the Access Revolver to obtain a more favorable secured position than if Access permitted a draw down under the Access Revolver.

316.   By December 20, 2008, Access was considering the tax benefits of waiting to abandon LBI in 2009 versus 2008.

317.   On December 29, 2008, Kassin informed Blavatnik that LBI was unraveling at a very rapid pace and would likely not last until January 5, 2009.

318.   On December 30, 2008, even though Lyondell managers knew that AI International would reject the request, they went through the charade of requesting a draw down

of the entire $750 million balance of the Access Revolver.  AI International promptly denied the request, and LyondellBasell thereafter filed a Chapter 11 proceeding.

319.    None of the difficulties that LBI faced in its first year should have been unanticipated.  Each should and could have been dealt with had LBI been adequately capitalized with a capital structure that reasonably provided for LBI's foreseeable needs to finance its businesses through a downturn.  Economists and industry analysts had been handicapping the possibility of an economic recession which foreseeably would depress demand and exacerbate the forecasted chemicals industry downturn.  As put by Alan Bigman in an affidavit submitted along with Lyondell's bankruptcy filings, "[t]he petrochemical industry historically *has been defined* by its cyclical nature."   Before Lyondell became an acquisition target, Lyondell's strategy was to leverage down in anticipation of the downturn.  Instead, indifferent to anything but taking the gamble on surviving a trough to benefit on the upside, Access chose to leverage up, imposing a staggering debt burden just as the peaks in both industries had past.  It was clear, moreover, by the fall of 2007, that the fact that LBI was operating in two major industries, petrochemicals and refining, would not operate as a hedge on risk.  Both industries would head into the downturn at the same time.  By the time the Merger closed, and indeed well before, it was known that LBI was on a high-wire without a net.

320.    The consequences to LBI of insufficient liquidity were also a known risk long before the Merger closed.  After two years of steady increases in the commodities markets and a marked increase in volatility, no petrochemicals manager should even be seriously heard to claim surprise at the trend continuing.  Crude oil prices had already reached $90 a barrel by the time the Merger closed in late December, up almost $40 a barrel from where they had been less than twelve months before.  As characterized by Smith, the commodities market for oil and gas was a

"crazy market" and an additional $40 rise may have seemed unlikely to some but was far from outside the realm of possibility.

321.    In short, LBI did not fail because of a unique or unforeseeable convergence of bad luck.  Levered within an inch of its life, it was absolutely barred from accessing financing needed to survive even a short term drop off in earnings.  As the capital markets that recoiled from holding its debt understood even before the Merger closed, LBI's capital structure made its failure during the downturn inevitable.  Once the Merger closed, the only question remaining was the precise point along the path to the trough at which complete and irretrievable failure would occur.  LBI failed because it was inadequately capitalized and grossly overleveraged and, accordingly, unable to deal with the stresses inherent in the industries in which it was operating.

## VI.    Upon the Merger, LyondellBasell Was Insolvent

322.    Because the Merger rendered the LBI enterprise insolvent, it rendered Lyondell flagrantly insolvent because Lyondell, only a part of the new enterprise, was nonetheless obligated on all of the Merger debt.  Upon the closing of the Merger, LBI, considered on a consolidated basis with its subsidiaries (the "LBI Group"), had liabilities in the amount of approximately $26 billion.  Of such amount, approximately $22 billion represented obligations under the Facilities and the balance was other debt.  On and as of the date of the Merger, December 20, 2007, the fair value of the assets of LBI Group ranged from no more than $21.1 billion to at most $24.29 billion and may have been materially less than this range of fair value. Accordingly, from and after the closing of the Merger, the LBI Group was insolvent.  This insolvency deepened over the course of 2008.

323.    Further, each of the LyondellBasell entities was likewise insolvent when considered on an individual basis, as a result of each taking on approximately $20.7 billion of joint and several liability which, when combined with other liabilities of the individual

LyondellBasell entities, was considerably more than the fair value of their assets. The amount of debt incurred by each individual Debtor was not diminished by the operation of contribution rights, as such rights were unavailable to those LyondellBasell entities that were primary borrowers under the Obligations (such as Lyondell Chemical Company for approximately $10 billion of the Obligations) and, moreover, were subordinate to the repayment in full of the obligors under the new Facilities. The contribution rights were, in any event, worthless against other entities that were themselves rendered insolvent by the Transaction.

