UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| LYONDELL CHEMICAL COMPANY, *et al.*, | ) | Case No. 09-10023 (REG) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
| EDWARD S. WEISFELNER, | ) |  |
| AS TRUSTEE OF THE | ) |  |
| LB CREDITOR TRUST, | ) |  |
| Plaintiff, | ) | Adversary Proceeding |
| v. | ) |  |
|  | ) | Case No. 10-04609 (REG) |
| FUND 1, *et al.*, | ) |  |
| Defendants. | ) |  |
|  | ) |  |
| EDWARD S. WEISFELNER, | ) |  |
| AS TRUSTEE OF THE | ) |  |
| LB CREDITOR TRUST, | ) |  |
| Plaintiff, | ) | Adversary Proceeding |
| v. | ) |  |
|  | ) | Case No. 12-01570 (REG) |
| REICHMAN, *et al.*, | ) |  |
| Defendants. | ) |  |
|  | ) |  |
| EDWARD S. WEISFELNER, AS | ) |  |
| LITIGATION TRUSTEE OF THE | ) |  |
| LB LITIGATION TRUST, | ) |  |
| Plaintiff, | ) | Adversary proceeding |
| v. | ) |  |
|  | ) | Case No. 10-05525 (REG) |
| HOFMANN, *et al.*, | ) |  |
| Defendants. | ) |  |

DECISION ON MOTIONS TO DISMISS AMENDED
INTENTIONAL FRAUDULENT TRANSFER CLAIMS, ET AL.

APPEARANCES:

BROWN RUDNICK LLP
*Counsel for the Plaintiff*
7 Times Square
46th Floor
New York, New York 10036
By:    Sigmund S. Wissner-Gross, Esq. (argued)
       Steven D. Pohl, Esq.
       May Orenstein, Esq.
       Aaron Lauchheimer, Esq.


WILMER CUTLER PICKERING HALE AND DORR LLP
*Counsel for Various Shareholder Defendant-Movants*
7 World Trade Center
New York, New York 10007
By:    Philip D. Anker, Esq. (argued)
       Ross E. Firsenbaum, Esq.
       Peter J. McDonald, Esq.
       Pamela Karten Bookman, Esq.


1875 Pennsylvania Avenue, NW
Washington, D.C. 20037
By:    Craig Goldblatt, Esq.
       Joel Millar, Esq.


BINGHAM McCUTCHEN LLP
*Counsel for Various Shareholder Defendant-Movants*
One Federal Street
Boston, MA 02110
By:    Sabin Willett, Esq. (argued)
       Amelia C. Joiner, Esq.


KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022
By:    Jeff J. Friedman, Esq. (argued)
       Arthur S. Linker, Esq.
       Joel W. Sternman, Esq.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In late December 2007, Basell AF S.C.A. ("**Basell**"), a Luxembourg entity controlled by

Leonard Blavatnik ("**Blavatnik**"), acquired Lyondell Chemical Company ("**Lyondell**"), a

Delaware corporation headquartered in Houston—forming a new company after a merger (the

"**Merger**"), LyondellBasell Industries AF S.C.A. (as used by the parties, "**LBI**," or here, the

"**Resulting Company**"),[1] Lyondell's parent—by means of a leveraged buyout ("**LBO**").  The

LBO was 100% financed by debt, which, as is typical in LBOs, was secured not by the acquiring

company's assets, but rather by the assets of the company to be acquired.  Lyondell took on

approximately $21 billion of secured indebtedness in the LBO, of which $12.5 billion was paid

out to Lyondell stockholders.

In the first week of January 2009, less than 13 months later, a financially strapped

Lyondell filed a petition for chapter 11 relief in this Court.[2]  Lyondell's unsecured creditors then

found themselves behind that $21 billion in secured debt, with Lyondell's assets effectively

having been depleted by payments of $12.5 billion in loan proceeds to stockholders.[3]  That led to

the filing of these three adversary proceedings, each brought against shareholder recipients of

that $12.5 billion by Edward Weisfelner (the "**Trustee**"), the trustee of two trusts formed to

---

[1]    Acronyms make understanding difficult for readers who have not been living with a case.  The Court tries to minimize their use.  For readability, except where acronyms appear in quotations or have acquired obvious meaning, the Court expands the acronyms out, or substitutes terms that are more descriptive of the entity's role in the transaction.

[2]    Lyondell then filed along with 78 affiliates.  About three months later, the Resulting Company and another Lyondell affiliate joined them as debtors in this Court.

[3]    Payments incident to the LBO and the Merger allegedly also cost Lyondell approximately $575 million in transaction fees and expenses, and another $337 million in payments to Lyondell officers and employees in change of control payments and other management benefits.  But this action does not address them, except insofar as they are alleged to have provided a motive for the alleged intentional fraudulent transfer claims that are the subject of this decision.

pursue claims on behalf of Lyondell and its creditors.[4]  The Trustee brought constructive

fraudulent transfer claims in the *Fund 1* and *Reichman* actions, and intentional fraudulent

transfer claims in all three.

 In an earlier published decision,[5] the Court ruled on 12(b)(6) motions attacking the

Trustee's constructive and intentional fraudulent transfer claims.  The Court denied defendants'

motion to dismiss the *constructive* fraudulent transfer claims, but dismissed the claims for

*intentional* fraudulent transfer—for deficiencies in alleging facts to support the requisite intent

on the part of Lyondell's Board of Directors (the "**Board**"), the ultimate decision maker as to the

Merger and LBO.  But the Court did so with leave to replead, and the Trustee availed himself of

that opportunity—filing a Third Amended Complaint (the "**Revised Complaint**") in *Fund 1* and

similarly amended complaints in *Reichman* and *Hofmann* (together with the Revised Complaint,

the "**Amended Complaints**") in efforts to address the Court's concerns.[6]

 Now shareholder defendants (the "**Movants**") in *Fund 1*, *Reichman,* and *Hofmann* have

moved once again to dismiss the intentional fraudulent transfer claims,[7] asserting that the

deficiencies identified in the First 12(b)(6) Decision were not cured.  The Movants also seek to

dismiss the state law *constructive* fraudulent transfer claims (asserted only in *Fund 1* and

---

[4]    The two trusts formed pursuant to the Lyondell Debtors' Third Amended and Restated Joint Chapter 11
       Plan of Reorganization [Dkt. No. 4418-1 in Case No. 09-10023] (the "**Plan**") are the LB Creditor Trust (the
       "**Creditor Trust**") and the LB Litigation Trust (the "**Litigation Trust**").

[5]    *Weisfelner v. Fund 1 (In re Lyondell Chemical Co.)*, 503 B.R. 348 (Bankr. S.D.N.Y. 2014) ("**First 12(b)(6)
       Decision**").

[6]    The underlying allegations in the *Reichman* and *Hofmann* amended complaints are virtually identical to
       those in *Fund 1*'s Revised Complaint. It's sufficient, for purposes of this decision, to refer to the allegations
       in the Revised Complaint without referring to the corresponding paragraphs in the amended complaints in
       *Reichman* and *Hofmann*.

[7]    The Movants' supporting brief with respect to their second 12(b)(6) motion. (*Fund 1* ECF No. 1983) is
       cited as "**Def. Br.**"  The Plaintiff Trustee's opposing brief (*Fund 1* ECF No. 2037) is cited as "**Pl. Br.,**" and
       the Movants' reply brief (*Fund 1* ECF No. 2096) is cited as "**Def. Reply**."

*Reichman*) for a number of other reasons as well—principally arguing that the Trustee lacks the standing to bring the suits.

Upon review of the Amended Complaints, the Court determines that the earlier deficiencies identified in the First 12(b)(6) Decision were not satisfactorily cured, and that plausible claims of intent on the part of Lyondell's Board to put assets beyond the reach of Lyondell creditors still have not been sufficiently alleged. Thus the intentional fraudulent transfer claims will be dismissed. The Movants' constructive fraudulent transfer claims contentions are rejected, and those claims survive.

<u>Facts</u>[8]

*1. Lyondell Corporate Governance Background*

Before the events that are the subject of these actions, Lyondell was a publicly traded chemicals company based in the United States. Lyondell's Board consisted of 10 elected outside directors (the "**Outside Directors**") and one additional director, Dan Smith ("**Smith**"), Lyondell's CEO.

As alleged in the Revised Complaint, Smith was CFO of Lyondell from 1988-1994; President of Lyondell from 1994 to an unstated date; CEO from 1996 until the time of the Merger, and a director of Lyondell from 1988 until completion of the Merger.[9] The Revised Complaint alleges further that Smith "utilized his longtime status as the CEO of Lyondell and the sole management member of the Board to regularly influence and dominate decisions of the

---

[8]     To avoid lengthening this decision further, the Court includes only the facts and procedural history relevant to the analysis in this decision; for the most part includes them only in connection with the Discussion to which they relate; and omits citations as to facts except for the most critical matters.

[9]     Revised Cmplt. ¶ 25.

Board"[10]—though this allegation is attacked as unsupported by sufficient evidentiary facts and conclusory.

Lyondell's other 10 directors at the time—the Outside Directors—were identified by name in the Revised Complaint, with individual paragraphs which included the length of service of each. Those paragraphs indicate that the Outside Directors had served as such for periods running from less than one year up to twelve years[11]—with half having served more than five years, as the Movants say in their opening brief.[12] But the duration of their service cuts both ways, and the Court declines the Movants' suggestion that the Court regard the duration of Outside Directors' service as relevant to the plausibility of the Revised Complaint.

*2. The Court's Earlier Ruling*

As noted above, the Court denied the defendants' earlier motion to dismiss the constructive fraudulent transfer claims, but granted it with respect to intentional fraudulent transfer claims. As to the latter, the court noted that the Complaint was "nearly entirely constructive fraudulent transfer focused, and [spoke] of the *effect* of the LBO, as contrasted to its *intent*."[13]

The Court then noted, based on earlier authority it cited and common sense, that the intent of a corporation transferring property was derived from the intent of the natural persons in a position to make the necessary decisions on the corporation's behalf.[14] The Court rejected the Trustee's contention that the Court should rely on any intent of Smith alone, as the Court concluded that the appropriate standard was, as the First Circuit had articulated it in *Roco*

---

[10]    *Id.*

[11]    *See id.* ¶¶ 26-35.

[12]    *See* Def. Br. 3.

[13]    First 12(b)(6) Decision, 503 B.R. at 391 (emphasis in original).

[14]    *Id.* at 387-389.