324.   The insolvency of the LBI Group (and each of its individual members) as of the date of the Merger can be strongly demonstrated by, among other means, the very same methodology repeatedly used by Merrill in its role as advisor to Blavatnik and Access for the Lyondell acquisition. As investment advisor to Access, to value the pro forma combined Lyondell-Basell companies, Merrill customarily performed what it referred to as a "Mid-Cycle EBITDA-based valuation." To perform such a valuation of the pro forma company, Merrill would first compute "Mid-Cycle EBITDA," which was the average of five years of projected pro forma combined EBITDA. Merrill would then multiply the resulting Mid-Cycle EBITDA by a range of "Exit Multiples," (5.75x, 6.50x, 7.25x) selected by it as appropriate, thereby arriving at a range of "enterprise values" for LBI Group.

325.   Using this methodology, over the course of its involvement, Merrill prepared for Access several different valuations based on a variety of different earnings projections. With respect to projected earnings of Basell, Merrill consistently used forecasts provided to Merrill by Access/Basell. With respect to projected earnings for Lyondell, until July 15, 2007, all projections used by Merrill for valuing the combined enterprise were developed using industry sources including industry data from industry consultants and analysts such as CMAI and other

publicly available company specific and industry sources.  For example, on or about July 10, 2007, before having received non-public projections from Lyondell management, Merrill, relying on Access projections for Basell and projections developed using industry sources for Lyondell, provided Access with a valuation based on its "Downside Case Projections" for the combined entity.   Using its "Downside Case" projections, Merrill calculated a Mid-Cycle EBITDA of $3.8 billion.  Then, applying its selected Exit Multiples to Mid-Cycle EBITDA, it provided a range of values from between $22 billion (using the 5.75x multiple) to $27.7 billion (using the 7.25x multiple), with $24.8 billion as its mid-point valuation (using the 6.50x multiple) for the combined companies.

326.    A few days after providing Access with this "Downside Case," Merrill applied this same Mid-Cycle EBITDA-based valuation methodology using the earnings projections provided to Access and Basell by Lyondell management.   Based on Lyondell management earnings projections as of July 15, 2007, Merrill calculated a Mid-Cycle EBITDA of $4.8 billion. Then, applying its selected Exit Multiples to this amount, it generated a range of posited values, with the mid-point value, based on the mid-point 6.50 exit multiple, being $31.5 billion.

327.    The EBITDA projections upon which Merrill based its valuations, however, included billions of dollars of earnings that were, at a minimum, entirely speculative, unsupported by the historical performance of the two companies, and unreasonable in view of macroeconomic, industry, and company specific factors known at the time of the Merger. Neither the Lyondell projections nor the Basell projections reasonably reflected the foreseeable impact on the earnings of these companies of the supply driven downturn widely forecasted for the petrochemical industry in the years immediately succeeding the Merger. Moreover, as demonstrated above, Lyondell's projections were pumped up with hundreds of millions of

dollars of annual projected earnings from refining operations based on an entirely unsupported

forecast of crack margins reflecting Smith's directions, at odds with objective industry data.

328.   Using the same Mid-Cycle EBITDA-based valuation methodology used by

Merrill to value the companies on a combined pro forma basis, but using the projections that

more reasonably reflected the earnings that could be reasonably anticipated in view of factors

known at the time of the Merger, the liabilities of the combined LBI Group exceeded the fair

value of its assets on and as of the date of the Merger.

## VII.   Upon the Merger, LyondellBasell Incurred Debts that Were Beyond its Ability to Repay

329.   Upon the Merger, LBI incurred obligations which, combined with its pre-existing

obligations, constrained its further access to the capital markets.  As financed pursuant to the

Merger, LBI was left with insufficient funds available to meet short and medium term needs,

including: (i) funding the post-Merger payment of the purchase price for Berre that it had

committed to purchase prior to the Merger, as well as other planned acquisitions and capital

expenditures; (ii) the payment of millions of dollars of interest and fees due to the Lead

Arrangers, including approximately $250 million of incremental fees due as a result of the

exercise by the Lead Arrangers of the "flex provisions" included in the Merger Financing; and

(iii) other costs, expenses and obligations that foreseeably would become due and payable within

the weeks and months following the Merger.  As a means to extricate itself from the resulting

liquidity crisis that arose shortly after the closing of the Merger, LBI "upsized" its existing

working capital facilities, effectively exhausting all remaining available sources of liquidity.