*Corp.*,[15] whether the individual whose intent is to be imputed "was in a position to control the disposition of [the transferor's] property."[16]

Here, consistent with the Delaware law principle that corporations can merge only with the approval of their boards of directors, the transaction that was the subject of the Trustee's attack had been approved by Lyondell's Board.  And thus it was the *Board's* intent that was critical—based, once again, on the intent of the individuals acting as members of the Board.  That could be shown by establishing, with nonconclusory factual allegations, either that enough Board members had the requisite intent on their own, or that Smith or another could cause that number of Board members to form the requisite intent.  But the Court did not believe that it could find the requisite Board intent based on imputation of Smith's intent alone.  The Court stated:

> Here, however, the Creditor Trust relies on a species of automatic imputation, without the additional showing that is required under *Roco Corp*. and common sense.  As pleaded, the claims are now insufficient.  If the Creditor Trust cannot plead facts supporting intent to hinder, delay or defraud on the part of a critical mass of the *directors* who made the decisions in question, the Creditor Trust must then allege facts plausibly suggesting that Smith (who was only one member of a multi-member Board) or others could nevertheless "control the disposition of [Lyondell's] property"—by influence on the remaining Board members or otherwise.  As the Complaint now lacks sufficient allegations of that character, the intentional fraudulent transfer claim must be dismissed.[17]

Thus, the requisite intent could be shown by two means:  (1) establishing the intent of a critical mass of Board members who might have that intent on their own, or (2) by establishing that Smith or another, by reason of the ability to control them, had caused the critical mass to form

---

[15]    *Consove v. Cohen (In re Roco Corp.),* 701 F.2d 978 (1st Cir. 1983) ("**Roco Corp**.).

[16]    First 12(b)(6) Decision, 503 B.R. at 388.

[17]    *Id.* at 388-89.

that intent.[18]  And that intent would have to be "an '*actual intent*' to 'hinder, delay or defraud

creditors.'"[19]  Allegations supporting the requisite intent by either means were missing then, and

the Court needed to see them in connection with any amended complaint if attacked by renewed

motion.

*3.  New Allegations in Revised Complaint*

Compared to its immediate predecessor, the Revised Complaint contains a fair number of

additional allegations, including information on Lyondell's acquisition of an oil refinery in

Houston; the process of preparing Lyondell's (financial) "Long Range Plan" and projected

earnings; and roles played by Blavatnik and certain senior Basell managers in the Merger.  But

the Court here focuses only on allegations added to address the deficiencies discussed in the First

12(b)(6) Decision.

First, with respect to the Board *as a whole*, the Revised Complaint adds allegations as to

the Board's knowledge of the inflated financials underpinning the Merger and foreseeable

---

[18]     The Court did not accept the notion that board intent could be found by reason of the imputation of the
intent of a single member—even a CEO who was also a board member—as the Court considered
mechanical application of imputation doctrine to be inappropriate in a corporate intentional fraudulent
transfer case where decisions were made by a board of directors and not a single manager.  But the Court
did not then need to decide how many members of a board would be needed to find the requisite critical
mass, or how influential any of them might need to be.  The Court does not need to decide that now either,
as the new allegations, as set forth below, are still insufficient to show the requisite intent on the part of any
of the Board members to put assets beyond the reach of creditors, and finds the allegations of intent to do
other wrongful conduct sufficient only as to two members of the Board, Smith and Chazen.

The Court notes, however, that its rulings have been in the context of a corporation with a functioning
board of directors, as contrasted to a closely held corporation with little or no board decision-making.  In a
case of a closely held corporation without a functioning board, finding the requisite intent based on the
intent of the company's principal(s) would at least seemingly be quite easy to find.

[19]     First 12(b)(6) Decision, 503 B.R. at 390 (emphasis added).  The Court found allegations in the earlier
complaint that, if proven, would establish that Smith and senior management intended to secure a variety of
benefits to themselves, but that the allegations of facts evidencing "an intention to injure creditors or to
recklessly disregard creditor interests—as contrasted to an intent to enrich oneself—[was] considerably
thinner." *Id.*

"dire"[20] consequences of approving the Merger and related LBO.  In that connection, the Revised
Complaint alleges that the Board:

- [K]new, or intentionally turned a blind eye, to the fact that the 'refreshed' projections
  of future earnings that had been provided to Blavatnik and his financing sources on
  July 14, 2007 grossly overstated and inflated the earnings that Lyondell could
  achieve, were not prepared using data derived from actual performance, and had in
  fact been fabricated specifically to induce Blavatnik to pay a price for Lyondell
  beyond what a realistic valuation would support;[21]

- Received a collective windfall of "over $19 million in Merger-related consideration,"
  from stock options, incentive and severance compensation, with "one director's
  (Stephen J. Chazen) own company (*Occidental* Petroleum Corporation) [] getting a
  windfall gain of $326 million through dumping all its Lyondell stock in the weeks
  prior to the Merger Agreement being executed";[22]

- "[W]as acutely aware of the direct relationship between the cyclicality of the
  industries in which the Company operated and the need to limit leverage in order to

---

[20]    Revised Cmplt. ¶ 5.

[21]    *Id.* ¶ 3.  The allegation as to the Board's knowledge of the falsity of Smith's "refreshed" projections is
repeated throughout in the Revised Complaint.  *See id.* ¶ 5 ("all the Board members … were well aware
that the 'refreshed' projections represented a remarkable inflation of Lyondell's already inflated 2007 Long
Range Plan earnings projections... [and] that the 'refreshed' projections presented by Smith and his inner
cadre of senior management were implausible and unachievable"); ¶ 178 ("The Board accordingly knew
that the 'refreshed' numbers they were shown were not the product of a good faith revision based on
changed circumstances.").  *But see* ¶ 5, noting that Smith hid the falsity of the "refreshed" projections from
the Board ("Smith did not disclose to the other members of Lyondell's Board … the actual process by
which the bogus set of Lyondell projections were created …"); ¶ 4 (alleging that Smith had failed to
"affirmatively disclose to the Board [] that 'refreshed' projections for Lyondell were bogus projections
manufactured at Smith's direction…").

[22]    *Id.* ¶ 9.  *See also id.* ¶ 36 ("The Directors… received, in aggregate, over $19 million in Merger-related
consideration); ¶ 202 ("Notably, members of the Lyondell Board, including Smith, stood to earn huge sums
of money on the deal.  In addition to benefitting from the Merger to the extent of existing stockholdings,
they would receive additional payments triggered by the Merger.").

ensure the financial flexibility to get through a trough,"[23] and that "all leading

industry analysts were forecasting that the ongoing petrochemical cycle peak …

would end sometime in 2008 or 2009 and that these industries would then experience

a [] downturn";[24]

- Understood that every dollar going out to the Lyondell shareholders would be funded

  with debt leveraged against the assets of Lyondell, and that the money needed to fund

  operations after the Merger and to pay interest on the debt would have to be generated

  through the earnings of the Resulting Company and its subsidiaries;[25]

- Knew that the Merger and related financing would leave Lyondell inadequately

  capitalized"[26] and the "highly leveraged capital structure that would result from the

  Merger also was and extremely reckless from the perspective of liquidity";[27] and

- In sum, "knew that the projections had been revised for the purpose of being provided

  to Access and the investment banks to support the price Smith wanted and not

  because they represented legitimate or even good faith management views regarding

  Lyondell's future performance.  The Board knew that the projections were inflated,

  unreasonable, and unachievable.  The Board further knew that the projections would

  be used and relied upon by Blavatnik's bankers in obtaining financing for the

  proposed transaction.  Finally, the Board knew the risk of overleveraging into a

---

[23]    *Id.* ¶ 90.

[24]    *Id.* ¶ 14.

[25]    *Id.* ¶ 3.

[26]    *Id.* ¶ 12.

[27]    *Id.* ¶ 13; *see also id.* ¶ 201 ("[T]he Board knew that as a consequence of the Merger, a bankruptcy or a
restructuring could likely occur with the outcome that Lyondell creditors would not be paid.").

trough and knew that they were putting Lyondell's creditors at grave risk by inducing

a leveraged buyout of the Company based on false projections."[28]

Second, the Revised Complaint bolsters earlier allegations with respect to Smith and

provides somewhat individualized allegations as to the 10 other directors.  The Revised

Complaint adds a paragraph with respect to each Board member by name,[29] and describes each's

tenure on the Board.[30]  It further alleges each member's attendance at Board meetings at which

Lyondell's Long Range Plan and other strategic planning, and the "fraudulent refreshed

projections," were presented and discussed, and that the Board member participated in Board

decisions with respect to the Merger.[31]  It then alleges that each member "by virtue, *inter alia*, of

his [or her] role on the Board, knew that consummation of the [Merger] and payments to the

[s]hareholder [d]efendants… would hinder, delay or defraud Lyondell [c]reditors."[32]

Further, the amended allegations expand on Board member Chazen, who was also a

Senior Executive Vice President and Chief Financial Officer of Occidental, one of Lyondell's

biggest ethylene customer and holder of approximately 8.5% (by November 2006) of Lyondell's

stock.  It alleges that:

> (i) while Chazen had initially challenged Smith's "bogus" earnings projections,
>
> Chazen later "stood by silently" and voted with the Board to approve the Merger because
>
> his company, Occidental, stood to gain $326 million from the sale of Lyondell stock to

---

[28]    *Id.* ¶ 179.

[29]    *See id.* ¶¶ 25-35.

[30]    *See*, *e.g.*, *id.* ¶ 27 (for Board member Travis Engen).

[31]    *See*, *e.g.*, *id.*

[32]    With the exception of Board members Smith and Stephen Chazen ("**Chazen**"), the allegations as to the directors are identical in this statement.  *See id.* ¶ 25-35.

Blavatnik, who wanted to start with a "toe-hold" interest in its pursuit of fully acquiring

Lyondell;[33] and

(ii) Chazen was intentionally coy in disclosing the sale of Occidental's Lyondell

shares to Blavatnik.[34]

Third, the Revised Complaint adds allegations that Smith dominated the Board's

decisions, particularly with respect to the Merger, by failing to disclose to the Board that:

(i) "refreshed" projections for Lyondell were bogus projections manufactured at

Smith's direction following Blavatnik's announcement of his intention to acquire

Lyondell;

(ii) Smith alone had pre-negotiated a $48 per share price with Blavatnik; and

(iii) that members of senior management, collaborating with Smith, all knowingly

participated in presenting the false projections in order to justify the $48 per share price

and induce the requisite financing.[35]

The Complaint also adds allegations reiterating the monetary incentives that Smith, his

"inner cadre" of senior managers, and Board members stood to gain from the Merger

consideration by an inflated per share price of $48[36]—including, most dramatically, that "[a]s a

result of the Merger, Smith walked away with a windfall of over $100 million, much of it in the

---

[33]    *Id.* ¶¶ 9, 26, 123-129, 178.

[34]    *Id.* ¶¶ 125-129.

[35]    *Id.* ¶¶ 4-5, 25; *see also id.* ¶¶ 135-143 (setting forth detailed allegations on how Smith directed the creation of fabricated "refreshed" EBITDA projections through Robert Salvin, Lyondell's Manager of Portfolio Planning, and T. Kevin DeNicola, Lyondell's CFO, using a "top-up" analysis); *id.* ¶ 148 (describing the negotiations between Smith and Volker Trautz, CEO of Basell, wherein Smith explicitly suggested a merger price of $48 per Lyondell share).

[36]    *Id.* ¶¶ 9, 103, 202.

-10-

form of Merger-related consideration paid in respect of stock and options issued to him pursuant to various management incentive plans."[37]

Discussion

I.