330.   Thereafter, when, as had been fully foreseeable, under the stress of a forecasted

industry downturn that reduced its earnings and margins, the borrowing bases of LBI's asset

based facilities contracted, and LBI was required to pay down these facilities, it was left with

insufficient funds to operate, fell into financial distress and was unable to pay other obligations as they became due, including payment of principal and interest due on the Facilities.

331.    Upon the Merger, LBI had incurred, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

## COUNT I
## INTENTIONAL FRAUDULENT TRANSFER
## (11 U.S.C. §§ 548(a)(1)(A), and 550)

### (Against Transferees and the Class)

332.    The LB Litigation Trust restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

333.    LyondellBasell approved the Merger and entered into and executed the transactions in connection therewith, including the making of the Shareholder Payments described herein with knowledge of the effect such payments would have on the creditors of LyondellBasell, and with the intent to hinder, delay or defraud the creditors of LyondellBasell.

334.    The Shareholder Payments should be avoided and recovered from the Transferees pursuant to 11 U.S.C. §§ 548(a)(1)(A), and 550(a).

## COUNT II
## CONSTRUCTIVE FRAUDULENT TRANSFER
## (11 U.S.C. §§ 548(a)(1)(B), and 550)

### (Against Transferees and the Class)

335.    The LB Litigation Trust restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

336.    On or about December 20, 2007, LyondellBasell made the Shareholders Payments described herein.

337.    LyondellBasell did not receive reasonably equivalent value or fair consideration in exchange for the obligations it incurred or the payments made to enable the Shareholder Payments paid to the Transferees and the Class.

338.    At the time the Shareholder Payments were made, LyondellBasell was insolvent or became insolvent as a result of the payments made.

339.    At the time the Shareholder Payments were made (i) LyondellBasell was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with LyondellBasell was an unreasonably small capital; and/or (ii) LyondellBasell intended to incur, or believed or reasonably should have believed that LyondellBasell would incur, debts that would be beyond its ability to pay as such debts matured. Moreover, LyondellBasell did not receive reasonably equivalent value or fair consideration in exchange for the Shareholder Payments.

340.    The Shareholder Payments should be avoided and recovered from the Transferees pursuant to 11 U.S.C. §§ 548, and 550(a).

## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, Plaintiff requests that judgment be entered in its favor against the Transferees as follows:

(1)    Certification of the Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(1)(B) and (b)(3), on behalf of the proposed defendant class, and designation of the proposed Class Representatives as representatives of this class, and appointing or designating Class Counsel to the defendant Class;

(2)    On Count I:

    a.    entering a judgment against the Transferees and the Class, finding that the Shareholder Payments constitute fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(A);

    b.    pursuant to 11 U.S.C. § 548, avoiding the Shareholder Payments;

137

    c.     pursuant to 11 U.S.C. § 550, entering judgment against the Transferees and the Class in the amount of the avoided Shareholder Payments; and

    d.     providing for such other relief as justice and equity may require.

(3)     On Count II:

    a.     entering a judgment against the Transferees and the Class, finding that the Shareholder Payments constitute fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(B);

    b.     pursuant to 11 U.S.C. § 548, avoiding the Shareholder Payments;

    c.     pursuant to 11 U.S.C. § 550, entering judgment against the Transferees and the Class in the amount of the avoided Shareholder Payments; and

    d.     providing for such other relief as justice and equity may require.

Dated: December  23, 2010
New York, New York

Respectfully submitted,

EDWARD S. WEISFELNER, AS LITIGATION
TRUSTEE OF THE LB LITIGATION TRUST

By:  _/s/ Sigmund S. Wissner-Gross_____
Sigmund S. Wissner-Gross
May Orenstein
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
(212) 209-4800

Steven D. Pohl
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111
(617) 856-8200

*Counsel for Edward S. Weisfelner, as
Litigation Trustee of the LB Litigation Trust*

# 8282819

138