Pleading Requirements

### A. Standards Governing 12(b)(6) Motions

The standard for evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), made applicable to adversary proceedings pursuant to Fed. R. Bankr. P. 7012, is well established. Although Rule 8(a)(2) generally requires only a "short and plain statement of the claim showing" entitlement to relief, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[38]  The allegations "must be enough to raise a right to relief above the speculative level."[39]  A court is not bound to accept as true legal conclusions couched as factual allegations.[40]

Further, to survive threshold scrutiny, the plaintiff must state a "claim to relief that is plausible on its face."[41]  This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."[42]  Hence, a

---

[37]   *Id.* ¶ 9; accord *id.* ¶¶ 25, 268.

[38]   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("***Twombly***") (internal citations and quotations omitted).

[39]   *Id.* (internal citations omitted).

[40]   *Id.* (internal citations and quotation marks omitted).

[41]   *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("***Iqbal***").

[42]   *Id.*

complaint should be dismissed unless the claims can be "nudged… across the line from conceivable to plausible."[43]

## B. Heightened Requirement under Rule 9(b)

Additionally, when a claim is premised on fraud—and claims for intentional fraudulent transfer are in this category[44]—Fed. R. Civ. P. Rule 9(b), which imposes a heightened pleading requirement, applies.  The more stringent standard of Rule 9(b) is essentially twofold.  It requires a plaintiff to (i) plead "with *particularity*, the circumstances constituting fraud or mistake," and to (ii) establish the defendant's mental state.[45]  While intent may be alleged generally, "the relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for [a] license to base claims of fraud on speculation and conclusory allegations."[46]

Thus, to support a fraud claim, a complaint must "allege facts that give rise to a 'strong inference' of fraudulent intent."[47]  The Supreme Court has interpreted "strong inference" as requiring an inference to be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent."[48]  In determining

---

[43]    *Id.* at 680 (citation omitted).

[44]    *See Nisselson v. Drew Indus. (In re White Metal Rolling & Stamping Corp.)*, 222 B.R. 417, 428 (Bankr. S.D.N.Y. 1998) (Bernstein, C.J.) ("It is well-settled that the Rule 9(b) pleading requirements apply to claims of intentional fraudulent transfer.") (citation omitted).

[45]    *See* Fed. R. Civ. Proc. 9(b) (emphasis added); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015).

[46]    *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990).

[47]    *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) ("***Acito***")).

[48]    *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) ("***Tellabs***").  While *Tellabs* was a securities fraud case under the Private Securities Litigation Reform Act of 1995 Pub. L. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.) (the "**PSLRA**"), the "strong inference" standard (originally established by the Second Circuit, and incorporated into the PSLRA by Congress) has been extended to apply to other (non-securities) fraud claims as wells.  *See e.g., Responsible Person of Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.)*, 398 B.R. 761, 774 n.7 (Bankr. S.D.N.Y. 2008) (Bernstein, S.J.) ("***Musicland***"); *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs.)*, 379 B.R. 5, 17 (Bankr. E.D.N.Y. 2007) (Stong, J.) (requiring plaintiffs to allege facts that give rise to a strong inference of fraudulent intent involving claims for fraudulent transfer).

whether the pleadings give rise to a strong inference of scienter, courts "must take into account plausible opposing inferences."[49]

## II.

### Intentional Fraudulent Transfer

The Court first addresses the principles applicable to the determination of this motion, and then applies those principles to the new allegations that have been put forward here.

*A. Applicable Principles*

For the purposes of this motion, the Court must focus first on *what was required* to allege the requisite intent, and then, as a separate matter, on the allegations addressing whether and how the Board members came to that intent. The First 12(b)(6) Decision, by reason of the Trustee's focus on Smith and the argument that Smith's intent should be imputed to Lyondell, focused principally on how one gauges the intent of a corporation with an actively functioning Board, and *whose* intent mattered. But now that it is established that it is the *Board's* intent that matters, the Court must focus much more on *the nature of that intent*, as a predicate to evaluating the allegations put forward to establish that intent.

The analysis begins, as it must, with statutory text. Section 548 of the Code provides that the trustee may avoid a transfer or obligation if the debtor "made such transfer or incurred such obligation with *actual intent to hinder, delay, or defraud* any entity to which the debtor was, or became… indebted."[50] Under state law, the Uniform Fraudulent Conveyance Act (adopted in New York) and the Uniform Fraudulent Transfer Act (adopted in Texas and Delaware) contain

---

[49]     *Tellabs*, 551 U.S. at 323.

[50]     *See* Code section 548(a)(1)(A) (emphasis added). The Litigation Trust's intentional fraudulent transfer
         claims in *Hofmann* are asserted under this section.

the same requirement for "actual intent to hinder, delay, or defraud" creditors.[51]  Though the language in these three provisions is not identical, it is conceptually the same; each requires *actual* intent, as opposed to implied or presumed intent.[52]  The takeaway, therefore, is that only the most limited substitutes for actual intent are acceptable, either under the Code or applicable state law.

And here the Court must emphasize that the subject of the analysis is an intentional tort—one with an intent to injure others (in this case, creditors), in a particular way:  by efforts to "hinder, delay or defraud" them.  As a textual analysis matter, the Court interprets those words with the assumption that none should be surplusage, and thus that they refer to different ways to effect the resulting injury.  But those words nevertheless take their meaning by the company they keep.[53]  Thus while "defraud" (which is closest to the acts on which the Trustee relies) is of potentially much greater breadth that its two predecessors "hinder" and "delay," the Court construes "defraud" similarly, as the Court consider it inappropriate to construe any of the three words to go beyond the concept underlying fraudulent transfer law.  Like the Supreme Court in *Gustafson*, the Court believes it should "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress"[54]—or, for the same reason, state legislatures.

Thus the Court holds that the requisite intent must be consistent with the overall theme of intentional fraudulent transfer law:  proscribing intentional actions to injure creditors, by means

---

[51]     As noted in the First 12(b)(6) Decision, identifying the particular applicable state law is unnecessary to the Court's analysis.  *See* 503 B.R. at 356 n.13.

[52]     In fact, the New York statute expressly states that it is "actual intent, *as distinguished from intent presumed in law*, to hinder, delay or defraud…" *See* N.Y. Debt. & Cred. Law § 276 (McKinney's 2015) (emphasis added).

[53]     *See, e.g., Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 575 (1995) ("***Gustafson***"); *In re Adelphia Communications Corp.,* 336 B.R. 610, 656 (Bankr. S.D.N.Y. 2006) (Gerber, J.).

[54]     *Gustafson*, 513 U.S. at 575.

of placing assets out of the reach of creditors' reach or by other intentional steps to prevent

creditors from collecting on their debts or placing obstacles in creditors' way.  Other wrongful

acts that the Trustee might more easily be able to show—*e.g.*, negligence, other breaches of

fiduciary duty, and *constructive* fraudulent transfers, which have an inevitable adverse effect on

creditor needs and concerns—may be seriously prejudicial to creditors, but the creditors' rights

rest on other law, not intentional fraudulent transfer law.  For that reason, the Court is unwilling

to consider intent to commit other wrongful acts as a substitutes for the intent to frustrate

legitimate creditor expectations that is the foundation of intentional fraudulent transfer law.

So what kinds of allegations provide the predicate for a finding of that intent?

*1. Restatement and "Natural Consequences" Standards*

One means of finding the requisite intent is by reference to its conceptual

underpinnings—by focus on what "intent" means.  Here we are talking about an intentional tort

of a particular nature.  Some acts to hinder, delay or defraud are so obvious that they would pass

muster under any test—such as the proverbial deeding of the house to one's brother-in-law just

after an adverse verdict has come down.  And there are others that appropriately should be

regarded the same way—as when hindering, delaying or defrauding creditors is the *inevitable*

*consequence*, as it typically is in Ponzi Scheme cases.  By the same token, the requirement for an

*intentional* act requires a standard that does not also capture situations where the consequence—

here, loss to creditors—is simply a bad result after the fact, or results from mere negligence. And

caselaw requires that courts be wary in relying on facts that are benign in nature, or

circumstances that would be applicable to nearly every corporate insider.

For that reason, the Court has considered, and ultimately agrees with, the Movants'

point[55] that the Court should look to the *Restatement of Torts* for the standard.[56]  The

*Restatement's* section § 8A provides:

> The word "intent" is used throughout the Restatement of
> this Subject to denote that the actor *desires* to cause
> consequences of his act, or that he believes that the
> consequences are *substantially certain to result* from it.[57]

Many courts have employed the *Restatement* test to measure the requisite intent in intentional

fraudulent transfer cases,[58] and the Court believes that it should employ the *Restatement* here as

well.

Although, as the Trustee observes, the bulk of the cases referencing the *Restatement*

involved Ponzi Schemes, this Court, like the *ASARCO* court,[59] considers reliance on the

---

[55]    Def. Br. at 18.

[56]    The current Restatement of Torts is the RESTATEMENT (SECOND) OF TORTS (1965) (the "*Restatement*").

[57]    Emphasis added.  One of the "Comments & Illustrations" to § 8A is instructive.  It states:

> *a.* "Intent," as it is used throughout the Restatement of Torts, has
> reference to the *consequences* of an act *rather than the act itself.* When
> an actor fires a gun in the midst of the Mojave Desert, he intends to pull
> the trigger; but when the bullet hits a person who is present in the
> desert without the actor's knowledge, he does not intend that result.
> "Intent" is limited, wherever it is used, to the *consequences* of the act.

(emphasis added).  Thus in this context, the Trustee must put forward allegations establishing the requisite
intent to achieve the *consequences*—impeding creditor recoveries—and not just to engage in an aggressive
transaction that puts creditor recoveries at risk.  But as the second clause of § 8A provides, intent to achieve
the consequences also may be found if those consequences are "substantially certain" to result from the
challenged actions.

[58]    *See, e.g., ASARCO LLC v. Am. Mining Corp.*, 396 B.R. 278, 387 (S.D. Tex. 2008) (Hanen, J.)
("**ASARCO**") (applying the definition of "intent" under the *Restatement* in analyzing actual intentional
fraudulent transfer claims under the Texas UFTA); *Bear, Stearns Securities Corp. v. Gredd (In re
Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 12 n.16 (S.D.N.Y. 2007) (Buchwald, J.) ("**Manhattan
Investment**") ("[k]nowledge to a substantial certainty constitutes intent in the eyes of the law," referencing
the *Restatement*); *Tronox, Inc. v. Kerr McGee Corp. (In re Tronox, Inc.)*, 503 B.R. 239, 279 (Bankr.
S.D.N.Y. 2013) (Gropper, J.) ("**Tronox**").  *See also* 5 Collier on Bankruptcy ("*Collier*") ¶ 548.04 (16th ed.
2015) ("many courts look to the Restatement (Second) of Torts to refine the concept of intent under section
548," citing *ASARCO* and other cases).

[59]    *See ASARCO*, 396 B.R. at 387 n.121 ("Most of the courts citing the Restatement definition of 'intent' are
cases dealing with ponzi schemes.  The Court finds this factual distinction to be of little relevance and finds

-16-

*Restatement* appropriate. Intentional fraudulent transfers, as their name implies, are intentional

torts. Focusing on the defendant's "desire" to cause a particular consequence (or a "substantial

certainty" of that consequence) as the measure for scienter corresponds to the particularity

required for pleading a defendant's mental state. And the *Restatement's* definition of "intent"

conforms to the higher standard of culpability for intentional fraudulent transfers for which the

underlying statutory language provides.[60] The Code and state laws provide for a double barreled

approach to fraudulent transfer actions, with *constructive* fraudulent transfer liability protecting

creditors from injuries suffered by something less than intentional fraud.

But as an alternative to the *Restatement* standard, the Trustee asks this Court to adopt a

"natural consequences" standard[61]—principally in reliance on a Seventh Circuit decision, *In re

Sentinel Management Group.*[62] But "natural consequences, while an expression that plainly was

used in *Sentinel* and elsewhere, is too ambiguous to constitute a standard upon which a court can

rely. "Natural consequences" can mean different things, with different levels of certainty. It can

be understood (as the Movants argue) to be simply a different way of saying what the

*Restatement* says—that even if a person didn't form the actual intent to cause particular

consequences, liability can be imposed if that outcome was inevitable from the outset. Yet it can

also be read in a broader way (akin to the way for which the Trustee argues), as a different way

of saying that the consequences are merely "foreseeable." But the Court cannot agree with a

---

these cases instructive on the proper definition of 'intent' as used in the UFTA's actual-intent fraudulent
transfer provision.").

[60] Thus the Court is disinclined to accept the Trustee's suggestion that the use of the *Restatement* be limited to
Ponzi Scheme cases, "where there is little question that intent is present." *See* Pl. Br. at 22 n.20. The Court
agrees that there is little question that intent is present in Ponzi Schemes, but sees no reason why use of the
*Restatement* should be limited to those cases. To the contrary, the *Restatement* provides a generalized
means of measurement of intent in any cases in which actual intent to cause a result matters—including, as
the *ASARCO* court concluded, intentional fraudulent transfer cases.

[61] *See* Pl. Br. at 21-23.

[62] *In re Sentinel Mgmt. Grp.*, 728 F.3d 660, 667 (7th Cir. 2013) ("***Sentinel***").

reading of the latter type, as that would effectively impose a standard quite a bit short of actual intent, leaving too much potential for a finding of liability based solely on negligence.

In *Sentinel*, the Seventh Circuit reversed a district court judgment after trial that had declined to find an intentional fraudulent transfer when the debtor had illegally co-mingled customer accounts and pledged customer assets as collateral for a loan used in funding its own proprietary activities—thereby rendering funds permanently unavailable to these customers. The *Sentinel* court found the requisite actual intent to hinder, delay or defraud, basing its conclusion on analysis stating that "Sentinel certainly should have seen this result as a natural consequence of its actions," and that "[i]n our legal system, "every person is presumed to intend the natural consequences of his acts."[63] But the *Sentinel* court never made mention of the *Restatement*— much less did it reject the *Restatement* as a standard—and could have reached the same bottom-line conclusion (which was probably correct) under the *Restatement's* second prong, since the underlying conduct involved a knowing removal of funds from a segregated account to use them for other purposes, an action that was substantially certain to frustrate the purpose for which they needed to remain where they had been.

Thus the Court sees insufficient basis for concluding that "natural consequences" can be the standard based on the Trustee's second, more expansive, meaning—*i.e.*, as anything other than another way of imposing the *Restatement* standard. Importantly, the Court can find no instance in which the *Restatement* standard has been rejected, in this district or elsewhere.[64]

---

[63]       *Sentinel*, 728 F.3d at 667.

[64]       The Court is aware of two instances in this district in which "natural consequences" was mentioned, but not to endorse "natural consequences" as an alternative test, nor to suggest that it should represent a less demanding standard than the *Restatement* imposes. *See Tronox,* 503 B.R. at 279; *SEC v. Haligiannis*, 608 F. Supp. 2d 444 (S.D.N.Y. 2009) (Holwell, J.) ("***Haligiannis***").  In each, the fraudulent transfer allegations there would easily pass muster under either test, including the more rigorous *Restatement* standard, and in neither did the Court disapprove of the *Restatement* test.

2.  *"Badges of Fraud"*

Another means for finding intent is the "badges of fraud" technique.  "Badges of Fraud"

are facts found in many intentional fraudulent transfer cases that provide a basis for finding

intentional fraudulent transfer by means of circumstantial evidence.[65]

"Badges of fraud" factors have been codified in state fraudulent transfer laws, and in

caselaw under the Code.  The Texas version of the UFTA provides, by way of example:

---

In *Tronox*, a decision after trial considering Kerr-McGee's actions to shed assets to free them from
environmental liabilities, Judge Gropper made express reference to the *Restatement* test and noted the
*ASARCO* court's reliance on it.  *See* 503 B.R. at 279.  And after trial, he found (though without a second
express reference to the *Restatement*) that both prongs of the *Restatement* test had been satisfied:

> In the present case, there can be no dispute that Kerr–McGee acted to
> free substantially all its assets—certainly its most valuable assets—
> from 85 years of environmental and tort liabilities.  The obvious
> consequence of this act was that the legacy creditors would not be able
> to claim against "substantially all of the Kerr–McGee assets," and with
> a minimal asset base against which to recover in the future, would
> accordingly be "hindered or delayed" as the direct consequence of the
> scheme. This was the *clear and intended consequence* of the act,
> *substantially certain* to result from it.

*Id.* at 280.  Judge Gropper mentioned "natural consequences" only incident to rejecting a contention that
the plaintiff had to prove that the "main or only" purpose of the transfer was an intent to damage a creditor
by preventing it from collecting a debt," and then only by reference to *Sentinel*, which had addressed that
contention.  *See id.* at 279.

In *Haligiannis*, Judge Holwell found an intentional fraudulent conveyance in a situation where the facts
screamed out for such a finding.  There, Haligiannis granted a mortgage to his father-in-law a few months
before he was convicted of running a Ponzi scheme, and fled the country just before his sentencing.  Judge
Holwell found that the grant of the mortgage was an intentional fraudulent conveyance—partly by reason
of Haligiannis's intent to convert an illiquid asset into a liquid one, but more importantly by reason of
Haligiannis's intent that the transferee, alone among the investors, recoup some of its losses when his fraud
was exposed.  Judge Holwell found that the "*inevitable effect* of granting the mortgage was to lock up
Haligiannis's sole remaining asset."  608 F. Supp. 2d at 451 (emphasis added).  Judge Holwell did not
make reference to the *Restatement*—neither relying on it nor finding its application inappropriate.  But the
"inevitable effect" standard he used was effectively synonymous—or even more demanding—than the
"substantially certain" standard appearing in the *Restatement*.  Though one sentence later, Judge Holwell
summarized his ruling by stating that he found that Haligiannis" intended the natural consequences of his
act—to 'hinder' and 'delay' other investors' ability to recover their funds," *id.*, the former sentence
explains what he meant in the latter.  *Haligiannis* cannot be regarded as authority for rejection of the
*Restatement* standards, nor for imposition of a less demanding test.

[65]    *See Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 46-47 (2d Cir.
2005) ("Due to the difficulty of proving actual intent to hinder, delay or defraud creditors, the pleader is
allowed to rely on 'badges of fraud' to support his case") (other quotation marks and citation omitted);
*Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir. 1983) ("Fraudulent intent is rarely
susceptible to direct proof.  Therefore, courts have developed 'badges of fraud' to establish the requisite
actual intent to defraud.") (citations omitted).

In determining actual intent under Subsection (a)(1) of this section, consideration may be given, among other factors, to whether:

  (1) the transfer or obligation was to an insider;

  (2) the debtor retained possession or control of the property transferred after the transfer;

  (3) the transfer or obligation was concealed;

  (4) the before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

  (5) the transfer was of substantially all the debtor's assets;

  (6) the debtor absconded;

  (7) the debtor removed or concealed assets;

  (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

  (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

  (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

  (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[66]

Caselaw applying the Code's federal equivalent, section 548, likewise identifies factors to

consider, though they are somewhat less specific and more abstract.[67]

---

[66]    Tex. Bus. & Com. Code § 24.005(b) (Vernon's 2015).

[67]    In cases alleging fraudulent transfers under section 548 of the Code, these factors have been held to include:

  (1) the lack or inadequacy of consideration;

  (2) the family, friendship or close associate relationship between the parties;

  (3) the retention of possession, benefit or use of the property in question;

  (4) the financial condition of the party sought to be charged both before and after the transaction in question;

While "the existence of a badge of fraud is merely circumstantial evidence and does not constitute conclusive proof" of actual fraudulent intent, "the more factors present, the stronger the inference."[68] Conversely, where the showing of badges of fraud is minimal, badges of fraud obviously cannot provide a basis for finding allegations of intentional fraudulent transfer to be plausible.[69]

### 3. "Motive and Opportunity"

Still another means of finding the requisite intent is "Motive and Opportunity" analysis, mentioned by the Court in the First 12(b)(6) Decision, and upon which the Trustee relies.[70] The Court considers Motive and Opportunity to be somewhat probative of intent, at least in some cases. But after considering its conceptual underpinnings, the Court cannot regard Motive and Opportunity analysis to be sufficient to provide the means to show the requisite intent—*i.e.*, the intent to deny or impede creditors their recovery, either as a goal or because that result is a substantial certainty—without other evidence of intent as well.

In the First 12(b)(6) Decision, the Court gave some, but not extensive, attention to the Trustee's Motive and Opportunity argument. The Court observed that judges in this district had

---

(5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

(6) the general chronology of events and transactions under inquiry.

*See Collier* ¶ 548.04.

[68]   *Manhattan Investment*, 397 B.R. at 10, n.13 (citing *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005) (Gropper, J.)); *MFS/Sun Life*, *Trust-High Yield Series v. Van Dusen Airport Servs., Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995) (Francis, M.J.).

[69]   *See Sungchang Interfashion Co., Ltd. v. Stone Mt. Access., Inc.*, 2013 U.S. Dist. LEXIS 137868, *24, 2013 WL 5366373, *8 (S.D.N.Y. Sept. 25, 2013) (Andrew Carter, J.) ("***Sungchang Interfashion***") ("Of course, the flip side of these badges of fraud is that their absence—or evidence that fair consideration was paid, the parties dealt at arm's-length, the transferor was solvent, the transfer was not questionable or suspicious, the transfer was made openly, or the transferor did not retain control—would constitute evidence that there was no intent to defraud." (citing *Lippe*, 249 F. Supp. 2d 357, 375 (S.D.N.Y. 2003) (Chin, J.)).

[70]   *See* Pl. Br. at 24-26, 34-35.

applied Motive and Opportunity analysis to intentional fraudulent transfer cases.[71]  In that

context, the Court quoted earlier authority to say—after observing that the intent element of an

intentional fraudulent transfer claim could "be alleged generally so long as the plaintiff alleges

'facts that give rise to a strong inference of fraudulent intent'"[72]—that "[g]enerally, in intentional

fraudulent transfer cases as well as securities fraud cases, a "strong inference of fraudulent intent

'may be established either (a) by alleging facts to show that defendants had both motive and

opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial

evidence of conscious misbehavior or recklessness.'"[73]  In that connection, the Court also quoted

Judge Lifland's statement in *Madoff* that "[t]his two-prong test is commonly applied to analyze

scienter in securities fraud actions, but the 'same standard has been applied in [the Second]

Circuit to non-securities fraud claims.'"[74]

　　　　Those statements accurately described what *Musicland*, *Adelphia-Bank of America* and

*Madoff* said, but the limits on the use of Motive and Opportunity analysis now need to be noted

as well.  In appropriate cases, Motive and Opportunity analysis may be quite useful in discerning

intent (especially in reinforcing conclusions drawn from other indicia of intent), but motive and

opportunity may also be found in situations that are totally benign.  Entities may have nearly

limitless opportunities to move their assets away from the reach of their creditors, and they may

sometimes have the motive to do so as well.  But it does not necessarily follow that entities

would always, or even regularly, act in accordance with that motivation, and the reasons for

---

[71]　　First 12(b)(6) Decision, 503 B.R. at 390 & n.208, citing *Musicland, supra* n.48, 398 B.R. at 774; *Adelphia Recovery Trust v. Bank of America, N.A.,* 624 F. Supp. 2d 292, 308 (S.D.N.Y.2009) (McKenna, J.) ("*Adelphia-Bank of America*"); *In re Bernard L. Madoff Inv. Sec. LLC,* 445 B.R. 206, 222 n.14 (Bankr. S.D.N.Y. 2011) (Lifland, C.J.) ("*Madoff*").

[72]　　First 12(b)(6) Decision, 503 B.R. at 390 (quoting *Pereira v. Grecogas Ltd. (In re Saba Enters.),* 421 B.R. 626, 642 (Bankr. S.D.N.Y. 2009) (Gonzalez, C.J.) (citations omitted)).

[73]　　*Id.* at 390 (quoting *Musicland,* 398 B.R. at 774).

[74]　　*Id.* at 390 n.208 (second alteration in original) (quoting *Madoff,* 444 B.R. at 222 n.14).

which they might or not act might have nothing to do with any motivation they might otherwise have.[75]  Thus it is dangerous, the Court believes, to rely on Motive and Opportunity analysis as the *only* means to determine intent, or to be sufficient, by itself, to support a finding of intent[76]— it being remembered that a plaintiff, in an intentional fraudulent conveyance case, must allege facts that give rise to a *strong inference* of fraudulent intent,[77] which Motive and Opportunity analysis will sometimes, but not always, provide.[78]

And in that connection, the Movants note that the Trustee fails to cite any fraudulent transfer case (as contrasted to a securities fraud case) in which the requisite intent was found based solely on motive and opportunity.[79]  That does not necessarily mean, in the Court's view, that such a case will *never* come down the road, but it is indicative of the fact that Motive and

---

[75]    Thus, observations by Judge Sweet in a non-fraudulent transfer case also noted in the First 12(b)(6) Decision are important:

> [I]n determining whether the pleaded facts give rise to a "strong" inference of scienter, the Court must take into account plausible opposing inferences, [such that] a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*In re Bear Stearns Cos., Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 499 (S.D.N.Y. 2011) (Sweet, J.).  *Cf. Shemian v. Research in Motion Ltd.*, 570 Fed. Appx. 32, 35 (2d Cir. 2014) (summary order) ("**Shemian**") (to make out the "strong inference of scienter" required under the PSLRA, the inference of scienter had to be "cogent and at least as compelling as any opposing inference of nonfraudulent intent.").

[76]    *See Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014) ("**Reese**") ("Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not independently sufficient.").

[77]    *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) ("**Zucco Partners**") ("although facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a *strong* inference of [intentional or knowing misconduct]" (emphasis in original)).

[78]    In *Shemian*, for example, the Circuit affirmed, by summary order, a ruling by Judge Sullivan of the district court dismissing, on a 12(b)(6) motion, a securities fraud action even though both motive and opportunity had been alleged.  Motivation by goals and incentives "possessed by virtually all corporate insiders"—even though these plainly could reasonably be regarded as providing motive—were "not sufficient to plead scienter through motive and opportunity."  570 Fed. Appx. at 35.

[79]    *See* Def. Reply at 4-5.

-23-

Opportunity analysis, without more, will at least normally be an insufficient basis for establishing the requisite intent to hinder, delay or defraud.[80]

Given the repeated mention (if not reliance) on Motive and Opportunity analysis in other cases, the Court is loath to say that Motive and Opportunity analysis will never qualify as a basis for finding intent to hinder, delay or defraud in a fraudulent conveyance case. And thus the Court assumes that Motive and Opportunity doctrine will sometimes provide a basis for drawing the "strong inference" of actual intent to defraud creditors that intentional fraudulent transfer claims require. But in such cases, especially when the allegations of motive and opportunity are not joined by other allegations supporting a finding of intent to injure creditors, the Court believes it must find, by reason of the other caselaw, that the inference of intent drawn from that motive and opportunity be quite strong—and that if there are other motivations that would not be wrongful (or if the motivations are shared by many other corporate insiders), the inference of wrongful intent drawn from the motive and opportunity allegations must outweigh any opposing inferences.

### 4. Recklessness

Finally, another potentially applicable basis for finding the requisite intent to injure creditors is recklessness, which is not infrequently a basis for finding the requisite scienter in securities fraud cases. In the First 12(b)(6) Decision, the Court assumed this to be a satisfactory basis for alleging the requisite intent,[81] based on earlier caselaw making reference to

---

[80]    *See Reese*, 747 F.3d at 569 ("Facts showing … a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not independently sufficient") (citation omitted); *Zucco Partners*, 552 F.3d at 991 ("although facts showing … a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a *strong* inference of [intentional or knowing misconduct]" (emphasis in original)).

[81]    *See* First 12(b)(6) Decision, 503 B.R. at 389 ("But the pleading of facts evidencing an intention to injure creditors or to recklessly disregard creditor interests—as contrasted to an intent to enrich oneself—is considerably thinner."); *id.* at 390 ("The participation of major financial institutions does not, without more, render allegations of intentional fraud or recklessness implausible.").

recklessness, along with "motive and opportunity to commit fraud" and "conscious

misbehavior," as a basis for finding intent.[82]

But while this Court and the courts that it had cited accurately quoted what the Second

Circuit had said in *Shields* (which was in a securities laws context), and the *Musicland* and

*Madoff* courts (and then this Court) expressly focused on whether the *Shields* language should

apply in cases involving other than securities fraud (concluding that it should),[83] neither this

---

[82]    *See id.* at 390 ("Generally, in intentional fraudulent transfer cases as well as securities fraud cases, a "strong inference of fraudulent intent 'may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"), quoting *Musicland*, *supra* n.48, and citing *Adelphia-Bank of America* and *Madoff*, *supra* n.71.

Musicland, a fraudulent transfer case, took those words by quotation from *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("***Shields***"), a securities fraud case, which in turn had quoted *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268–69 (2d Cir. 1993) (also a securities fraud case) and *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), a RICO case based on mail fraud.  *See* 398 B.R. at 773.

Adelphia-Bank of America, a fraudulent transfer case, likewise quoted that same passage from *Shields*.  *See* 624 F. Supp. 2d at 307.  And *Madoff*, also a fraudulent transfer case, quoted that same passage from a district court discussion of the fraudulent transfer claims then before it in *Official Comm. of Asbestos Claimants of G-I Holding, Inc.,* 277 B.R. 20, 36 (S.D.N.Y. 2002) (Sweet, J.) ("***G-I Holding***"), which in turn had quoted that same passage from *Shields*.  *See* 445 B.R. at 222.

[83]    The *Musicland* court stated:

> The discussion that follows borrows heavily from case law interpreting the standard for pleading *scienter* in securities fraud actions brought under the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Congress adopted the Second Circuit's "strong inference" standard when it enacted the PSLRA.  The same standard has been applied in this Circuit to non-securities fraud claims.

398 B.R. at 774 n.7.  For its "same standard" conclusion, the *Musicland* court cited *Serova v. Teplen,* 2006 U.S. Dist. LEXIS 5781 at *26, 2006 WL 349624, at *8 (S.D.N.Y. Feb.16, 2006) (Baer, J.) (concluding that the Second Circuit applies PSLRA standards for pleading securities fraud to claims for common law fraud).

Likewise, the *Madoff* court observed that:

> This two-prong test is commonly applied to analyze *scienter* in securities fraud actions, but the "same standard has been applied in [the Second] Circuit to non-securities fraud claims."

445 B.R at 222 n.14.

From these origins, the language first appearing in *Shields*, quoted *supra* n.82, now appears as part of the analysis in the reported fraudulent transfer decisions in *G-I Holding* (in 2002), *Musicland* (in 2008), *Adelphia-Bank of America* (in 2009), *Madoff*, (in 2011), and the First 12(b)(6) Decision (in 2014).

-25-

Court nor the others had occasion to focus on whether the "recklessness" language included within the *Shields* language should likewise apply in intentional fraudulent conveyance cases.

It is probably too late in the day to say that the quoted language in *G-I Holding, Musicland, Adelphia-Bank of America*, and *Madoff*, and the First 12(b)(6) Decision, all taken from the *Shields* securities law holding, should no longer be applicable in fraudulent transfer cases. Yet it is still fair to observe that "recklessness" was imported from securities fraud cases into intentional fraudulent transfer cases in the *Musicland, Adelphia-Bank of America* and *Madoff* decisions in contexts in which distinctions between recklessness and higher levels of intent would not matter.

But in at least some intentional fraudulent transfer cases, the distinction would matter— because some state fraudulent transfer statutes (like those based on the Uniform Fraudulent Conveyance Act) impose liability based on "actual intent, as distinguished from intent presumed in law"[84]—and recklessness-based scienter is either "intent presumed by law" or something very close. And even when they do not say so expressly, intentional fraudulent conveyance rights of act rest on findings of intent.

Thus, while the Court will remain within the confines of its citation of *Musicland, Adelphia-Bank of America* and *Madoff* in the First 12(b)(6) Decision, and thus assume the continued validity of recklessness as a potential basis for finding intent, the Court must nevertheless construe the required level of recklessness in a fraudulent transfer case to require allegations of facts "that give rise to a strong inference of fraudulent intent."[85]

---

[84]    Uniform Fraudulent Conveyance Act § 7 ("Every conveyance made and every obligation incurred *with actual intent, as distinguished from intent presumed in law*, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.") (emphasis added).

[85]    *Musicland*, 398 B.R. at 773-774, quoting *Shields*, 25 F.3d at 1128.

The "strong inference" requirement must be imposed to ward off allegations of "fraud by hindsight,"[86] and the Court believes that its reliance on recklessness doctrine here must be sensitive to that concern as well.  Thus, if securities fraud doctrine is to be imported into fraudulent transfer doctrine and thereby permit liability based on recklessness, the Court must also import into the fraudulent transfer doctrine the requirement that the recklessness show "a state of mind approximating actual intent, and not merely a heightened form of negligence."[87]

## B.  Application to Facts Here

The Court now considers the sufficiency of the amended pleadings against these standards.  Ultimately, it determines that the Trustee failed to fill the gaps that needed to be filled after the First 12(b)(6) Decision.  Most importantly, the Trustee has failed to meet the requirements for establishing intent under the *Restatement*.  Nor can the Court find that deficiency remedied by any of the other potential means.

### 1.  Satisfying the Restatement

Here the Court examines the allegations of the Complaint to ascertain whether there here are plausible allegations that a "critical mass"[88] of the directors had either a "desire" to hinder, delay or defraud creditors in the recovery of their debt, or intended to take steps where that outcome would be "substantially certain."

---

[86]    *Id.* (quoting *Shields*, 25 F.3d at 1129, which in turn had quoted *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (speaking through Friendly, J.)).

[87]    *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) ("*South Cherry*") (in securities fraud case, holding that an investor's allegations were insufficient to give rise to a strong inference of either fraudulent intent or recklessness, having failed to show "conscious recklessness—*i.e.*, a state of mind *approximating actual intent,* and *not merely a heightened form of negligence*") (emphasis in original).

[88]    The Court did not then flesh out what would constitute a "critical mass."  What the Court meant was "sufficient to cause the outcome."  In various cases, this might be a requisite super-majority of the entire board; a super-majority of directors voting; a majority of all the directors; a majority of all the directors present and voting; or some lesser number that was nevertheless sufficient cause the outcome.  Since there are no allegations here suggesting that more than one or two directors had anywhere near the requisite intent (and since the intent the one or two had was of a different type), the Court does not need to decide what constitutes "critical mass" now, either.

-27-

Here the Court can find no allegations supporting an inference that any of the Board members other than Smith and Chazen had any wrongful intent of any type. Nor, for that matter, can the Court find allegations supporting the view that Smith's and Chazen's satisfactorily pleaded dishonesty and greed was accompanied by an actual intent that creditors not be paid, or that they be otherwise hindered in their debt recovery efforts.

The individual allegations as to the Board members (after saying when each was elected to the Board and when each served) say that the Board member "routinely attended" board meetings at which Lyondell's Long Range Plan and other strategic planning for Lyondell was discussed[89]—but without saying what he or she then said (or, for that matter, heard) with respect to any creditors not being paid. The Board member allegations continue by saying that the Board member "attended Board meetings, *inter alia*, at which the fraudulent refreshed protections were presented and discussed"[90]—but without alleging that directors other than Smith knew they were fraudulent. The Board member allegations continue that the particular Board member "participated in Board decisions with respect to the transaction"[91]—without alleging that there were any decisions to take steps to cause creditors not to be paid. And finally, each paragraph then says that the named director "by virtue, *inter alia*, of his role on the Board, knew that consummation of the Merger and payments to the Shareholder Defendants and other recipients of the Merger Consideration) would hinder, delay or defraud Lyondell Creditors."[92] But this last allegation is entirely conclusory, without including any factual allegations as to *how*

---

[89] *See*, *e.g.*, Revised Cmplt. ¶ 27 (as to Director Travis Engen). The respective paragraphs dealing with Board members other than Smith and Chazen are at least substantially identical.

[90] *Id.*

[91] *Id.*

[92] *Id.*

any director *knew* of such, or, more importantly, *intended* that any creditor be hindered, delayed

or defrauded.

In fact, allegations of the last type are paradigmatic examples of the practice, condemned

by the Supreme Court in *Twombly*, by which a "formulaic recitation of a cause of action's

elements will not do."[93]  And other allegations[94] are of facts which, if true, would not necessarily

be civilly actionable, or even imply an intent to hinder, delay or defraud.

In another section of the Revised Complaint,[95] there are allegations that "the Lyondell

Board knew" of matters that, without more, would be benign; were conclusory; or might support

claims for other kinds of fraud.  But again, none would go to an intention to harm creditors.

Nor can the Court find the allegations to be sufficient based on the alleged ability of

Smith to control or dominate the Board to form the intent to hinder, delay or defraud Lyondell

creditors.  The Court noted in the First 12(b)(6) Decision that the earlier complaint's allegations,

if proven, would establish that Smith and senior management intended to secure a variety of

benefits to themselves, as management and stockholders, but that the allegations of facts

evidencing "an intention to injure creditors or to recklessly disregard creditor interests—as

contrasted to an intent to enrich himself—[was] considerably thinner.[96]  That problem remains.

The allegations as to Smith's conduct are sufficient, the Court believes, to establish intent on his

part to defraud Blavatnik, lender financial institutions, or others who might part with value based

---

[93]     *Twombly,* 550 U.S. at 555 (internal citations and quotations omitted).

[94]     For example, that the Board "was acutely aware of the direct relationship between the cyclicality of the industries in which the Company operated and the need to limit leverage in order to ensure the financial flexibility to get through a trough" (Revised Cmplt. ¶ 90); had been aware that "all leading industry analysts were forecasting that the ongoing petrochemical cycle peak … would end sometime in 2008 or 2009 and that these industries would then experience a [] downturn" (*id.* ¶ 14); and "understood that every dollar that would go out to the Lyondell shareholders … would be funded with debt leveraged against the assets of Lyondell and its operating subsidiaries" (*id.* ¶ 3).

[95]     *See* Revised Cmplt. ¶¶ 176-179.

[96]     First 12(b)(6) Decision, 503 B.R. at 590.

on too high a merger price,[97] but they still do not support an intent on his part to hinder, delay or
defraud creditors.  And assuming that it did, the allegations are too thin to support conclusions
that he caused other Board members to join him in such a plan.  The fact that Board members
typically voted in favor of Smith's recommendations does not, without quite a bit more, support
the conclusion that he controlled them.

 Nor can the Court conclude find the requisite Board intent by the accepted substitute for
actual intent—such as the Restatement's alternate requirement that a loss to creditors be
"substantially certain."  There may well have been clues available to the Board that could lead
Board members to believe that the transaction under consideration was too aggressive, and that
losses to creditors were foreseeable.  It may also be that before voting in favor of a transaction
like the Merger and related LBO, Board members should have sought and obtained more
information.  But it is quite different to conclude, based on allegations even in the Revised
Complaint, that Board members believed at the time of the Merger that leaving creditors unpaid
was "substantially certain."

 This should hardly be viewed as an endorsement of the degree of care of the Board.  The
case for more questions from Board members, that might have led to more answers, is very
strong.  But allegations are lacking that Board members actually knew of the things that the
Trustee believes they should have known.  As negligent as Board members may have been, there
are still no allegations supporting a view that they intentionally wished to do creditors harm, or
knew that harm to creditors was substantially certain.

---

[97]  *See, e.g.*, Revised Cmplt. ¶ 137 ("Smith was determined to make sure that Blavatnik and his lenders would
receive an inflated set of management projections that 'justified' the highest price and financing possible,
regardless of its disastrous or even catastrophic consequences to creditors.").

## 2. Badges of Fraud

If, notwithstanding the preceding analysis, "Badges of Fraud" supported an inference of

an actual intent to hinder, delay or defraud, the Court would allow the Revised Complaint to

survive at this point.  But here the "Badges of Fraud" do not support such a conclusion, and

indeed are notably inapplicable in the case.  In the typical Badges of Fraud situation, many or

most of the Badges can be found, and here nearly none of them can.[98]

As noted above,[99] where the showing of badges of fraud is minimal, badges of fraud

obviously cannot provide a basis for finding allegations of intentional fraudulent transfer to be

plausible.  The Court here cannot find an intention to hinder, delay or defraud based on the

Badges of Fraud.

## 3. Motive and Opportunity

In its discussion of the law above, the Court recognized that Motive and Opportunity

analysis could sometimes provide a basis for drawing the "strong inference" of actual intent to

defraud creditors that intentional fraudulent transfer claims require.  But the Court concluded that

when the allegations of motive and opportunity were not joined by other allegations supporting a

finding of intent to injure creditors, they would at least normally not suffice.  In the relatively

rare cases in which they might, the inference of intent drawn from that motive and opportunity

would have to be quite strong—and that if there were other motivations that would not be

---

[98]    *See* Section II.A.2. "Badges of Fraud," *supra*, listing them.  Of these, the only one that is plainly applicable
is Badge #5 (that the transfer was of substantially all of the debtor's assets), in the sense of the very large
proportion of Lyondell assets that became subjected to liens.  Badge #1 (that the transfer was to an insider)
might be stretched to apply as well (as directors are insiders, and directors received cash payments as
elements of the much larger overall transaction), but these payments, while large in absolute terms, were a
relatively small component of the overall picture.  It also is possible that that the debtor became insolvent
shortly after the transfer was made (see Badge #9), but this would be equally true in a constructive
fraudulent transfer situation, and there here are no allegations that Board members actually *knew* that the
Merger and LBO would promptly make Lyondell insolvent.  As to the other Badges of Fraud—and to the
Badges as a whole—the silence is deafening.

[99]    *See Sungchang Interfashion*, *supra* n.66.

wrongful (or if the motivations were shared by many corporate insiders), the inference of

wrongful intent drawn from the motive and opportunity allegations would have to outweigh any

opposing inferences.

Here they do not.  "Motive" must be understood as a motive to hinder, delay or defraud

creditors—not a motive for self-enrichment, which the Court has already held to be insufficient

for pleading intent to impair creditors' rights to be repaid.[100]  In this Circuit, at least, generalized

motives of corporate officers and directors to achieve other ends common in the corporate

environment—including, specifically, motives to maximize the amount received on the sale of

stock, or even to increase executive compensation—do not support the required "strong

inference" of scienter even in securities fraud cases.[101]  And as a conceptual matter, they give

rise *to an intent to hinder, delay or defraud creditor recoveries* even less.  The Court believes

that it should be slow to find fraudulent intent based on routine incentives present in virtually

every corporate action case, and where the alleged wrongful conduct can be explained by a

benign purpose, such as a desire to maximize value for shareholders.

---

[100]    *See* the First 12(b)(6) Decision, 503 B.R. at 390-391 ("But the pleading of facts evidencing an intention to injure creditors or to recklessly disregard creditor interests—as contrasted to an intent to enrich oneself—is considerably thinner… The Movants are also right in contending that the Complaint is devoid of any allegations of facts supporting an intention to actually injure creditors (and in particular, to hinder delay and defraud them), as contrasted to allegations evidencing an intention on the part of Lyondell corporate officers to enrich themselves…").

[101]    *See Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. N.Y. 2001)*, 264 F.3d 131, 139 (2d Cir. 2001) (holding that "the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired" and was a generalized desire insufficient to establish scienter) (citation omitted); *Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004) (holding that seeking to inflate stock price to "complete a previously arranged corporate acquisition… and to retire debt" was insufficient motive); *Acito,* 47 F.3d at 54 (stating "Plaintiffs' allegation that defendants were motivated to defraud the public because an inflated stock price would increase their compensation is without merit. If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions. Incentive compensation can hardly be the basis on which an allegation of fraud is predicated.); *Leventhal v. Tow*, 48 F. Supp. 2d 104, 115 (D. Conn 1999) (Squatrito, J.) (finding allegations that defendants artificially inflated stock price to obtain favorable terms in stock exchange transactions and debentures insufficient to prove motive).

Similarly, opportunity in the fraudulent transfer context cannot simply mean the ability of an officer to effect an alleged transfer, or of a director to vote to authorize it—because officers and directors always have that ability.  If opportunity were satisfied so easily, such a test would be rendered meaningless.

One may legitimately query, then, what kinds of standards for "Motive and Opportunity" would satisfactorily separate conduct that is benign from conduct that is wrongful.  And the Court finds the existing caselaw to be less than clear in answering that question.  But the Court believes that, at the least, Motive and Opportunity analysis can provide the basis for an intent to hinder, delay or defraud only when it reflects something out of the ordinary—*i.e.*, when the motive and opportunity are coupled with something else, and where the Court can find the "strong inference" of the requisite intent.  Here there is nothing else, and the Court need not speculate how Motive and Opportunity analysis might be employed in a stronger case.

### 4. Recklessness

For reasons set forth above, the Court assumes that recklessness is still a basis for imposing liability for intentional fraudulent transfer—but believes that if recklessness is to be used as a substitute for actual intent to injure creditors, it must be construed in such a fashion that it embodies "a state of mind approximating actual intent, and not merely a heightened form of negligence."[102]  Here the allegations are more than enough to allege negligence, but are insufficient to go beyond that.

From time to time, the Revised Complaint makes allegations, in conclusory terms, like that in which it is alleged that the Board "knew, or intentionally turned a blind eye," to the fact that the projections grossly overstated the earnings that Lyondell could achieve, were not

---

[102]    *See South Cherry*, *supra* n.87.

prepared using data derived from actual performance, and in fact had been fabricated;[103] that members "well understood" that Smith's projections were "implausible and unachievable";[104] and that "Creditors were being set up to be the eventual victims when the combined enterprise collapsed under $22 billion of Merger financing."[105]  And it says, once more in conclusory terms, that Board members "turned a blind eye and rubber-stamped the Transaction negotiated and engineered by Smith."[106]

But the Revised Complaint also alleges that Smith did not disclose to the other members of the Board "the true circumstances of his negotiations with Blavatnik nor the actual process by which the bogus set of Lyondell projections were created."[107]  The allegations fall short of alleging that Board members *knew* the projections were fraudulent; instead (*e.g.*, by use of the words "rubber stamped"), they say that Board members accepted Smith's projections without sufficient scrutiny, and (as an alternative to knowing the projections were falsified), approved the Merger and LBO with insufficient attention to the "foreseeable risk" that after incurring so much debt, Lyondell could not pay its creditors back.[108]  Those satisfactorily allege negligence—and perhaps even gross negligence—but even a heightened form of negligence is not enough.

---

[103]    Revised Cmplt. ¶ 3.  It also alleges that Board members understood that the money to go out to shareholders would be fund with debt leveraged against Lyondell assets, and that capital needed to fund operations and pay off debt incurred as part of the LBO would have to come from Resulting company operations, *see id.*, but each of those would be benign unless it were also known that the inability to repay Lyondell's debt was substantially certain.

[104]    *Id.* ¶ 5.

[105]    *Id.*

[106]    *Id.*

[107]    *Id.*

[108]    Exemplifying the distinction is ¶ 197 ("There is no record that the Board discussed or considered the devastating impact, or even the risk of leverage on present or future creditors of Lyondell that they were all aware the Transaction would cause.  Instead it appears that all members consciously ignored and intentionally turned a blind eye to the disastrous consequences to creditors of the leverage being incurred pursuant to the Transaction.").

### 5. *Plausibility and Competing Inferences*

Finally, it is important to note the caselaw backdrop against which this Court is ruling, and the difficult burden facing the Trustee. On a motion to dismiss, it is not enough to plead facts that are "merely consistent with a defendant's liability."[109] When there are two potential explanations for a defendant's conduct—one innocent and one suggesting wrongdoing—a plaintiff's inference of fraudulent intent must be at least as compelling as any competing inference.[110]

Here, there are undisputed extrinsic facts that cut against the inference the Trustee asks the Court to draw. One is that Blavatnik was inputting into the transaction substantial capital and assets of his own; apart from evidencing Blavatnik's own commitment to the transaction under consideration, it provides additional assets available to creditors for repayment. Another is that Lyondell's existing creditors at the time were paid back to a very substantial degree—to the extent of $7 billion.

Similarly, the Trustee here asserts that Board members intended to hinder, delay or defraud the future creditors of Lyondell (or the emerging entity) when Board members (i) did not challenge Smith's inflated projections, (ii) accepted Blavatnik's acquisition offer at $48 per share, and (iii) approved the Merger and the terms of the LBO financing. But there are also competing, non-fraudulent, inferences for the actions of the Board that are entirely reasonable (which competing inferences the Court must evaluate under *Tellabs*)[111]—that instead of intending to injure creditors, Board members were merely negligent by being deferential towards Smith and not questioning the "refreshed" projections; were foolishly bullish and chose to

---

[109]     *Iqbal*, 556 U.S. at 678 (citation omitted).

[110]     *See Tellabs*, *supra* n.48.

[111]     *Id.*

believe in an overly optimistic projection of Lyondell's performance; were motivated by self-enrichment and wanted to cash out stock options; wanted to obtain the maximum share price for shareholders (to whom the directors owed a duty of care and loyalty) without regard to creditors' needs and concerns; and failed to anticipate the magnitude and severity of the economic collapse that would befall not just Lyondell, but the entire country, in 2008 and early 2009.

Constructive fraudulent transfer doctrine (and ordinary breach of fiduciary duty doctrine) can protect against such things. But intentional fraudulent transfer doctrine covers offenses of a wholly different nature.

\* \* \*

In sum, the Trustee has failed to satisfactorily plead factual allegations demonstrating a strong inference of an actual intent to hinder, delay or defraud creditors by a critical mass of Lyondell's board of directors. Accordingly, the claims for intentional fraudulent transfer must be dismissed, this time without leave to amend.[112]

## III.

### Constructive Fraudulent Transfers

The Movants also assert several additional grounds for dismissal of the state law constructive fraudulent transfer in *Fund 1* and *Reichman*—that:

---

[112] The Trustee has had the benefit of capable counsel, and substantial discovery. The Court already granted leave to amend once. With the benefit of all of these things, the Revised Complaint is still insufficient. The Court has no reason to believe that any further effort would be successful, and it would be unfair to the Trustee's opponents. Thus the Court is not granting further leave to amend. *See, e.g., Liquidation Trust v. Daimler AG (In re Old Carco LLC)*, 2011 U.S. Dist. LEXIS 134539, at *50, 2011 WL 5865193, at *15 (S.D.N.Y. Nov. 22, 2011) (Cote, J.) (denying leave to replead where amendments would be futile and prejudicial).

-36-

(A)  The Creditor Trust lacks standing to prosecute these actions because the

Litigation Trust is simultaneously asserting intentional fraudulent transfer claims under

the Code on the same underlying transaction and transfers;[113]

(B)  The Creditor Trust did not receive an assignment of any unsatisfied claim by

any creditor against any Lyondell Debtor;[114]

(C)  The bankruptcy estate has exclusive standing to pursue creditors' avoidance

claims, and such rights cannot revert back to creditors unless the bankruptcy case is

dismissed; and

(D)  The Creditor Trust is a *de facto* estate representative, and thus barred from

pursuing the constructive fraudulent transfer claims by virtue of the safe harbor

provisions under section 546 of the Code.[115]

The Court is unpersuaded by any of these contentions.

## A.  Lack of Standing Due to Concurrent Actions

The Court agrees with the Movants that the Trustee, in his dual capacities on behalf of

the Litigation Trust and the Creditor Trust, is pursuing simultaneous causes of action that are

"similar in object and purpose."  Obviously, the Trustee seeks to recover the consideration

---

[113]    The Movants raise a second, related objection that the Litigation Trust's concurrent prosecution of intentional fraudulent transfer claims under section 548 of the Code (in *Hofmann*) with the Creditor Trust's actions for state law constructive fraudulent transfer claims (in *Reichman* and here) violates the rule against claims-splitting.  *See* Def. Br. at 40-43.

[114]    This ground for dismissal is framed as both a lack of standing and a failure to plead a required statutory element of the claim.  *See* Def. Br. at 43-45.

[115]    In the First 12(b)(6) Decision, the Court held that the Plaintiff had failed to identify the specific debtors for purposes of the collapsing doctrine and analyzing the fraudulent transfers.  503 B.R. at 389.  The Movants renewed this objection as another ground for dismissal of the Amended Complaints.  *See* Def. Br. at 35, n.25.  The Amended Complaints were revised to list, in exhibits, all of the Lyondell Debtors that were borrower and/or guarantor parties to the credit facilities that financed the LBO (defined collectively as the "LyondellBasell Debtor Obligors" in the Revised Complaint) and describes the assets subjected to liens or pledges, as well as the agreements pursuant to which such liens and pledges were granted.  The Court is satisfied that the Trustee cured the prior deficiency by properly identifying, with particularity, the relevant Lyondell Debtor transferors.

received by Lyondell's former shareholders pursuant to the Merger and related LBO on behalf of each trust, albeit under different legal predicates. Obviously as well, there is an overlap in ownership of the fraudulent transfer claims by both Trusts. While that might be troublesome in other contexts (in which two trusts had conflicting claims, or, especially, where defendants were at risk of a double recovery), the issue is academic here, because the competing intentional fraudulent transfer claims have been dismissed.[116]

There is no longer a basis for dismissal of the constructive fraudulent transfer claims on this ground, if there was.[117]

## B. Assignment of Rights by an Unpaid Creditor

The second basis for dismissal is somewhat puzzling to the Court. The Movants do not dispute that Lyondell's unsecured creditors[118] hold impaired, "unpaid," claims since they did not receive distributions equal to the value of their claims. That's why the Creditor Trust was created. Instead, the Movants argue that Lyondell creditors' assignment of their rights of action to the Creditor Trust was defective because the creditors must have also assigned their underlying unpaid *debt* to the Creditor Trust.

No caselaw or other authority was offered in support of this supposed rule, and if ever adopted it would run contrary to the Code—which permits reorganization plans to "include any other appropriate provision not inconsistent with the applicable provisions of this title,"[119] and

---

[116] By extension, the Movants' related argument that the concurrent actions by the Creditor Trust and Litigation Trust violates the rule against claim splitting is likewise moot.

[117] Of course, the Trustee can appeal the dismissal of the intentional fraudulent transfer claims. If he succeeds, the issue can be revisited. In that event, the parties would need to address whether it should be that *neither* trust could vindicate any otherwise viable claims in this regard, and why the problem could not be resolved by simply protecting defendants from double recoveries, and providing for an allocation, between deserving plaintiff groups, of any otherwise recoverable sums.

[118] The general unsecured creditor body includes the deficiency claims of secured creditors to the extent they were undersecured.

[119] Code section 1123(b)(6).

important bankruptcy policy, which allows fiduciaries to sue on behalf of creditors to maximize

their recoveries in instances in which debtors have given away their assets.  The Court can see no

basis, in either law or logic, for forcing creditors to choose between receiving distributions in a

chapter 11 case and assigning their underlying claims to a trust in order to also assign their

choses in action to such trust.  It is a regular feature of chapter 11 plans to set up trusts to pursue

claims on behalf of creditors—including by bringing avoidance actions—and creditors

commonly assign their avoidance claims to a trust while opting at the same time to receive

distributions.

There can be no plausible argument that Lyondell's unsecured creditors lack unsatisfied

claims, and there likewise can be no plausible argument that the Trustee, as the assignee of their

claims, lacks the same rights they have.  The Court rejects this contention as well.

C.      *Contention That Standing to Prosecute the Actions
        Cannot Revert to Creditors Absent Dismissal*

The Movants further argue that the Creditor Trust lacks standing to bring its constructive

fraudulent transfer claims on behalf of the creditors that they once belonged to.  That is so, the

Movants argue, because standing rested exclusively with the Lyondell bankruptcy estate, and

cannot revert back to creditors or their assignee unless there is a dismissal of the bankruptcy

case.  In support of this contention, the Movants rely on three cases from the 1800's,[120] under an

earlier bankruptcy statute that lacked much of the content of the present one.  The Court rejects

this contention as well.[121]

---

[120]     *Glenny v. Langdon*, 98 U.S. 20 (1878) ("**Glenny**"); *Trimble v. Woodhead*, 102 U.S. 647 (1881)
         ("**Trimble**"); *Moyer v. Dewey*, 103 U.S. 301 (1881) (together, the "**1800s Cases**").

[121]     The Movants also cite as support section 349 of the Code, which provides that the dismissal of a case other
         than under section 742 of this title "revests the property of the estate in the entity in which such property
         was vested immediately before the commencement of the case under this title."  But nowhere does Section
         349 state that dismissal is the only manner in which interests or property of the estate may revert to the

The 1800s Cases were decided under the Bankruptcy Act of 1867,[122] a liquidation-driven statute preceding not just the present Code, but the 1898 Bankruptcy Act and the 1938 Chandler Act amendments to the 1898 Act which evolved into the much more sophisticated statute we have now.  Most significantly, the 1867 Act lacked an analog to section 1123, discussed below, which provides an express statutory authorization for what reorganization plans now may contain.  In fact, the 1867 Act had no provisions with respect to reorganization plans at all.

Moreover, the 1800s Cases did not hold that creditors could never have reversionary standing absent a dismissal of the bankruptcy case.  To the contrary, while the Supreme Court in *Glenny* held that the right to sue would lie in the "bankrupt's assignee,"[123] it also found that such standing was not absolute, stating "if it be represented that the assignee[] will not sue, the court having jurisdiction over the matter may … give the bankrupt or a creditor the right to institute the suit in the name of the assignee..."[124]

That is exactly what happened here.  The Lyondell debtors elected not to pursue causes of action under section 554 of the Code, and expressly abandoned such right (exclusive or not) in the Plan.[125]  Upon abandonment, the standing to bring avoidance actions under state law reverted back to Lyondell's creditors by virtue of the Plan—by both contractual transfer between the Debtors and the creditors, and by confirmation of the Plan.

---

original entity, or that that it trumps provisions in chapter 11 and in caselaw with respect to what a reorganization plan can provide.

[122]    ch. CLXXVI, 14 Stat. 517 (1867) (the "**1867 Act**").

[123]    As used in this context, "assignee" referred to the person who was in charge of and administered the bankrupt's estate under the 1867 Act.  The equivalent party under the Code would be a chapter 7 or chapter 11 trustee or the debtor-in-possession.  "The bankrupt" was an expression used under the former Bankruptcy Act (and the earlier 1867 Act) to describe the person or entity who owed money to creditors.  It was replaced by "debtor" and "debtor in possession" in the present Code, and no longer is used as a noun by those familiar with modern bankruptcy law.

[124]    *Glenny*, 98 U.S. at 30.

[125]    *See* Third Am. and Restated Joint Ch. 11 Plan of Reorg. § 5.8(b).

The Plan's mechanism is entirely consistent with the modern Code, which, to state the obvious, supersedes the 1867 Act as the statute that now governs this case. Section 1123(b)(6) provides that a plan "may include any other appropriate provision not inconsistent with the applicable provisions of this title," and this broad language gives flexibility to a debtor and its creditors to include a host of plan provisions to fit the needs of a case. In practice, trusts are often created under chapter 11 plans as a useful tool for giving more time to creditors to pursue recovery from third parties in protracted litigation while allowing for a reorganization and/or interim distributions to creditors before the litigation concludes.

What was done here is also consistent with existing bankruptcy jurisprudence. The estate representative's authority to bring suits for the benefit of creditors is premised on the underlying objective of equality of distribution, and not to flout it.[126] Here there is no concern that allowing the Creditor Trust to pursue the state law constructive fraudulent transfer claims against shareholders would frustrate bankruptcy goals or result in preferential payments to creditors—since any recoveries by the Trustee would inure to the benefit of all trust beneficiaries and be distributed in accordance with the prescribed waterfall. Most importantly, there is ample caselaw under the present Code supporting the view that creditors regain standing to pursue

---

[126]    *See, e.g., Trimble*, 102 U.S. at 650:

> The primary object of the bankrupt law is to secure the equal distribution of the property of the bankrupt of every kind among his creditors. This can only be done through the rights vested in the assignee and by the faithful discharge of his duties. Let us suppose, however, that a creditor is aware of the existence of property of the bankrupt sufficient to satisfy his own debt, which has not come to the possession or knowledge of the assignee. He has but to keep silence for two years, and then bring suit in his own name against the fraudulent holder of this property, and make his debt really at the expense of the other creditors; or he may have an understanding with the bankrupt, who, after two years, and after his own discharge from all his debts, may confess judgment to this creditor and furnish him the evidence to prove the fraud, and thus secure him a preference forbidden by the act itself.

-41-

fraudulent transfer claims under state law once the trustee no longer has a viable cause of

action.[127]  It is hardly a major leap to conclude that the same may be done on a consensual

basis.[128]Accordingly, the Court finds that the Creditor Trust has standing to prosecute these

shareholder actions.

## D.  Prohibition under Section 546(e)

Finally, the Movants effectively repeat contentions the Court has already rejected.  In the

First 12(b)(6) Decision, the Court ruled that section 546(e) of the Code did not apply to the

claims of the Trustee of the Creditor Trust, on behalf of individual creditors:

> While the Movants spend 10 pages in their brief arguing
> the matter as if sections 544 and 548—and hence section
> 546(e)—apply to this case, this is not a case about sections
> 544 and 548.  The Creditor Trust's claims are not asserted
> under those provisions.  The claims here are not being
> asserted on behalf of the estate; they are asserted on behalf
> of individual creditors.[129]

---

[127]    *See In re Tribune Co. Fraudulent Conveyance Litig.*, 499 B.R. 310, 322 (S.D.N.Y. 2013) (Sullivan, J.)
(noting that when the statute of limitation ran on the trustee's avoidance actions, the claims automatically
reverted back to the creditors) (citing *Barber v. Westbay (In re Integrated Agri, Inc.)*, 313 B.R. 419, 427-
428 (Bankr. C.D. Ill. 2004) (Perkins, J.) ("A creditor regains standing to pursue a state law fraudulent
conveyance action, in its own name and for its own benefit, once the statute of limitations expires on the
bankruptcy trustee's right to bring the claim.") (citation omitted)); *Klingman v. Levinson*, 158 B.R. 109, 113
(N.D. Ill. 1993) (Moran, J.) ("This holding should not be construed as suggesting that creditors may vie
with the bankruptcy trustee for the right to pursue fraudulent conveyance actions.  To the contrary, the
commencement of bankruptcy gives the trustee the right to pursue fraudulently conveyed assets to the
exclusion of all creditors. … However, the trustee does not retain this exclusive right in perpetuity.  The
trustee's exclusive right to maintain a fraudulent conveyance cause of action expires and creditors may step
in (or resume actions) when the trustee no longer has a viable cause of action.").

[128]    It has long been recognized that sometimes a trustee (or debtor-in-possession) may choose not to pursue
causes of action against third parties for strategic reasons—for example, where the debtor-in-possession is
reluctant to assert breach of fiduciary duties claims against former management, or where a trustee lacks
the resources to engage in protracted litigation.  In that sense, the rationale for authorizing reverter standing
where the estate representative fails to act is analogous to the doctrine of derivative standing.  The caselaw
on granting derivative standing allowing a creditor or creditors committee to sue on behalf the estate
requires a showing that: (1) there is a colorable claim, and (2) the trustee unjustifiably refused to pursue the
claim.  *See, e.g., In re STN Enterprises*, 779 F.2d 901, 904 (2d Cir. 1985); *Official Comm. of Unsecured
Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 579 (3d Cir. 2003); *see also Commodore Int'l
Ltd. v. Gould (In re Commodore Int'l Ltd.)*, 262 F.3d 96, 100 (2d Cir. 2001) (finding that derivative
standing may be appropriate where the trustee consents).

[129]    First 12(b)(6) Decision, 503 B.R. at 359.

Nevertheless, the Movants argue that the constructive fraudulent transfer claims are "barred by the *express* provisions of § 546(e)" because the Creditor Trust is a "*de facto*" estate representative since the Creditor Trust was created by a bankruptcy, funded by a bankruptcy, and acts only for bankruptcy creditors.[130]  The Court cannot agree.

First (though this is dispositive), while the Court respects the rights of litigants appearing before it to appeal decisions they regard as misguided, the Court has already ruled on this issue. The Court ruled in the First 12(b)(6) Decision that section 546(e) did not apply in this case, for reasons the Court discussed at length.  Adding rhetoric that the Creditor Trust was created by assigns from creditors at the end of a bankruptcy case—aside from telling the Court nothing it did not already know—is hardly a basis for reargument.

Additionally, the Movants' contention that a Creditor Trust is a *de facto* estate representative because the shareholder suits are, "in short, a creature of Chapter 11" is unpersuasive.  Of course the suits and the Creditor Trust are products of Chapter 11.  But that does not change the fact that the Creditor Trust is an assignee of the Lyondell Debtors' *creditors*, and are pursuing these suits on behalf of the *creditors*.  The Movants' argument ignores the carefully considered and crafted terms of the Plan establishing a Litigation Trust (which serves as the estate representative) that is separate and distinct from the Creditor Trust, which is the assignee of creditors' rights.

---

[130]      Def. Br. at 52 (emphasis in original).

<u>Conclusion</u>

For the reasons set forth above, the Movants' motions:

      (1)  to dismiss the claims for intentional fraudulent transfer are granted (this time without leave to replead); and

      (2)  to dismiss the claims for constructive fraudulent transfer are denied.

The parties are to confer and try to agree on the form of one or more orders to implement these rulings, without prejudice to rights on appeal and their rights as to whether or not any judgment(s), as contrasted to an order, should also be entered at this time.  In the event of an inability to timely agree, either side may settle an order.  Any settled order should be presented for Court consideration on no less than five business days' notice.

Dated: New York, New York          <u>  *s/Robert E. Gerber*    </u>
      November <u>18</u>, 2015         United States Bankruptcy Judge